**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |  |
|---|---|---|
| | : | |
| **R. ALEXANDER ACOSTA**, Secretary of Labor, U.S. Department of Labor, | : | Case No. |
| | : | |
| Plaintiff, | : | Judge: |
| | : | |
| v. | : | Magistrate Judge: |
| | : | |
| **RELIANCE TRUST COMPANY, STEVEN R. CARLSEN, PAUL A. LILLYBLAD, KELLI WATSON, and KURT MANUFACTURING COMPANY, INC., EMPLOYEE STOCK OWNERSHIP PLAN,** | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## COMPLAINT

Plaintiff, R. Alexander Acosta, Secretary of the United States Department of Labor ("Secretary"), alleges:

1.      This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., and is brought by the Secretary of Labor under ERISA § 502(a)(2) and (5), 29 U.S.C. § 1132 (a)(2) and (5), to enjoin acts and practices which violate the provisions of Title I of ERISA, to obtain appropriate relief for breaches of fiduciary duty under ERISA § 409, 29 U.S.C. § 1109, and to obtain other appropriate relief to redress violations and enforce the provisions of that Title.

2.      Kurt Manufacturing Company, Inc. Employee Stock Ownership Plan ("ESOP") was originally created on November 1, 1995 and as of October 5, 2011, held 24.4% of shares of

1

Kurt.  The ERISA violations alleged herein arise from Reliance Trust Company, ("Reliance") causing the Kurt Manufacturing Company, Inc. Employee Stock Ownership Plan ("ESOP") to purchase 100% of the outstanding stock of Kurt Manufacturing Company, Inc. ("Kurt") for $39 million, from a party in interest to the Plan ("ESOP Transaction"), and from Steven R. Carlsen, Paul A. Lillyblad, and Kelli Watson, failing to monitor Reliance's approval of the ESOP Transaction.  As alleged more fully below, Defendant Reliance knew or should have known of numerous prior valuations and stock redemptions that valued Kurt significantly lower than the price paid by the ESOP and should have analyzed them with respect to the ESOP Transaction. Although Defendant Reliance approved the ESOP Transaction based on a valuation opinion, Defendant Reliance knew or should have known that the opinion contained serious flaws, which resulted in the stock purchased in the ESOP Transaction being significantly overvalued.  As a result, the ESOP purchased the stock for a price in excess of fair market value.

## Jurisdiction and Venue

3.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(l).

4.      Venue of this action lies in the District of Minnesota, pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the ESOP was administered and the breaches alleged herein took place in Minneapolis, Hennepin County, Minnesota, within this district.

## Defendants

5.       The ESOP is a pension plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2).  The ESOP is named as a Defendant in this Complaint solely for the purpose of ensuring complete relief among the parties under Fed. R. Civ. P. 19.

6.      From July 22, 2011 until October 28, 2011, Reliance was the discretionary trustee for purposes of evaluating the prudence, adequate consideration, and fairness of the transaction for the ESOP, and determining whether the ESOP would purchase employer securities; and exercised discretionary authority and control over the management and disposition of the ESOP's assets by approving the transaction.

7.      Reliance was a fiduciary to the ESOP pursuant to ERISA § 3(21)(A) because it had discretionary authority or discretionary responsibility in the administration of such plan and exercised discretionary authority and control over the ESOP and its assets when it made the decision, on behalf of the ESOP, to engage in the purchase of the Company's outstanding shares. 29 U.S.C. § 1002(21)(A).

8.      Kurt was a fiduciary to the ESOP pursuant to ERISA § 3(21)(A) because it had discretionary authority or discretionary responsibility in the administration of the Plan and exercised discretionary authority and control over the ESOP and its assets.  29 U.S.C. § 1002(21)(A).

9.      At all relevant times, including on October 5, 2011, Steven R. Carlsen ("Carlsen") was a fiduciary to the ESOP pursuant to ERISA § 3(21)(A) because he exercised discretionary authority and control respecting management of the ESOP on behalf of the Company.  29 U.S.C. § 1002(21) (A).

10.      At all relevant times, including on October 5, 2011, Paul A. Lillyblad ("Lillyblad") was a fiduciary to the ESOP pursuant to ERISA § 3(21)(A) because he exercised discretionary authority and control respecting management of the ESOP on behalf of the Company.  29 U.S.C. § 1002(21) (A).

11.     At all relevant times, including on October 5, 2011, Kelli Watson ("Watson") was a fiduciary to the ESOP pursuant to ERISA § 3(21)(A) because she exercised discretionary authority and control respecting management of the ESOP on behalf of the Company.  29 U.S.C. § 1002(21) (A).

## Parties in Interest

12.     The ESOP is sponsored by Kurt, a Minnesota corporation and manufacturer of products and services, including CNC precision machining, gearing, and assembly, engineering, fabricating, die casting, workholding solutions, kinetic bike trainers, and hydraulics.  Kurt is headquartered in Minneapolis, Minnesota.

13.     At all relevant times, Kurt's employees participated in the ESOP.  Kurt was a party in interest pursuant to ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C).

14.     At all relevant times, including on October 5, 2011, William G. Kuban ("Kuban") was the former President and a director of Kurt; and, until the time of the transaction on October 5, 2011, Kuban was a 75.6% shareholder of Kurt.  Therefore, at all relevant times, Kuban was a party in interest to the ESOP pursuant to ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

15.     At all relevant times, including on October 5, 2011, Kuban owned all of Kurt's outstanding stock not held by the ESOP.

16.     At all relevant times, including on October 5, 2011, Carlsen was the President and a director of Kurt, and therefore, was a party in interest to the ESOP pursuant to ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

17.     At all relevant times, including on October 5, 2011, Lillyblad was the Vice President of Finance and a director of Kurt, and therefore, was a party in interest to the ESOP pursuant to ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

4

18.     At all relevant times, including on October 5, 2011, Watson was the Vice President of Human Resources and a director of Kurt, and therefore, was a party in interest to the ESOP pursuant to ERISA § 3(14)(H), 29 U.S.C. § 1002(14)(H).

### Redemptions of Kurt stock before October 5, 2011

19.     On October 28, 2005, Kurt's Board of Directors ("the Board") approved Kurt's redemption of 8,362 shares of the common stock held by the ESOP at a redemption price of $6.80 per share prior to the end of the fiscal year.

20.     On October 27, 2006, Kurt's Board of Directors approved Kurt's redemption of 14,115 shares of the common stock held by the ESOP at a redemption price of $7.00 per share prior to the end of the fiscal year.

21.     On November 2, 2007, Kurt's Board of Directors approved Kurt's redemption of 14,252 shares of the common stock held by the ESOP at a redemption price of $13.71 per share prior to the end of the fiscal year.  On November 2, 2007, Kuban, Carlsen and Watson were members of Kurt's Board of Directors.  The source of this share price was a valuation provided on October 31, 2006 by Willamette Management Associates.

22.     On November 1, 2008, Kurt's Board of Directors approved Kurt's redemption of 15,127 shares of the common stock held by the ESOP at a redemption price of $23.08 per share prior to the end of the fiscal year.  On November 1, 2008, Kuban, Carlsen, and Watson were members of Kurt's Board of Directors.  The source of this share price was a valuation provided on October 31, 2007 by Willamette Management Associates.

23.     On November 20, 2009, Kurt's Board of Directors approved Kurt's redemption of 28,610 shares of the common stock held by the ESOP at a redemption price of $21.79 per share prior to the end of the fiscal year.  On November 20, 2009, Kuban, Carlsen, Lillyblad, and

Watson were members of Kurt's Board of Directors.  The source of this share price was a valuation provided on October 31, 2008 by Willamette Management Associates.

24.     On November 12, 2010, Kurt's Board of Directors approved Kurt's redemption of 14,737 shares of the common stock held by the ESOP at a redemption price of $13.86 per share prior to the end of the fiscal year.  On November 12, 2010, Kuban, Carlsen, Lillyblad, and Watson were members of Kurt's Board of Directors.  The source of this share price was a valuation provided on October 31, 2009 by Willamette Management Associates.

### Valuations of Kurt Stock held by the ESOP before October 5, 2011

25.     Willamette Management Associates completed a valuation of Kurt stock as of July 1, 1999, finding its value was of $24.70 per share.

26.     Willamette Management Associates completed a valuation of Kurt stock as of October 31, 2006, finding its value was $13.71 per share.

27.     Willamette Management Associates completed a valuation of Kurt stock as of October 31, 2007, finding its value was $23.08 per share.

28.     Willamette Management Associates completed a valuation of Kurt stock as of October 31, 2008, finding its value was $21.79 per share.

29.     Willamette Management Associates completed a valuation of Kurt stock as of October 31, 2009, finding its value was $13.86 per share.

30.     Willamette Management Associates completed a valuation of Kurt stock as of October 31, 2010, finding its value was $33.44 per share.  This valuation was provided to the Kurt Board members as trustees of the Kurt ESOP on or about April 5, 2011, approximately six months prior to the ESOP transaction.

**Kurt's Engagement of Chartwell**

31.     At least as early as March 2011, Kurt engaged in communications with Chartwell Business Valuation, LLC ("Chartwell") about the potential sale, or redemption, of all non-ESOP shareholders' stock of the company, *i.e.*, the ESOP transaction, and about Chartwell serving as Kurt's financial advisor in connection with the ESOP transaction.

32.     Prior to communicating with Chartwell, in January 2011, Kurt had explored selling the company to a third party.  Kurt had engaged Mesirow Financial for advice, and was advised on January 18, 2011, by Mesirow that likely buyers would be private equity firms, and that those firms would obtain greater value by breaking Kurt apart to sell in pieces.

33.     On March 30, 2011, Chartwell sought from the Board financial information and projections for the Company in order to develop an initial, detailed presentation, dubbed "Project Spartacus," related to the potential ESOP transaction.

34.     On April 28, 2011, Chartwell made a presentation on Project Spartacus to the Board recommending a 100% sale of the outstanding shares to the ESOP.  The presentation included detailed information about valuation methodologies, share value, and share pricing, and funding for the transaction, including the use of warrants.  Chartwell estimated the equity purchase value for the Kuban shares was $28.7 million.

35.     On June 3, 2011, Kurt entered into an agreement with Chartwell Business Valuation, LLC ("Chartwell") wherein Chartwell would provide financial advisory and investment banking services in relation to the potential sale, or redemption, of all non-ESOP held stock of the company, *i.e.*, the ESOP transaction.  The agreement also provided that Chartwell would direct and/or assist in the coordination, design, economic analysis, and execution of the

ESOP transaction.  The agreement also provided that Chartwell intended to complete the ESOP transaction on an expedited basis on or before August 5, 2011.

36.     On June 6, 2011, Chartwell made a presentation on Project Spartacus to the Board in which it outlined in detail the next steps and timeline for the sale of Kuban's shares to the ESOP, including a due diligence list of all of the financial information and projections that the Board was required to provide to Chartwell.

37.     On July 11, 2011, Chartwell sent to Lillyblad, via email, a report titled "Project Spartacus, Updated Transaction Opportunity Overview Materials," showing that the equity redemption price for the Kurt stock from Kuban would be for $39.1 million.  In the body of its email, Chartwell states that the report constitutes "the final lender material packet for distribution to U.S. Bank….includ[ing] historical income statements, cash flow breakdowns, and balance sheet as well as forecasted income statement, cash flow breakdown, and working capital assumptions….[as well as] the collateral summary and the brief company overview."

**Kurt's Communications with Premier Bank**

38.     On July 6, 2011, Premier Bank ("Premier") had provided to Lillyblad by written instrument a proposal for a $2 million secured loan, on which U.S. Bank would rely to finance the $39.1 million Transaction.  In this letter, Premier stated that the proposal was "subject to receipt, review, and approval of [the Company's] ESOP financing structure related to the purchase of William Kuban's 75% ownership of Kurt Manufacturing, Inc."

39.     On July 11, 2011, Lillyblad emailed Premier, attaching the July 11 "Project Spartacus, Updated Transaction Opportunity Overview Materials" Chartwell report.

40.     On July 15, 2011, in an email to Premier, Lillyblad stated that the Board had already approved the structure of the $39.1 million transaction, with a targeted closing date of August 15, 2011.  He stated there was "[n]ot much room for [him] to argue."

41.     On July 18, 2011, in an email to Lillyblad, Premier raised concerns about the valuation of Kurt for the ESOP purchase, including a large negative net worth and a projected adjusted Earnings Before Interest Taxes Depreciation and Amortization ("EBITDA") that Premier thought considerably exceeded actual performance for each of the prior 6 years at Kurt, even excluding 2009.  In that email, Premier also raised concerns about the projected gross profit margins and operating expenses, versus actual profit and expense reports from the past 6 years.

**Kurt's Engagement with Reliance and Related Plan Provisions**

42.     On July 18, 2011, Kurt's President, Carlsen, signed an engagement letter with Reliance, in which Reliance described the conditions and terms under which it would serve as Trustee to the ESOP, in pertinent part, as follows:

> 2.     Reliance shall also assume fiduciary responsibility as a discretionary trustee for determining, in consultation with its advisors, the prudence of the purchase, that the purchase price in the Proposed Transaction does not exceed "adequate consideration" as that term is defined under Section 3(18) of the Employee Retirement Income Security Act of 1974 ("ERISA") and that the Proposed Transaction is fair to the ESOP from a financial viewpoint. Reliance shall have complete and absolute discretionary authority in investigating and evaluating the Proposed Transaction and nothing contained herein shall be construed to constitute a representation or warranty that Reliance will approve or disapprove the Proposed Transaction. In order for the ESOP to become a party to the Proposed Transaction, upon completion of our due diligence we will have to determine that the Proposed Transaction is prudent, that the purchase price in the Proposed Transaction is not in excess of "adequate consideration," and that the Proposed Transaction is fair to the ESOP from a financial viewpoint.  Reliance will exercise its independent discretionary judgment and authority in connection with the Proposed Transaction in accordance with the requirements of Part 4 of Title I of ERISA.

43.     In the agreement, Reliance agreed to maintain fiduciary liability insurance covering the performance of its duties under the agreement in a coverage amount no less than $10,000,000.00 (the "Insurance").

44.     The agreement also contained an indemnification clause, in which Kurt "agrees, to the fullest extent federal law permits, to indemnify and hold Reliance and its directors, employees and officers harmless against and from any and all claims, damages, expenses, liabilities, and losses whatsoever (including, but not limited to, any and all expenses reasonably incurred in investigating, preparing, or defending any government investigations, litigation, or other proceedings, commenced or threatened, or any claim whatsoever, whether or not resulting in any liability), to which any or all of them may be come subject under any applicable federal or state law or otherwise relating to the Proposed Transaction or Reliance's duties as ESOP trustee (including all events that occurred prior to Reliance becoming the trustee under the ESOP).

45.     The indemnification clause goes on to state that "any such indemnification or agreement to hold Reliance harmless shall not apply to any claim, damage, expense, liability, or loss that is covered in whole or in part by the Insurance, or that is attributable to Reliance's "bad faith, breach of fiduciary duty under ERISA, negligence, willful misconduct, or a material breach of the terms of this letter or any subsequent agreement."  However, Kurt agreed that "[t]he Company shall reimburse Reliance for all reasonable expenses and fees as and when Reliance incur them in connection with any Proceeding, including the expenses and fees of investigating, of responding to discovery proceedings, of testifying in any hearing, and of consulting with the Company or its advisors and attorneys, and for the reasonable expenses and fees of the experts and legal counsel whom Reliance engages for any Proceeding."

46.     As alleged herein the Kurt Board of Directors were aware of the material elements of the ESOP transaction, including the purchase price, employment agreements, stock appreciation rights ("SARs"), and warrants, prior to engaging Reliance.  The Board remained substantially involved in communications with Chartwell and Reliance regarding the terms of the transaction, including those that would impact current and future ESOP redemption share values, through the execution of the transaction on October 5, 2011.

47.     As alleged herein, Reliance approved the ESOP Transaction.

**Reliance's Engagement with Stout Risius Ross**

48.     On July 22, 2011, Reliance entered into an agreement with Stout Risius Ross ("SRR") to provide certain financial advisory services to Reliance related to the ESOP transaction, with Gray Plant Mooty as legal counsel to Reliance.  SRR agreed to render a written opinion, as of the transaction date, that among other things, "the consideration to be paid by the ESOP for its shares of Company stock pursuant to the terms of the Transaction is not greater than the fair market value of such shares," and "the terms of the loan from the Company to the ESOP are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from negotiations between independent parties."

49.     According to Reliance's agreement with SRR, SRR would report solely to the Trustee and Kurt would pay all fees for their work.

50.     On August 26, 2011, SRR and Reliance entered into a second agreement, in which SRR established that it would provide a written fairness opinion on the ESOP purchase of all of the Kuban shares for "an aggregate purchase price of approximately $39 million." Specifically, SRR agreed to provide an opinion on whether:  the fair value and present fair saleable value of the Company's assets would exceed the Company's stated liabilities; the

Company should be able to pay its debts as they become absolute and mature; and the Company should not have unreasonably small capital for the business in which the Company is engaged.

51.     In the August 26, 2011 agreement, SRR defined "fair market value" as "the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset."  The letter also stated that "the Company acknowledges that SRR has no obligation to conduct any appraisal of any specific assets or liabilities of the Company," and that their opinion should be used by Reliance "as one input to consider the process of analyzing the contemplated Transaction."

### The Board Members' Resignations as Trustees

52.     On July 22, 2011, Carlsen, Lillyblad, and Watson executed a document, resigning as Trustees of the ESOP.  In a separate document executed that same day, the Kurt Board members executed a Written Resolution, appointing Reliance as the Trustee of the ESOP.

53.     The Board remained substantially involved in communications with Chartwell and Reliance regarding the terms of the transaction, including those that would impact current and future ESOP redemption share values, through the execution of the transaction on October 5, 2011.

### SRR's Valuation and Solvency Opinion

54.     On August 19, 2011, SRR issued an "Analysis of Transaction Fairness for the October 5, 2011 Transaction."

55.     In its valuation included in its analysis, SRR used the Discounted Cash Flow ("DCF") Method and the Guideline Company Method.

56.     Using both methods, SRR concluded that the fair market value of Kurt's equity not already owned by the ESOP was between $34.2 million and $43.1 million, with a midpoint of $39 million.

57.     SRR did not make any allowance in its valuation for Warrants or Stock Appreciation Rights ("SARs") that would be included in the ESOP transaction.  In Chartwell's valuation of the Company stock at October 31, 2011, just 26 days after the Transaction, the Warrants were valued as a liability of approximately $1.7 million.

58.     In its opinion, SRR identified the price to be paid by the ESOP for the stock, $39 million, or $85.22 per share.

59.     In its opinion, SRR concluded that the consideration to be paid by the ESOP for the shares of Kurt common stock pursuant to the terms of the transaction is not greater than the fair market value of such shares.

60.     On August 26, 2011, SRR and Reliance signed an agreement for SRR to issue a Solvency Opinion regarding the effects after the ESOP transaction.  The agreement was also signed by Lillyblad on behalf of Kurt on September 2, 2011.

61.     SRR's Solvency Opinion was issued on October 5, 2011, the same date as the transaction.  In the document, SRR opines that the Company's fair value and present fair saleable value assets would exceed Kurt's stated liabilities; that Kurt should be able to pay its debts as they become absolute and mature; and that Kurt should not have unreasonably small capital for the business in which it is engaged.

62.     SRR's opinion as to the value of the stock purchased by the ESOP was flawed, because, among other reasons:

(a) For the Income Approach, the profit projections used by SRR, as measured by EBITDA were significantly higher than historical EBITDA as a percentage of revenues, otherwise referred to as the EBITDA margin.  Whereas the ESOP's historical EBITDA margin was approximately 7 percent, in its valuation, SRR used an EBITDA margin between 10 and 11 percent.

(b) For the Income Approach, SRR used three flawed components for the weighted average cost of capital, including an incorrect risk free rate, a debt rate that was too low for market conditions, and a BETA (a measure of the company's risk) that was too low.

(c)  For the Income Approach, SRR calculated a terminal value using an exit multiple that is internally inconsistent with that approach.

(d)  For the Guideline Company Method, SRR used a range of market multiples that was too high.

(e)  In its opinion, SRR failed to recognize and identify that the overall financing structure of the Transaction was flawed and required analysis as to its impact on fair market value.

**The ESOP's Purchase of Kurt**

63.     As of October 5, 2011, the ESOP owned 147,739.08 shares of Kurt stock, which represented 24.44% of all shares then outstanding.

64.     On October 5, 2011, pursuant to a Stock Purchase and Sale Agreement, the ESOP purchased an additional 457,623 shares from Mr. Kuban, which represented the remaining 75.56% of shares, for an aggregate purchase price of $39 million, or $85.22 per share.  The Stock Purchase and Sale Agreement was signed by Kuban as the selling shareholder, by Reliance as ESOP trustee, and by Carlsen as Kurt President.

65.     After the purchase, the ESOP owned 100% of all outstanding shares of Kurt stock.

66.     As part of the transaction, the ESOP borrowed $20,000,000 from Kurt on October 5, 2011.  The ESOP Exempt Loan Agreement for the loan was signed by Reliance as trustee and by Carlsen as Kurt President.  As security, the ESOP pledged 234,678.462 shares of Kurt stock to be purchased with the proceeds of the loan pursuant to an ESOP Pledge Agreement signed by Reliance as Trustee and Carlsen as Kurt President.

67.     As part of the transaction, the ESOP borrowed $19,000,000 from Kuban on October 5, 2011.  The Second ESOP Exempt Loan Agreement for the loan was signed by Reliance as trustee and Kuban.  As security, the ESOP pledged 222,944.538 shares of Kurt stock to be purchased with the proceeds of the loan, pursuant to a Second ESOP Pledge Agreement signed by Reliance as Trustee and Kuban.

68.     As part of the transaction, Kuban, Kurt, and Reliance executed an Assignment and Assumption Agreement on October 5, 2011.  Pursuant to this agreement, Kuban assigned his rights to payment under the Second Exempt Loan to Kurt in exchange for two unsecured promissory notes from Kurt.  The Restated Second Loan Agreement, the Restated Second Exempt Note, and the Restated Second ESOP Pledge Agreement were executed on October 5, 2011 to substitute Kurt for Kuban as the lender to the ESOP.

69.     As part of the transaction, the two unsecured promissory notes from Kurt to Kuban included one for $7,500,000 and one for $11,500,000.  In connection with his $7,500,000 promissory note from Kurt, Kuban received a detachable warrant to purchase up to 71,747 shares of Kurt's common stock.  In connection with his $11,500,000 promissory note from Kurt, Kuban

received a detachable warrant to purchase up to 152,462 shares of Kurt's common stock.  The exercise price for the shares included in the warrants was $30.00 per share.

70.     As part of the transaction, the Company's Board of Directors established a Stock Appreciation Rights (SARs) plan for key officers, including Carlsen, Lillyblad, and Watson. Units could be awarded by the Board at least annually based on a combination of individual, company-wide, and division performance criteria.  The total number of units that could be awarded was initially limited to no more than 7.5% of the outstanding equity of Kurt including other synthetic equity such as warrants.

71.     As part of the transaction, Carlsen, Kurt's President, and Reliance executed a Price Support Agreement on October 5, 2011.  The purpose of the Agreement was to ensure that eligible ESOP participants and beneficiaries will receive the greater of the "Support Price" or the fair market value of a share, after the transaction and the ESOP's purchase of the "New Shares" from Kuban.

72.     For purposes of the Price Support Agreement, "Fair Market Value" was defined as "the most recent valuation of the Shares determine in accordance with the terms of the ESOP with the advice of an independent appraiser."  The Board and Reliance executed the Price Support Agreement at $55.29 per share.

73.     The Price Support Agreement also provided a Price Protection Period, which had a termination date of the earlier of either October 31, 2013, or "the first date as of which the Fair Market Value of the Shares is determined to be greater than the Support Price."

### The Board's Termination of Reliance

74.     On October 28, 2011, the Kurt Board members signed a Written Action terminating Reliance as Trustee of the ESOP.

16

## Reliance's Reliance on SRR's Opinion

75.     In connection with the ESOP Transaction, Reliance had a duty to make certain that its reliance upon SRR's advice was reasonably justified under the circumstances.  To this end, Reliance was obligated to review SRR's valuation report in order to understand its analysis and conclusions, and to identify, question, and test its underlying assumptions.  In addition, Reliance was obligated to verify that SRR's conclusions were consistent with the data provided to it and that the appraisal was internally consistent.  Reliance failed to comply with these duties under ERISA and, as described below, caused the ESOP to overpay for the stock purchased in the ESOP Transaction.

76.     Reliance failed to obtain and/or adequately consider numerous prior stock redemptions and valuations that valued Kurt significantly less than what the ESOP paid. Reliance failed to obtain and/or adequately consider pre-transaction stock redemptions, including that on November 12, 2010, the Kurt Board members approved Kurt's redemption of 14,737 shares of the common stock of the ESOP at a redemption price of $13.86 per share.  Reliance also failed to adequately consider the most recent valuation of Kurt stock, provided to the Kurt Board members as trustees of the ESOP on or around April 5, 2011 by Willamette, which valued Kurt stock at $33.44 per share as of October 31, 2010.

77.     At the time of the transaction, Reliance also approved a Price Support Agreement, along with the Board, which established a fair market value for post-transaction redemptions of ESOP shares at $55.29 per share.  The Price Support Agreement terminates at the earliest of either October 31, 2013, or "the first date as of which the Fair Market Value of the Shares is determined to be greater than the Support Price."  The Price Support Agreement was executed on

October 5, 2011, along with the Stock Purchase and Sale Agreement, which provided a fair market value of shares at $85.22 per share.

78.     Reliance's reliance on SRR's opinion was unreasonable considering the fundamental flaws identified above.  Reliance knew or should have known that reliance on SRR's opinion was not justifiable.  Indeed, the prior redemptions and valuations for starkly lower amounts should have made Reliance well aware that SRR's valuation had significant flaws.  By relying on SRR's valuation, despite these readily-apparent flaws and other information to the contrary that Reliance knew or should have known about, Reliance failed to prudently and loyally represent the interests of the ESOP and its participants and beneficiaries, and caused the ESOP to overpay for Kuban's stock far in excess of fair market value.

79.     Reliance should have vigorously questioned whether SRR's valuation and fairness opinion were accurate and reliable.

### First Count
### (Disloyalty and Imprudence in violation of ERISA §§ 404(a)(1)(A) and (B))

80.     Paragraphs 1-79 above are hereby re-alleged and incorporated herein.

81.     In connection with the ESOP Transaction, Reliance breached their fiduciary duties to the ESOP to act solely in the interest of the participants and beneficiaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), by, among other things:  (a) continuing to engage to SRR to perform the valuation, (b) failing to carry out a meaningful review of SRRs valuation; (c) failing to understand and question SRR's findings, assumptions or methodologies; (d) failing to independently determine that the ESOP was paying no more than fair market value for the stock;

(e) approving the ESOP's purchase of stock despite the fact that they knew or should have known that the valuation upon which it was based was inflated and flawed; (f) failing to give due weight and consideration to prior redemptions and valuations before the transaction they knew or should have known existed, and (g) paying vastly more than fair market value for the stock.

82.     In connection with the ESOP Transaction, Carlsen, Lillyblad, and Watson, breached their fiduciary duties to the ESOP to act solely in the interest of the participants and beneficiaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), by failing to monitor Reliance to prevent the breaches alleged in paragraph 81 above in that, among other things, they had knowledge of:  (a) prior redemptions and valuations of Kurt stock at significantly lower values than the Transaction price; (b) the material terms and structure, including bank financing and proposed price, of the Transaction, before appointing Reliance and throughout the Transaction process; and (c) by way of developing and approving, the fair market value for the floor price of Kurt stock post-transaction, which was significantly lower than the transaction price.

83.     As a result of the foregoing imprudent and disloyal acts and omissions, Reliance, Carlsen, Lillyblad, and Watson caused losses to the ESOP for which they are personally liable pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

**<u>Second Count</u>**
**(Prohibited transaction in violation of**
**ERISA §§ 406(a)(1)(A) and (D))**

84.     Paragraphs 1-83 above are hereby re-alleged and incorporated herein.

85.     Reliance caused the ESOP to acquire stock in the ESOP Transaction by purchasing the shares from Kuban, who was a party in interest to the ESOP.

86.     As trustee of the ESOP, Reliance caused the ESOP to enter into a prohibited transaction by approving the ESOP's purchase of the Company's stock from Kuban in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), which prohibits a fiduciary from causing a plan to engage in a transaction if he knows or should know that such transaction constitutes a direct or indirect sale or exchange, or leasing, of any property between the plan and a party in interest.

87.     As trustee of the ESOP, Reliance caused the ESOP to enter into a prohibited transaction by approving the ESOP's purchase of the Company's stock from Kuban in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), which prohibits transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

88.     As a result of the fiduciary breaches described above, Reliance caused the ESOP to suffer financial losses for which it is personally liable pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).

89.     Defendants Carlsen, Lillyblad, and Watson are liable, pursuant to ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), for the breaches of fiduciary responsibility by a co-fiduciary, as described in paragraphs 85 through 88 above, because by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of their specific responsibilities which gave rise to their status as fiduciaries of the Plan, they enabled Reliance to commit the breaches set forth in paragraphs 85 through 88 above.

90.     Defendants Carlsen, Lillyblad, and Watson knowingly participated in Reliance's violations involving the ESOP's purchase of Kuban's shares of Kurt stock.  For this reason, the

Secretary may obtain equitable relief from Carlsen, Lillyblad, and Watson, pursuant to ERISA § 502(a)(5), 29 U.S.C. § 1132(a)(5).

## Third Count
### (Exculpatory Provision in Violation of ERISA § 410)

91.  Paragraphs 1-90 above are hereby re-alleged and incorporated herein.

92.  ERISA § 410(a) provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation or duty under this part shall be void as against public policy." ERISA § 410(a), 29 U.S.C. § 1100(a). A fiduciary is impermissibly relieved of responsibility or liability for its ERISA fiduciary duties when an ERISA plan itself bears some of the burden of indemnifying the fiduciary for its breaches. *See* 29 C.F.R. § 2509.75-4.

93.  As set forth in Paragraphs 44 to 45 above, Kurt's indemnification agreement with Reliance could require Kurt, which is 100% owned by the ESOP, to reimburse Reliance for all reasonable expenses and fees in connection with any Proceeding, including expenses and fees of investigating, of responding to discovery proceedings, of testifying in any hearing, and of consulting with the Company or its advisors and attorneys, and for the reasonable expenses and fees of the experts and legal counsel whom Reliance engages for any Proceeding in connection with ERISA violations relating to the 2011 Transaction. As the 100% shareholder of Kurt, the ESOP could incur significant indemnification obligations.

94.  To the extent Reliance seeks to recover any money from Kurt pursuant to the indemnification agreement in connection with the violations alleged herein, any such payments would be in violation of ERISA.

95.     Reliance should not gain any benefit at the expense of Kurt, should Reliance's actions on behalf of the ESOP be found in violation of ERISA pursuant to ERISA § 410(a), 29 U.S.C. § 1100(a).

### Prayer for Relief

WHEREFORE, the Secretary prays for judgment:

1.      Requiring Reliance, Carlsen, Lillyblad, and Watson to restore all losses caused to the ESOP as a result of their fiduciary breaches;

2.      Requiring Reliance, Carlsen, Lillyblad, and Watson to take such further and other action as necessary to fully reverse the transactions prohibited by ERISA § 406, 29 U.S.C. § 1106;

3.      Requiring Reliance, Carlsen, Lillyblad, and Watson to disgorge all profits, fees, and costs, including legal fees that they or their agents received from Kurt, the ESOP, or any other source for all services related to the ESOP and any litigation related to their fiduciary breaches alleged herein;

4.      Removing Reliance, Carlsen, Lillyblad, and Watson from all fiduciary or service provider positions they may now have in connection with the ESOP;

5.      Enjoining Reliance from acting as a fiduciary or service provider to any ERISA-covered plan.

6.      Appointing an independent fiduciary to distribute all recoveries made to the ESOP and requiring Reliance, Carlsen, Lillyblad, and Watson to pay for all fees and expenses related to such appointment;

7.      To the extent Reliance seeks to recover any money from Kurt pursuant to the indemnification agreement in connection with ERISA violations relating to the 2011 Transaction, finding that the indemnification agreement between Kurt and Reliance is null and void; and

8.      Granting such other relief as may be equitable, just and proper.

Respectfully submitted,

Dated:  October 4, 2017

**NICHOLAS C. GEALE**
Acting Solicitor of Labor

**CHRISTINE Z. HERI**
Regional Solicitor

s/ Barbara A. Goldberg
**BARBARA A. GOLDBERG**
Senior Trial Attorney
United Stated Department of Labor,
Office of the Solicitor
230 S. Dearborn Street, Room 844
Chicago, Illinois 60604
Telephone: (312) 353-5747
Facsimile:  (312) 353-5698
Email: goldberg.barbara@dol.gov

Attorneys for **R. ALEXANDER ACOSTA**,
Secretary of Labor, U.S. Department of Labor