# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| R. Alexander Acosta, *Secretary of Labor, U.S. Department of Labor*, <br><br> Plaintiff, <br><br> v. <br><br> Reliance Trust Company; Steven R. Carlsen; Paul A. Lillyblad; Kelli Watson; and Kurt Manufacturing Company, Inc., Employee Stock Ownership Plan, <br><br> Defendants and Third-Party Plaintiffs, <br><br> v. <br><br> Gretchen Kuban Rode, *in her capacity as Personal Representative of the Estate of William G. Kuban*, <br><br> Third-Party Defendant. | Case No. 17-cv-4540 (SRN/ECW) <br><br><br><br><br><br><br><br> **MEMORANDUM OPINION AND ORDER** |

Ruben R. Chapa, Elizabeth Arumilli, and Kevin M. Wilemon, United States Department of Labor, Office of the Solicitor, 230 South Dearborn Street, Suite 844, Chicago, IL 60604, for Plaintiff.

William B. Brockman and Pierce G. Hand IV, Bryan Cave Leighton Paisner LLP, 1201 West Peachtree Street, Fourteenth Floor, Atlanta, GA 30309, and Bradley R. Armstrong and Terese A. West, Moss & Barnett PA, 150 South Fifth Street, Suite 1200, Minneapolis, MN 55402, for Defendant and Third-Party Plaintiff Reliance Trust Company.

Jonathan P. Norrie, Alan I. Silver, Brittany B. Skemp, and Casey D. Marshall, Bassford Remele PA, 100 South Fifth Street, Suite 1500, Minneapolis, MN 55402, for Defendants and Third-Party Plaintiffs Steven R. Carlsen, Paul A. Lillblad, and Kelli Watson, and Defendant Kurt Manufacturing Company, Inc., Employee Stock Ownership Plan.

David R. Marshall, Kyle W. Ubl, Leah C. Janus, and Marie Williams, Fredrikson & Byron PA, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, for Third-Party Defendant Gretchen Kuban Rode.

---

SUSAN RICHARD NELSON, United States District Judge

This case centers around a closely held Minnesota company called "Kurt Manufacturing Inc." ("Kurt"), and around a sale of Kurt stock that occurred on October 5, 2011. In that sale of stock, Kurt's then-majority shareholder and board chairman, William Kuban, sold his 75% stake in Kurt to Kurt's "employee stock ownership plan," or "ESOP,"[1] so as to allow the ESOP to own 100% of Kurt. The ESOP entered into this transaction after the non-Kuban-related members of Kurt's board of directors, *i.e.*, Defendants Carlsen, Lillyblad, and Watson ("the Directors"), vetted the transaction, and then appointed an independent trustee, *i.e.*, Defendant Reliance Trust Company ("Reliance"), to negotiate the final price on the ESOP's behalf.

In the view of the United States Department of Labor ("DOL"), however, in orchestrating this transaction, Defendants (both the Directors and Reliance) failed to abide by the fiduciary duties they owed the ESOP, as set forth in the Employee Retirement Income Security Act of 1974 ("ERISA").[2] More specifically, DOL alleges, Defendants

---

[1]     An ESOP is a kind of pension plan that invests primarily in the stock of the company that employs the plan's participants.

[2]     "ERISA is a comprehensive [federal] statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). To that end, the statute "sets various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility, for both pension and welfare plans." *Id.* at 91.

breached their duties of loyalty and prudence to the ESOP because they approved the at-issue transaction despite being aware of data suggesting that Kuban's selling price was unreasonably high. As a result, DOL claims, the ESOP paid far more for Kuban's share of the company than it should have, and thus enriched Kuban (and Defendants) at the expense of Kurt employees.

Defendants dispute DOL's theory of the case on two fronts. *First*, on the merits, Defendants argue that the ESOP did not overpay for Kuban's share of the company, and that they acted with prudence and loyalty toward the ESOP at all relevant times. *Second*, from a procedural perspective, Defendants argue that, even assuming an ERISA violation occurred, they should not have to pay DOL damages. Rather, Defendants contend, because of an indemnification obligation allegedly to them by Kuban, Kuban's Estate should pay those damages. (Kuban is deceased and is now represented by his surviving daughter, Gretchen Kuban Rode.) Accordingly, both sets of Defendants have brought third-party complaints against Rode, on grounds that, if DOL succeeds on the merits of its ERISA suit, Rode must indemnify them for their losses.

The Court now considers one motion related to each of these two defenses. *First*, the Directors (but not Reliance) have moved for judgment on the pleadings, contending that DOL has failed to set forth a plausible set of fiduciary breach allegations against them. *Second*, Rode has moved to dismiss both third-party complaints filed against her, arguing that there are no contractual, equitable, or statutory grounds under which she must indemnify Defendants.

After carefully considering the parties' arguments and the applicable case law, the Court denies the Directors' motion for judgment on the pleadings, and grants Rode's motion to dismiss the third-party complaints.

## I.     BACKGROUND

### A. Factual Background

#### 1. *The Parties*

The United States Department of Labor ("DOL") is the plaintiff in this case. DOL is a federal agency tasked with enforcing ERISA, among other statutes. Congress has authorized DOL to bring civil suits against persons who fail to comply with ERISA. *See* 29 U.S.C. §§ 1132(a)(2), (a)(5).

Defendants are all connected to Kurt, a privately-owned Minnesota corporation that provides a variety of industrial services, such as "fabricating" and "die casting." (Am. Compl. [Doc. No. 46] ¶ 12.) For ease of reference, however, the Court will treat the "Kurt Defendants" as four distinct entities.

The first defendant is Third-Party Defendant Gretchen Kuban Rode, who currently serves as the personal representative for the Estate of William G. Kuban ("Rode"). (*See* Directors' Third-Party Compl. [Doc. No. 100] ¶ 2.) Before the at-issue ESOP transaction, Kuban owned 75.6% of Kurt, and served as the chairman of Kurt's board of directors. (*Id.*) In 2012, sometime after selling his stake in Kurt, Kuban died, and thereafter left his daughter, Rode, to administer his estate. (*Id.*) At the time of the at-issue transaction, Rode also served on Kurt's board of directors.

The second defendant (or, more accurately put, group of defendants) consists of Steven R. Carlsen, Paul A. Lillyblad, and Kelli Watson (collectively, "the Directors"). At all relevant times, Carlsen was Kurt's President, Lillyblad was Kurt's Vice President of Finance, and Watson was Kurt's Vice President of Human Resources. (Am. Compl. ¶¶ 16-18; *see also* Directors' Am. Answer [Doc. No. 100] ¶ 10 (noting that all three individuals are still executives at Kurt, albeit with slightly different titles).) In October 2011, these three individuals, together with Kuban and Rode, comprised the entirety of Kurt's five-member board of directors. (Am. Compl. ¶¶ 16-18.)

The third defendant is Reliance Trust Company, Inc. ("Reliance"), an independent trust company based in Atlanta, Georgia. (Reliance Third-Party Compl. [Doc. No. 90] ¶ 1.)

The fourth and final defendant is Nominal Defendant[3] Kurt Manufacturing Company, Inc. Employee Stock Ownership Plan ("ESOP"), which is a "pension plan" subject to ERISA's regulatory scheme. (Am. Compl. ¶ 5 (citing 29 U.S.C. § 1002(2)); *see also Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992) (explaining that ESOPs are pension plans that invest in "stock of the employer creating the plan," and are therefore intended to be "both an employee retirement benefit plan and a technique of corporate

---

[3]     The Court uses the phrase "nominal defendant" because, in its complaint, DOL avers that "the ESOP is named as a Defendant . . . solely for the purpose of ensuring complete relief among the parties under Fed. R. Civ. P. 19." (Am. Compl. ¶ 5.) Although the ESOP is technically represented by the same counsel as the Directors, to date, neither the Plan nor its current trustee, Bremer Trust, N.A., has attempted to participate in this litigation in any manner whatsoever. (*See* Reliance Third Party Compl. ¶¶ 22-24 (noting that Bremer has served as the ESOP's trustee since November 10, 2011).)

finance that encourage[s] employee ownership").) Until October 5, 2011, the ESOP

controlled the portion of Kurt that Kuban did not control, *i.e.*, 24.4% of the company. (*Id.*

¶ 15.) Since that date, however, the ESOP has owned 100% of Kurt's stock. (*Id.* ¶ 65.)

### 2. *The October 5, 2011 Transaction*

#### a. *The Undisputed Facts*[4]

The basic facts and timeline surrounding the October 5, 2011 Kuban-ESOP stock

transaction are undisputed. At some point in late 2010 or early 2011, Kurt's board of

directors (who, at the time, were also serving as the ESOP's trustees) began "exploring"

the idea of "selling the company to a third party." (Am. Compl. ¶ 32.) However, upon

learning that selling Kurt to a willing third-party buyer, such as a private equity firm, would

likely entail "breaking Kurt apart," Kurt's board decided to consider an "inside" transaction

instead. (*Id.* ¶ 31.) That is, instead of selling Kurt to an outside private equity firm, Kurt's

board determined that perhaps Kuban could sell his 75% stake in the company to the ESOP,

*i.e.*, Kurt's only other shareholder, and thus allow Kurt's ownership to stay "in house." As

such, in March 2011, Kurt's board began working with a financial advisory company,

Chartwell Business Valuation, LLC ("Chartwell"), on a proposed "ESOP transaction." (*Id.*

¶¶ 31, 33.)

On April 28, 2011, after receiving Kurt's "financial information" and "future

projections," Chartwell made a "detailed presentation" to Kurt's board. (*Id.* ¶ 34.) In this

presentation, Chartwell "estimated [that] the equity purchase value for the Kuban shares

---

[4]     The Court describes these facts as "undisputed" because, in their Amended
Answer, the Directors conceded the truth of the cited allegations.

was $28.7 million." (*Id*.) As a result of this presentation, on June 3, 2011, Kurt's board retained Chartwell to "direct and/or assist in the coordination, design, economic analysis, and execution of the ESOP transaction." (*Id*. ¶ 35.)

On July 11, 2011, following more meetings between Chartwell and Kurt's board, Chartwell sent Kurt's board a "final lender material packet" valuing Kuban's share of Kurt at $39.1 million, which, for unclear reasons, was over $10 million higher than Chartwell's initial projection in April. (*Id*. ¶ 37.) Moreover, on a per-share basis, Chartwell's $39.1 million number valued Kurt shares at approximately $85 per share. (*Id*. ¶ 58.) This valuation was notable because it stood in marked contrast to prior valuations of Kurt stock. (*See id*. ¶¶ 19-30 (noting that, between July 1999 and October 2010, Kurt's stock had been consistently valued between $13.86 per share and $33.44 per share); Directors' Am. Answer ¶¶ 11-12 (admitting that, with one exception, the Directors had been aware of these valuations prior to the ESOP transaction).)

A week after receiving Chartwell's "final" $39.1 million valuation, on July 18, 2011, Kurt's President, Director Defendant Carlsen, "signed an engagement letter with Reliance," which required Reliance to act as the ESOP's "trustee" for purposes of the forthcoming ESOP transaction. (*Id*. ¶ 42.) Specifically, Reliance agreed to "assume fiduciary responsibility as a discretionary trustee for determining, in consultation with its advisors, the prudence of the [ESOP's] purchase, that the purchase price in the Proposed Transaction [did] not exceed 'adequate consideration' as that term is defined [in ERISA] and that the Proposed Transaction [was] fair to the ESOP from a financial viewpoint." (*Id*.) The engagement letter also stated that Reliance would have "complete and absolute

discretionary authority in investigating and evaluating the Proposed Transaction." (*Id.*) Shortly after signing this engagement letter with Reliance, Kurt's board of directors resigned as "Trustees of the ESOP," and "executed a Written Resolution appointing Reliance as the Trustee of the ESOP." (*Id.* ¶ 52.)[5]

After taking over as the ESOP's trustee, Reliance hired the financial advisory firm Stout Risius Ross ("SRR") to produce a "written fairness report" detailing what a fair and reasonable buyer would pay for Kuban's share of Kurt under normal market conditions. (*Id.* ¶¶ 48-51.) SRR produced that report shortly thereafter, on August 19, 2011. (*Id.* ¶ 54.) In its report, SRR "concluded that the fair market value of Kurt's equity not already owned by the ESOP was between $34.2 million and $43.1 million, with a midpoint of $39 million." (*Id.* ¶ 56.) Consequently, "SRR identified the price to be paid by the ESOP for the stock [as] $39 million, or $85.22 per share." (*Id.* ¶ 58.) Notably, this recommended price tag was the same "final" number Kurt's board had received from Chartwell about a month earlier, before Kurt had hired Reliance to serve as the ESOP's new trustee.

Reliance adopted SRR's recommendation in full and, on October 5, 2011, Kuban sold his 75% stake in Kurt to the ESOP for $39 million. (*Id.* ¶ 64.) The agreement "was

---

[5]     As a point of context, the Court notes that this "changing of the guard" occurred because ERISA outright prohibits pension plan fiduciaries from entering into an "inside" ESOP transaction like the proposed Kuban transaction *unless* the ESOP's fiduciary/trustee shows that the ESOP purchased the insider's stock for "adequate consideration." *See* 29 U.S.C. § 1108(e)(1); *see also Martin*, 965 F.2d at 670-71 (observing that this rule exists because the "potential for disloyal self-dealing" is "inherently great when insiders act for a closely held corporation's ESOP"). Hence, to ensure that the ESOP paid a fair and "adequate" price for Kuban's share of Kurt (or to at least give that appearance), Kurt's board of directors hired Reliance, an independent trust company, to "negotiate" the final ESOP transaction price on behalf of the ESOP.

signed by Kuban as selling shareholder, by Reliance as ESOP trustee, and by Carlsen as Kurt President." (*Id.* ¶ 64.) The ESOP financed the transaction by taking out loans from Kurt (for $20 million) and from Kuban himself (for $19 million). (*Id.* ¶¶ 66-67.) Moreover, as part of this transaction, Kurt's board "established a Stock Appreciation Rights (SAR) plan for key officers," including the Director Defendants, which allowed those officers to be awarded Kurt stock as bonus payments. (*Id.* ¶ 70.) In addition, to ensure that soon-to-retire Kurt employees did not lose their ESOP investment if Kurt's share price suddenly dropped after the ESOP transaction, Carlsen (Kurt's President) and Reliance executed a "Price Support Agreement" on October 5, 2011, too. (*Id.* ¶¶ 71-72.) However, in contrast to the $85 per-share sales price, the Price Support Agreement set Kurt's "fair market value" at only $55.29 per share. (*Id.*)

With its work complete, Reliance resigned as the ESOP's trustee on October 28, 2011. (*Id.* ¶ 74.) A few weeks later, Kurt's board of directors appointed Bremer Trust, N.A. ("Bremer") as "the new ongoing trustee for the ESOP." (Reliance Third-Party Compl. ¶ 22.) Bremer remains in that position today. (*Id.* ¶ 24.)

### b. *The Disputed Facets of the Transaction*

As is evident from even a cursory comparison of DOL's Complaint and the Directors' Amended Answer, however, several important facets of this transaction are hotly disputed.[6]

---

[6]    Admittedly, because motions for judgment on the pleadings are decided before discovery has been conducted in a case, these kinds of stark factual disputes are often not evident at this early a stage of litigation. However, because the Directors elected to include numerous new "affirmative allegations" in their Amended Answer, the disparity

*First*, although DOL alleges that the Directors essentially organized and approved the ESOP transaction (including the final $39 million price tag) "prior to engaging Reliance," and therefore only hired Reliance for appearance's sake, the Directors point to the Reliance engagement letter and contend that the letter single-handedly shows that the Directors "had no ability to control the terms of" the ultimate ESOP transaction. (*Compare, e.g.*, Am. Comp. ¶¶ 40, 46 *with* Directors' Am. Answer ¶¶ 19-20.)

*Second*, although DOL alleges that Chartwell's jump from valuing the Kuban stock at $28.7 million on April 28, 2011 to valuing that same stock at $39.1 million on July 11, 2011 did not make financial sense, and that Director Lillyblad (Kurt's Vice President of Finance) had been told as much by a lender in a late July 2011 e-mail exchange, the Directors counter that the $28.7 million valuation was merely an "initial estimate based on incomplete information," and that the e-mail exchanged cited by DOL in its complaint does not mean what DOL infers it to mean. (*Compare, e.g.*, Am. Comp. ¶¶ 34-41 *with* Directors' Am. Answer ¶¶ 14-18.)

*Third*, although DOL alleges that the prior valuations of Kurt's stock should have put the Directors on notice that a $85 per share sales price was unreasonably high, the Directors counter that sound economic and practical reasons justified the price differential. (*Compare, e.g.*, Am. Comp. ¶ 82 *with* Directors' Am. Answer ¶¶ 82-83 (listing at least six such reasons).)

---

in the parties' interpretation of certain facts is evident from the face of the pleadings alone.

*Fourth*, although DOL alleges that the Directors "failed to monitor" Reliance as it negotiated on behalf of the ESOP, and did not stop Reliance (and/or SSR) from simply rubber-stamping the (purportedly excessive) July 11 $39 million Chartwell valuation, the Directors counter that they "were actively engaged in ensuring the growth projections that were utilized by Reliance and SRR were reasonable." (*Compare, e.g.*, Am. Comp. ¶ 82 *with* Directors' Am. Answer ¶¶ 24-25.)

*Fifth*, and finally, although DOL alleges that the $55 per share price used in the Price Support Agreement provides further evidence that the Directors knew the $85 per share was unreasonably high at the time of the ESOP transaction, the Directors counter by, again, pointing out various economic rationales justifying the price differential. (*Compare, e.g.*, Am. Comp. ¶¶ 71-72, 82 *with* Directors' Am. Answer ¶¶ 36, 44.)

### 3. *The Indemnification Agreements*

Setting aside for the moment the substance of the October 5, 2011 transaction, the Court also notes that, as part of this transaction, the at-issue parties signed indemnification agreements with each other.

*First*, and most importantly, on October 5, 2011, Kuban, Reliance (on behalf of the ESOP), and Director Defendant Carlsen (on behalf of Kurt) signed and executed a "Limitation Agreement." (*See* Reliance Third-Party Compl., Ex. A [Doc. No. 90-1] ("Limitation Agreement").) Two provisions are of note here.

*One*, in the section of the Limitation Agreement detailing "Covenants of the Company," the parties agreed that, should a court of competent jurisdiction decide that the ESOP overpaid for Kuban's shares, *i.e.*, more than "adequate consideration," Kuban

"shall" either (1) offset the "Excess Purchase Price" from "amounts otherwise due under the Seller Notes [due to the ESOP] in the manner that [Kuban] (or his successor) may specify,"[7] or (2) "if no amounts remain due and payable under the Seller Notes, [Kuban] (or his successor) shall pay to the [ESOP] the amount of the Excess Purchase Price." (*Id.* § 3.1(d) (hereinafter, the "Excess Purchase Price" provision).)

*Two*, in the section of the Limitation Agreement detailing "Special Indemnifications" for "ERISA Proceedings," the parties agreed that *Kurt* shall "indemnify and defend [Reliance] and hold [Reliance] harmless from and against any and all Adverse Consequences which may be incurred by [Reliance], arising by virtue of the applicability of legal or regulatory requirements . . . including without limitation any applicable provisions of ERISA." (*Id.* § 4.4(c).) However, in accordance with ERISA, the Agreement did *not* require Kurt to indemnify Reliance "for its own gross negligence, breach of fiduciary duty, or willful misconduct as determined by a court of competent jurisdiction." (*Id.* § 4.4(c); *see* 29 U.S.C. § 1110(a) ("[A]ny provision in agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy.").)

**Second**, on October 5, 2011, Kurt also signed materially identical "indemnification agreements" with each of the Director Defendants. (*See* Rode's Br. in Support of Mot. to Dismiss, Exs. A-C [Doc. No. 112-1] ("Director Indemnification Agreement").) Under Section 11 of the Agreement(s), detailing "Special Fiduciary Indemnification," *Kurt* agreed

---

[7]     Again, as the Court noted above, Kuban lent the ESOP $19 million to help facilitate the transaction. (*See supra* at 9.)

to "indemnify and hold harmless [each Director] from and against any losses, claims, expenses, damages or liabilities . . . related to serving as a fiduciary of the [ESOP]." (*Id.* § 11(a).) Again, though, in accordance with ERISA, the Agreement did *not* require Kurt to indemnify any individual Director for their own "gross negligence, breach of fiduciary duty, or willful misconduct." (*Id.*)[8]

### B. Procedural Background

On October 4, 2017, nearly six years after the ESOP transaction, DOL filed its initial complaint in this Court. On August 20, 2018, DOL filed its operative complaint, *i.e.*, the Amended Complaint. The Complaint contains two primary claims: ***First***, a breach of fiduciary duty ERISA claim against both Reliance and the Directors, *see* 29 U.S.C. § 1104(a)(1)(A)-(B) (imposing a "duty of loyalty" and a "duty of prudence" on pension plan fiduciaries), and, ***second***, a "prohibited transaction" ERISA claim against both Reliance and the Directors, *see* 29 U.S.C. § 1106(a) (barring pension plan fiduciaries from "causing" their plan to enter into a "prohibited" transaction with a company insider, unless the transaction was for "adequate consideration").[9]

---

[8]    That said, the Directors' indemnification agreement appears to be more favorable than Reliance's indemnification agreement, in that the Directors' agreement provides that, even if a Director cannot be completely indemnified for their ERISA violations, Kurt will nonetheless "share in responsibility for the Losses" "to the extent permitted by ERISA or other applicable law," and will also pay for the Director's attorneys' fees "unless and until a court of competent jurisdiction determines that [the Director] has committed gross negligence, willful misconduct, or a breach of fiduciary duty." (*Id.* § 11(b)-(c).)

[9]    The Amended Complaint also seeks to nullify a (separate) July 18, 2011 indemnification agreement between Reliance and Kurt, on grounds that that agreement does not comply with ERISA's prohibition against indemnifying "breaches of fiduciary

DOL's complaint, in turn, requests the following equitable relief from Reliance and the Directors: **(a)** that Reliance and the Directors "restore all losses caused to the ESOP as a result of their fiduciary breaches," **(b)** that Reliance and the Directors "disgorge all profits, fees, and costs, including legal fees that they or their agents received from Kurt, the ESOP, or any other source for all services related to the ESOP and any litigation related to their fiduciary breaches alleged herein," **(c)** that the Court "remove" Reliance and the Directors "from all fiduciary or service provider positions they may now have in connection with the ESOP," **(d)** that the Court "enjoin" Reliance and the Directors "from acting as a fiduciary or service provider to any ERISA-covered plan," and **(e)** that the Court "appoint" an "independent fiduciary to distribute all recoveries made to the ESOP" and "require" Reliance and the Directors to "pay for all fees and expenses related to such appointment." (Am. Compl., Prayer for Relief; *accord* 29 U.S.C. § 1109 (permitting ERISA plaintiffs to seek this relief for breaches of fiduciary duty).)

On September 4, 2018, Reliance moved to dismiss DOL's complaint under Fed. R. Civ. P. 12(b)(7), for failing to join Rode as an allegedly "necessary party" to this litigation. (*See* Doc. No. 61.)[10] On January 7, 2019, the Court determined that Rode was not a "necessary party" to this litigation, as that term is defined in the Federal Rules of Civil Procedure, and accordingly denied Reliance's motion to dismiss. *See Acosta v. Reliance*

---

duty," discussed *supra*. (*See* Am. Compl. ¶¶ 92-95.) However, because this claim is not at issue now, the Court will not address it further in this opinion.

[10]     The Directors did not join Reliance in this motion, and, instead, immediately filed an Answer to DOL's Amended Complaint. (*See* Doc. No. 76.)

*Trust Co.*, 2019 WL 121185 (D. Minn. Jan. 7, 2019); *see also* Doc. No. 87. The Court reached this result in large part because Reliance's interest in defending the propriety of the October 5, 2011 ESOP transaction and Rode's interest in defending the propriety of that transaction are "virtually identical" (because Rode, like Reliance, is at risk of incurring a substantial financial obligation if the Court finds that the ESOP paid more than "adequate consideration" for Kuban's share of the company). *Id.* at *3; *see also supra* at 12 (discussing the Excess Purchase Price provision of the October 5, 2011 Limitation Agreement). Therefore, the Court concluded, Rode's absence from the litigation was not "impairing" or "impeding" her interests. *Reliance Trust*, 2019 WL 121185, at *3; *see* Fed. R. Civ. P. 19(a)(1)(B)(i) (explaining that a "necessary party" is a "person [who] claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may, as a practical matter, impair or impede the person's ability to protect the interest").[11]

On February 5, 2019, about a month after the Court denied Reliance's attempt to bring Rode into this litigation by way of Fed. R. Civ. P. 19, Reliance filed a third-party complaint against Rode. (*See* Doc. No. 90.) In Reliance's third-party complaint, it asserted claims of "contractual indemnification," "common law indemnification," "equitable indemnification," and "promissory estoppel" against Rode, arguing largely that it (Reliance) was a "third-party beneficiary" to the Excess Purchase Price provision discussed

---

[11] The Court also observed that Rode had at no point attempted to "affirmatively claim" an interest in the "subject of [this] action," despite having been aware of DOL's suit for "over a year." *Reliance Trust*, 2019 WL 121185, at *3.

*supra*, and that, if DOL succeeded on the merits of its suit, the provision entitled Reliance to seek indemnification from Rode in the amount of any judgment entered against it. On March 13, 2019, the Directors filed a materially identical third-party complaint against Rode, arguing that they, too, were "third-party beneficiaries" to the Excess Purchase Price provision. (*See* Doc. No. 100.)[12]

On May 7, 2019, the Directors (but not Reliance) moved for judgment on the pleadings under Fed. R. Civ. P. 12(c), and Rode moved to dismiss both Reliance's and the Directors' third-party complaints under Fed. R. Civ. P. 12(b)(6). The parties filed briefing for and against each other's respective motions, and the Court entertained oral argument on June 18, 2019. (*See* Directors' Br. in Support of Judgment on the Pleadings [Doc. No. 107] ("Directors' 12(c) Br."); DOL's Br. in Opp. to Judgment on the Pleadings [Doc. No. 117] ("DOL 12(c) Opp. Br."); Directors' 12(c) Reply Br. [Doc. No. 120]; Rode's Br. in Support of Mot. to Dismiss [Doc. No. 111] ("Rode 12(b)(6) Br."); Reliance's Br. in Opp. to Mot. to Dismiss [Doc. No. 116] ("Reliance 12(b)(6) Opp. Br."); Directors' Br. in Opp. to Mot. to Dismiss [Doc. No. 118] ("Directors' 12(b)(6) Opp. Br."); Rode's 12(b)(6) Reply Br. [Doc. No. 119].)

## II. DISCUSSION

The Court will first address the Directors' motion for judgment on the pleadings, and will explain why, at this early stage of litigation, the Court cannot grant the Directors

---

[12] In their third-party complaint, the Directors also asserted an ERISA claim against Rode for "co-fiduciary breach." Reliance did not include such a claim in its third-party complaint.

judgment as a matter of law. Next, the Court will address Rode's motion to dismiss the third-party complaints, and will detail why Defendants have failed to state a claim for indemnification.

## A. The Directors' Motion for Judgment on the Pleadings

Motions for judgment on the pleadings under Fed. R. Civ. P. 12(c) are treated the same as motions to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). That is, in evaluating a motion for judgment on the pleadings, a Court must accept as true the factual allegations in the complaint, must construe all reasonable inferences from those allegations in the light most favorable to the non-moving party, and must only grant the motion if the complaint fails to state a "plausible" claim for relief. *State Farm Auto. Ins. Co. v. Merrill*, 353 F. Supp. 3d 835, 837, 841 (D. Minn. 2018); *see also Potthoff v. Morin*, 245 F.3d 710, 715 (8th Cir. 2001) ("Judgment on the pleadings is appropriate only where the moving party has clearly established that no material issue of fact remains and the moving party is entitled to judgment as a matter of law."). Moreover, because granting a Rule 12(c) motion "summarily extinguish[es] litigation at the threshold and foreclose[s] the opportunity for discovery and factual presentation," courts must treat such motions with the "greatest of care." *Comcast Cable Commc'ns, LLC v. Hourani*, 190 F. Supp. 3d 29, 32 (D.D.C. 2016); *accord* 5C Wright & Miller, Federal Practice & Procedure § 1368 (3d ed.).

### 1. The Law

As the Court noted above, ERISA is a "comprehensive [federal] statute" that "sets various uniform standards, including rules concerning . . . fiduciary responsibility, for both

pension and welfare plans." *Shaw*, 463 U.S. at 90-91. Four of ERISA's fiduciary responsibility provisions are of note here.

*First*, ERISA imposes the "twin duties" of "loyalty" and "prudence" on any person acting as a "fiduciary" for an employee retirement plan (including an ESOP). *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (citing 29 U.S.C. § 1104(a)(1)). These duties require fiduciaries to act with "diligence" and with an "eye single" to the interests of the plan's participants when making decisions about the plan, even if the fiduciary is employed by the plan's sponsor in some other capacity. *Pegram v. Herdich*, 530 U.S. 211, 224-26, 235 (2000); *see also Braden*, 588 F.3d at 598 (describing ERISA's fiduciary duties as "the highest known to law"). A person is a "plan fiduciary," and thus subject to these exacting duties, not only if they are named as such in a plan document, or if they are appointed as such by a prior plan fiduciary, but also "to the extent [they] exercise[] any discretionary authority or discretionary control respecting management of such plan or exercise[] any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i); *accord Martin*, 965 F.2d at 669. Thus, determining whether a person is acting as a "fiduciary" to a plan at any given time presents a functional inquiry; the question is not whether the person was called a "fiduciary" or "trustee" on paper, but, rather, whether the person "exercised *effective control* over the [plan's] assets" with respect to the transaction at issue. *See, e.g.*, *Martin*, 965 F.2d at 669 (finding that, although a company's accountants were not named fiduciaries of the company's ESOP, they were nonetheless fiduciaries under ERISA because "they recommended transactions, structured deals, and provided investment advice to such an extent that they exercised

effective control over the ESOP's assets"); *accord Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) ("ERISA . . . defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan . . . thus expanding the universe of persons subject to fiduciary duties [beyond traditional trust law]"). Moreover, to prevent high-ranking company employees or directors from "passing the buck to another person and then turning a blind eye," ERISA also requires persons responsible for appointing and removing plan fiduciaries (often the sponsoring company's board of directors) to "monitor the activities of their appointees" "at reasonable intervals." *Howell v. Motorola, Inc.*, 633 F.3d 572-73 (7th Cir. 2011) (citing 29 C.F.R. § 2509.75-8)); *accord Krueger v. Ameriprise Fin., Inc.*, No. 11-cv-2781 (SRN/JSM), at *17-18 (D. Minn. Nov. 20, 2012).

*Second*, ERISA supplements the duty of loyalty by outright prohibiting fiduciaries from "causing" their plans to enter into certain "insider" transactions, such as the transaction at issue here, *see* 29 U.S.C. § 1106(a), on grounds that these transactions are "presumably not at arm's length." *Lockheed Corp. v. Spink*, 517 U.S. 882, 893 (1996). However, as the Court noted above, *see supra* n.5, a fiduciary may always defend against a "prohibited transaction" charge by producing evidence that the pension plan transacted with the company insider in exchange for "adequate consideration." 29 U.S.C. § 1108(e)(1); *see also Perez v. Bruister*, 823 F.3d 250, 262-63 (5th Cir. 2016) (discussing the "affirmative defense" of "adequate consideration" in the context of an ESOP insider transaction).

*Third*, ERISA also subjects plan fiduciaries to liability if they "knowingly participate in," "enable," or "have knowledge of" a breach of fiduciary duty by a fellow

fiduciary to the plan. 29 U.S.C. § 1105(a); *see also Acosta v. Saakvitne*, 355 F. Supp. 3d 908, 923-24 (D. Hawaii 2019) (detailing the different variants of "co-fiduciary liability").

*Fourth*, and finally, ERISA imposes liability on certain *non*-fiduciaries, too, *i.e.*, any "person" who "knowingly" participates in a "breach or violation" of ERISA by "any other person." 29 U.S.C. § 1132(*l*)(1)(B); *see also Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000) (explaining the breadth of this provision). However, with respect to remedies, ERISA imposes far more limited sanctions on *non*-fiduciaries who knowingly participate in a breach of duty than on *fiduciaries* who participate in a breach of duty, or who breach a fiduciary duty themselves. *Compare Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210-215 (2002) (explaining that plaintiffs can only seek certain kinds of "non-monetary," "equitable" relief from *non*-fiduciaries, such as "injunctions," "mandamus," and (non-monetary) "restitution") *with Mertens*, 508 U.S. at 252 (noting that, by contrast, "*fiduciaries*" are "personally liable for damages ('to make good to [the] plan any losses to the plan resulting from each such breach'), for restitution ('to restore to [the] plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary'), and for 'such other equitable or remedial relief as the court may deem appropriate,' including removal of the fiduciary") (quoting 29 U.S.C. § 1109(a)).

### 2. Analysis

Here, the Directors move for judgment on the pleadings with respect to **(a)** DOL's breach of fiduciary duty claim, **(b)** DOL's prohibited transaction claim, and **(c)** the scope of DOL's proposed equitable relief. The Court will address each issue in turn.

### a. *The Breach of Fiduciary Duty Claim*

Viewing the complaint in the light most favorable to DOL, as the Court must at this stage, it appears that DOL is asserting two different breach of fiduciary duty theories here. *First*, and most broadly, DOL alleges that, because the Directors "orchestrated" the final ESOP transaction prior to their appointment of Reliance, and because the Directors knew the ESOP was paying Kuban "vastly more than fair market value" as part of that transaction, the Directors "effectively controlled" the ESOP's purchase of Kuban's stock, and thus breached the duties of prudence and loyalty they owed the ESOP *as fiduciaries*. (*See* DOL 12(c) Opp. Br. at 8-9, 13, 27-28; *accord, e.g.*, *Saakvitne*, 355 F. Supp. 3d at 920-23 (declining to dismiss individual company directors from ERISA suit for their role in orchestrating improper ESOP transaction, simply because the directors had appointed a different party to be the ESOP's fiduciary for purposes of the final transaction); *Keach v. U.S. Bank Trust Co., N.A.*, 234 F. Supp. 2d 872, 881-83 (C.D. Ill. 2002) (same, and observing that "[w]hile Defendants' invitation to look simplistically at the power to appoint as the [limit on their fiduciary obligations] is attractive, to do so would be [to] elevat[e] form over substance and [to] ignore the Court's obligation to 'look beyond' formal authority to the realities of the fiduciary relationship at issue").) *Second*, and more narrowly, DOL alleges that, even if the Directors no longer served as fiduciaries for purposes of approving the final ESOP transaction (because they had appointed Reliance to act as the ESOP's fiduciary in that capacity), as board members responsible for overseeing Reliance, the Directors also breached their general fiduciary "duty to monitor" Reliance, in the sense that they allowed Reliance to approve a transaction that the Directors knew

was harmful to the ESOP's pecuniary interests. (*See* DOL 12(c) Opp. Br. at 9, 13-17; *accord, e.g.*, *Saakvitne*, 355 F. Supp. 3d at 922-23.)

It is clear to the Court that both of DOL's theories present "plausible" ERISA fiduciary breach claims on their face, and that, to the extent the Directors have viable defenses to these claims, those defenses are based on disputed facts and inferences not suitable for resolution at this preliminary stage of litigation. (*See supra* at 9-11 (detailing disputed facts and inferences).) Indeed, DOL's case here is comparable to a variety of recent "overpriced ESOP insider transaction" cases, almost all of which have either been resolved at summary judgment or through a bench trial – *not* through a motion to dismiss or a motion for judgment on the pleadings. *See, e.g.*, *Brundle v. Wilmington Trust, N.A.*, 919 F.3d 763 (4th Cir. 2019) (affirming finding for plaintiffs after bench trial); *Perez v. Bruister*, 823 F.3d 250 (5th Cir. 2016) (affirming finding for DOL after bench trial); *Chao v. Hall Holding, Inc.*, 285 F.3d 415 (6th Cir. 2002) (affirming finding for DOL at summary judgment); *Blackwell v. Bankers Trust Co. of South Dakota*, 18-cv-141 (CWR/FKB), 2019 WL 1433769 (S.D. Miss. Mar. 29, 2019) (denying motion to dismiss); *Acosta v. Saakvitne*, 355 F. Supp. 3d 903 (D. Hawaii 2019) (denying motion to dismiss); *Acosta v. Vinoskey*, 310 F. Supp. 3d 662 (W.D. Va. 2018) (granting in part and denying in part motions for summary judgment); *Perez v. First Bankers Trust Servs., Inc.*, No. 12-cv-4450 (MAS/DEA), 2017 WL 1232527 (D.N.J. Mar. 31, 2017) (finding for DOL after bench trial); *Fish v. GreatBanc Trust Co.*, No. 09-cv-1668, 2016 WL 5923448 (N.D. Ill. Sept. 1,

2016) (finding for defendants after bench trial). The Court sees no need to break from this precedent here.[13]

The Directors advance a few other, more focused arguments in support of dismissing DOL's breach of fiduciary duty claim, too. However, the Court finds none of the Directors' arguments availing (at least at this stage of litigation).

*First*, the Directors point to an ERISA decision with relatively similar facts to those alleged in their Amended Answer, *see Fish v. GreatBanc Trust Co.*, No. 09-cv-1668, 2016 WL 5923448 (N.D. Ill. Sept. 1, 2016), and argue that, because the court in that case rejected a "duty to monitor" claim against individual director defendants, the Court should rule likewise here. (*See* Directors' 12(c) Br. at 19-20.) However, the Directors' attempts to analogize this case to *Fish* elides a critical distinction between the cases: the District Court in *Fish* only ruled in favor of the director defendants after holding a *bench trial*, where the

---

[13]     The Court acknowledges that in one "overpriced ESOP insider transaction" case cited by neither party, *Neil v. Zell*, Judge Rebecca Pallmeyer of the Northern District of Illinois dismissed a group of individual director-defendant at the motion to dismiss stage. *See* 677 F. Supp. 2d 1010 (N.D. Ill. 2009). However, the plaintiffs' allegations against the individual directors in *Zell* are readily distinguishable from DOL's allegations here.

In that case, plaintiffs argued that the board of directors should be held liable as fiduciaries to the ESOP simply because they approved the (allegedly overpriced) transaction that the independent trustee negotiated on the ESOP's behalf. But there was no allegation that those directors helped structure that transaction or "influenced [the independent trustee's] decision in any way." *Id.* at 1023. Indeed, several of the defendant directors did not even join the ESOP sponsor's board of directors until *after* the at-issue transaction was "made and finalized." *Id.* Moreover, although plaintiffs in that case also asserted a "duty to monitor" claim, they made that allegation "only in the most general terms," and without any factual enhancement. *Id.* at 1023-24.

Here, by contrast, DOL has set forth a (relatively) detailed complaint explaining what role the Directors played in orchestrating the at-issue "overpriced ESOP transaction," and how the Directors (allegedly) breached their fiduciary duties to the ESOP in so doing.

judge considered *evidence* that the director defendants acted diligently and in the best interests of the ESOP at all relevant times, not just "affirmative allegations" contained in an answer. Accordingly, at this early stage of the case, *Fish* is inapposite.

*Second*, the Directors cite a District Court's decision to grant a board of directors' motion to dismiss an ERISA "failure to monitor" claim, *see In re Dynergy, Inc., ERISA Litig.*, 309 F. Supp. 2d 861 (S.D. Tex. 2004), and argue that that case further shows why a "duty to monitor" claim must fail here. (*See* Directors' 12(c) Br. at 18-19.) However, the "duty to monitor" allegations in that case, which centered around a large corporation's responsibility for overseeing (allegedly imprudent) investment decisions made by the company's ESOP investment committee, are nothing like the fact-bound questions of "effective control" and "valuation" at issue here. Moreover, DOL's complaint alleges that the Directors *knew* that Reliance acted wrongfully when it entered into the Kuban transaction on behalf of the ESOP (because the Directors knew the ESOP was purchasing Kuban's share of the company for far more than fair market value), and that the Directors failed to "monitor" (and then stop) that wrongdoing. These allegations distinguish this case from *Dynergy* as well. *See Dynergy*, 309 F. Supp. 2d at 904 ("The Court nevertheless concludes that plaintiff has failed to state a claim against [the corporate defendants] for breach of the fiduciary duty to monitor because she has *failed to allege . . . that any of them were on notice of possible misadventure by any of their appointees*.") (emphasis added).

*Finally*, the Directors briefly argue that DOL failed to distinguish between its "duty of prudence" and "duty of loyalty" allegations in its Complaint, and that this failure provides reason to dismiss the breach of fiduciary duty claim in its entirety. (*See* Directors'

12(c) Reply Br. at 10-11.) The Directors are correct, as a general matter, that a fiduciary's "duty of loyalty" differs somewhat from their "duty of prudence." *See, e.g.*, *In re Wells Fargo ERISA 401(k) Litig.*, 331 F. Supp. 3d 868, 874-75 (D. Minn. 2018) (explaining that, while the duty of prudence is based on an "objective" reasonableness standard, the duty of loyalty focuses on "*why* the defendant acted the way he did"). However, as Magistrate Judge Brisbois of this Court recently observed, when considering an analogous argument at the motion to dismiss stage, the Eighth Circuit has often treated the duties of prudence and loyalty as "intertwined," and has thus suggested that breaches of the two duties "need not be pled separately in a Complaint in order to survive a Rule 12(b)(6) Motion to Dismiss." *Morin v. Essentia Health, Inc.*, No. 16-cv-4397 (RHK/LIB), 2017 WL 4083133, at *9 (D. Minn. Sept. 14, 2017) (denying defendants' motion to dismiss), *report and recommendation adopted*, 2017 WL 4876281 (D. Minn. Oct. 27, 2017); *accord Martin*, 965 F.2d at 670 (in an ESOP insider transaction case, similarly describing the duties of loyalty and prudence as "overlapping"). Indeed, in many of the "overpriced ESOP insider transaction cases" cited above, the court used similar (albeit not identical) analyses when reviewing "breach of the duty of loyalty" and "breach of the duty of prudence" claims. *See, e.g.*, *First Bankers Trust Servs., Inc.*, 2017 WL 1232527, at *79 (finding a breach of the duty of loyalty in large part because of the "reasons set forth" in the portion of the Court's opinion explaining why the defendant had breached its duty of prudence). As such, at this

stage of litigation, the Court declines to dismiss DOL's breach of fiduciary duty claim on this ground.[14]

### b. *The Prohibited Transaction Claim*

DOL's complaint also seeks to hold the Directors liable, as co-fiduciaries, for Reliance's breach of *its* fiduciary duty against approving "prohibited transactions." *See* 29 U.S.C. § 1106(a) (barring fiduciaries from "causing" their pension plan to enter into a prohibited inside transaction, unless the transaction was for "adequate consideration"). More specifically, DOL alleges that the Directors were fiduciaries to the ESOP at all relevant times (even after appointing Reliance as the ESOP's trustee), and that, by breaching their fiduciary duties of prudence and loyalty, the Directors "enabled" Reliance to "breach" ERISA's "prohibited transaction" provision. *Id.* § 1105(a)(2); *see also* Am. Compl. ¶ 89.[15]

The Directors argue that the Court must dismiss this claim against them, too, but solely on grounds that, "because [DOL's breach of fiduciary duty claim against them] fails as a matter of law, [DOL's prohibited transaction claim against them] must similarly follow suit." (Directors' 12(c) Reply Br. at 13.) However, because the Court declined to grant the Directors judgment on the pleadings with respect to DOL's breach of fiduciary

---

[14] However, as the case proceeds toward summary judgment and trial, the Court expects DOL to more clearly delineate the scope and nature of its breach of fiduciary duty claim, in accordance with the existing case law.

[15] DOL does not allege that the Directors themselves "caused" the ESOP to enter into the at-issue transaction (and thus directly breached 29 U.S.C. § 1106(a)), or that the Directors are liable as co-fiduciaries for "knowingly" participating in Reliance's breach of the prohibited transaction provision, *see* 29 U.S.C. §§ 1105(a)(1),(a)(3).

duty claim, the Directors' argument on the prohibited transaction claim fails, too. And, to the extent the Directors are disputing whether their conduct "enabled" Reliance to enter into a prohibited transaction, or whether the Kuban transaction was in exchange for "adequate consideration," those arguments are premature. *See, e.g.*, *Blackwell*, 2019 WL 1433769, at *4 (denying defendant's motion to dismiss prohibited transaction claim in "ESOP overpriced transaction" case, and observing that, "[i]t might be that [defendant's 'adequate consideration'] defense proves successful in this case at a later stage. At this point, however, the plaintiffs allege one thing and [the defendant] claims another. That is a fact dispute not appropriate for resolution at this time.").

### c. *DOL's Proposed Equitable Relief*

Finally, with respect to DOL's requested remedies, the Directors contend that DOL is legally barred from seeking certain kinds of monetary relief from them. (*See* Directors' 12(c) Reply Br. at 14 (describing the Complaint's request that the Directors "restore all losses [to the ESOP]," "repay all fees and costs, including legal fees, that they received from the company," and "pay for all fees and expenses related to the appointment of an independent fiduciary to distribute all recoveries made to the ESOP," as the kind of improper "monetary" relief sought by DOL).) However, this argument appears to be based on a misunderstanding of ERISA's remedial structure. As the Court explained above, *if* the Court finds that the Directors acted as a fiduciary to the ESOP with respect to the at-issue transaction, and then breached their fiduciary duties (or helped Reliance breach its fiduciary duties), DOL is entitled to seek the relief requested in its Complaint. (*See supra* at 20; *accord* 29 U.S.C. §§ 1109(a), 1132(a)(2).) But, *if* this Court were to find that the

Directors did *not* act as a fiduciary to the ESOP at the relevant time, but that the Directors nonetheless "knowingly" participated in a breach of fiduciary duty by Reliance, *then* the Court would be dutybound to curtail DOL's proposed remedies in the manner suggested by the Directors. (*Id.*) In other words, this issue, like the other issues raised in the Directors' motion, cannot be definitively resolved until further fact-finding is conducted. *Accord Zell*, 677 F. Supp. 2d at 1022 (similarly declining to resolve remedial issue in a decision on a motion to dismiss).

* * * *

For all of these reasons, the Court denies the Directors' motion for judgment on the pleadings.

### B. Rode's Motion to Dismiss the Third-Party Complaints

As the Court noted above, in evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a Court must accept as true the factual allegations in the complaint, must construe all reasonable inferences from those allegations in the light most favorable to the non-moving party, and must only grant the motion if the complaint fails to state a "plausible" claim for relief. (*See supra* at 17.) However, Rule 12(b)(6) also "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989); *see, e.g.*, *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018) (noting that courts may interpret "unambiguous" contractual language as a matter of law).

In their third-party complaints, Defendants essentially contend that, because Rode's late father (William Kuban) played such an instrumental role in the October 5, 2011 ESOP

transaction – indeed, he was the one who most directly benefited from the (allegedly improper) transaction – if they (Defendants) are held liable under ERISA, Rode must be required to cover their losses. More specially, Defendants allege that Rode has a duty to "indemnify" them "in an amount equal to any judgment for loss entered against [them] on [DOL's] claims in this action," (Reliance Third-Party Compl., Prayer for Relief; *accord* Directors' Third-Party Compl., Prayer for Relief), either because Defendants are "third-party beneficiaries" to the Excess Purchase Price provision described *supra*, or because "equity" demands such an outcome.

Contrary to Defendants' assertions, however, there is no legal or equitable basis for indemnification here. The Court accordingly grants Rode's motion to dismiss both complaints.

### 1. The Law

Indemnification is an "exceptional and limited" remedy that "requires one party to reimburse the other entirely" for their losses. *Hendrickson v. Minn. Power & Light Co.*, 104 N.W.2d 843, 847-48 (Minn. 1960). The purpose of indemnification is to protect parties who have "been held liable even though not personally at fault," or to protect parties who have explicitly contracted to receive indemnification (so long as the contract does not violate public policy). *Tolbert v. Gerber Indus., Inc.*, 255 N.W.2d 362, 366 (Minn. 1977); *accord United States v. J&D Enter. of Duluth*, 955 F. Supp. 1153, 1157 (Minn. 1997).[16]

---

[16]    "Contribution," by contrast, is an equitable remedy that focuses on "relative fault"; it is not "all-or-nothing," like indemnification. *Tolbert*, 255 N.W.2d at 367; *see also Hendrickson*, 104 N.W.2d at 847 ("Contribution requires parties to *share* the liability"

Thus, to receive indemnification under Minnesota law, "a party must show" an "express contractual relationship" or "implied legal duty" "that requires one party to reimburse the other entirely." *All Metro Glass, Inc. v. Tubelite, Inc.*, 227 F. Supp. 3d 1007, 1019 (Minn. 2016).

An "implied legal duty" to indemnify a liable party arises when "(1) the one seeking indemnity has only a *derivative or vicarious liability* for damage caused by the one sought to be charged; (2) the one seeking indemnity has incurred liability by action *at the direction, in the interest of, and in reliance upon* the one sought to be charged; or (3) the one seeking indemnity has incurred liability because of a *breach of duty owed to him* by the one sought to be charged." *Id*. at 1020 (emphasis added) (quoting *Hendrickson*, 104 N.W.2d at 848).

An "express contractual relationship" to indemnify a liable party arises "where there is an express contract between the parties containing an *explicit* undertaking to reimburse for liability of the character involved." *Id*. (emphasis added). However, a party may also be indemnified as a "third-party beneficiary" to an indemnification contract. *See* 13 Williston on Contracts § 37.1 (4th ed.) (explaining that the "third-party beneficiary doctrine" allows "an individual who is not a party to a contract [to] nonetheless enforce" the contract). Minnesota courts use two tests to determine whether a person is a "third-party beneficiary" to a contract: the "duty owed test" and the "intent to benefit test." *Hickman v. SAFECO Ins. Co.*, 695 N.W.2d 365, 369 (Minn. 2005). To prove third-party beneficiary status under the "intent to benefit test," which is the only test at issue here, "the

---

"where there is a common liability among the parties.") (emphasis added). Defendants are not seeking contribution from Rode here.

contract must express some intent by the parties to benefit the third party through contractual performance." *Dayton Dev. Co. v. Gilman Fin. Servs., Inc.*, 419 F.3d 852, 856 (8th Cir. 2005). "To ascertain the parties' intent, courts look to the surrounding circumstances at the time of the contracting, and generally require the contract to express some objective manifestation of intent to benefit a third party." *Nassar v. Chamoun*, No. A11-793, 2012 WL 426595, at *2 (Minn. Ct. App. Feb. 13, 2012) (citing *Hickman*, 695 N.W.2d at 370). "Absent ambiguity, the surrounding circumstances do not include extrinsic evidence." *Id.*

Importantly, however, in the specific context of ERISA, the Eighth Circuit has held that the statute's preemption provision bars liable fiduciaries from bringing "state common-law claims" of "contribution" and "indemnification" against other arguably liable fiduciaries, so as to share in (or shift entirely) liability. *Travelers Cas. and Sur. Co. of Am. v. IADA Servs., Inc.*, 497 F.3d 862, 867 (8th Cir. 2007). That is, the Eighth Circuit reasoned, because "ERISA is a comprehensive and reticulated statute, the product of a decade of congressional study of the Nation's private employee benefit system," and because ERISA contains no express provision allowing for co-fiduciary contribution or indemnification, "it would undermine the comprehensive federal scheme to permit an action under state law for [those remedies]." *Id.* at 865-67. Although the Eighth Circuit acknowledged that "there are certainly equitable arguments for allowing contribution among wrongdoers," the panel ultimately ruled that the question of whether to permit those kinds of common law remedies

in the ERISA context was "a matter of high policy" fit "for resolution within the *legislative*

process." *Id*. at 867 (emphasis added).[17]

A 2010 decision by then-Magistrate Judge Keyes provides further guidance on this

point. *See Christopher v. Hanson*, No. 09-cv-3703 (JNE/JJK), 2010 WL 3002889 (D.

Minn. May 24, 2010), *report and recommendation adopted*, 2010 WL 3023417 (D. Minn.

July 29, 2010). *Christopher*, like this case, centered around an allegedly overpriced ESOP

transaction. More specifically, in *Christopher*, plaintiffs alleged that a company's President

and CEO (Hanson) sold his controlling stake in his company to the company's ESOP for

"millions" more dollars than necessary, and thus both "cheated" the ESOP and "saddled

[the company] with crippling financial obligations" going forward. *Id*. at *1. In a role

reversal from this litigation, though, the *Christopher* plaintiffs sued just Hanson and his

family members (*i.e.*, the sellers), *not* the key directors/ESOP trustees who allegedly helped

Hanson facilitate this transaction. *Id*. at *2. As a result, after being sued by the ESOP,

Hanson brought a third-party complaint against those key directors, on grounds that, if he

was found liable as a breaching fiduciary under ERISA, they should have to indemnify him

(or, at the least, pay some form of contribution). Judge Keyes rejected this argument and

found that Hanson's third-party complaint was "preempted" under *Travelers*. *See id*. at *6.

---

[17]     Two additional facts are worth noting about the Eighth Circuit's decision in
*Travelers*. *First*, the Eighth Circuit reached this decision as a matter of federal common
law *and* as a matter of preemption. Therefore, in this Circuit, there is no indemnification
remedy under ERISA, whether construed as a "federal common law" remedy or as a
"state common law" remedy. *Second*, the Eighth Circuit's decision is currently the
subject of a circuit split. *See, e.g.*, *Chesemore v. Fenkell*, 829 F.3d 803, 813 (7th Cir.
2016) (describing the split, and then joining the side of the split in disagreement with the
Eighth Circuit).

Judge Keyes also examined Hanson's indemnification claim under Minnesota state law, and found that, because Hanson did not plausibly allege the existence of any of the three "implied legal duties" indicating that indemnification is appropriate, his third-party complaint could not go forward either. *See id*. at \*8-9; *see also supra* at 30 (listing the three "implied legal duties").

### 2. Analysis

Here, Defendants argue that Kuban must indemnify them, either under a theory of (1) "common-law indemnification," (2) "equitable indemnification," (3) "contractual indemnification," (4) "promissory estoppel," or (5) in the case of the Director Defendants, "ERISA co-fiduciary liability." The Court will address these claims in turn.

### a. *Common-Law and Equitable Indemnification*

As an initial matter, Defendants' claims for "common-law indemnification" and "equitable indemnification" are plainly barred under the Eighth Circuit's decision in *Travelers*, just like the indemnification claim Judge Keyes considered in *Christopher*. Moreover, even if *Travelers* was not controlling, these two indemnification claims would fail on the merits because Defendants have not articulated an "implied legal duty" that Rode (or, better put, Kuban) owed them as part of the at-issue transaction. Without pointing to one of those duties, all of which essentially require Defendants to show that they will be "held liable [for violating ERISA] even though not personally at fault," Defendants cannot

seek "equitable" or "common-law" indemnification from Rode here. *Tolbert*, 255 N.W.2d at 366.[18]

### b. *Contractual Indemnification*

Defendants' contractual indemnification claim, by contrast, does not appear to be foreclosed by *Travelers* (because "common-law indemnification" is different than "contractual indemnification"). However, this claim fails, too, for at least three reasons.

*First*, although Defendants describe the Excess Purchase Price provision of the Limitation Agreement as an "indemnification agreement" between Kuban and the ESOP, *see supra* at 11-12 (detailing the provision), the Court is not certain that that is the case, and, hence, is skeptical that Minnesota indemnification law even applies here. As explained above, the at-issue provision is found in a section of the Agreement called "Covenants of the Company," and merely provides that, should this Court decide that the ESOP paid more than "adequate consideration" for Kuban's shares in Kurt, Kuban "shall" reimburse the ESOP in the amount of the "excess purchase price," either by forgiving in part the loan he made to the ESOP to help facilitate the transaction, or by re-paying the ESOP in cash. However, the provision does not use the terms "indemnify" or "hold harmless," and is limited solely to the issue of "excess purchase price." Thus, unlike a typical indemnification agreement, which focuses on shielding a party from incurring *any* liability

---

[18]    Moreover, because Defendants are seeking indemnification from any liability they may incur as a result of DOL's suit, and because DOL's claims against Defendants are based on *Defendants' own* breaches of fiduciary duty, this does not appear to be a situation where Defendants are at risk of being "held liable [for violating ERISA] even though not personally at fault." *Tolbert*, 255 N.W.2d at 366. Thus, the Court struggles to see how "equitable" or "common law" indemnification could ever arise here.

as a result of its own illegal conduct, the allegedly "indemnifying" provision here appears far narrower in scope. (*Compare, e.g.*, *with supra* at 12 (the "Special Indemnification" agreement between Kurt and Reliance) ("[Kurt] shall indemnify and defend [Reliance] and hold [Reliance] harmless from and against any and all Adverse Consequences which may be incurred by [Reliance], arising by virtue of the applicability or legal or regulatory requirements . . . including without limitation any applicable provisions of ERISA.").) As such, although the Excess Purchase Price provision undoubtedly created a contractual obligation between Kuban and the ESOP, it is not the kind of "explicit" promise of indemnity that courts usually see in the indemnification context. *See All Metro Glass*, 227 F. Supp. 3d at 1020 (noting that an "express contractual relationship" to indemnify a liable party arises "where there is an *express contract* between the parties containing an *explicit* undertaking to reimburse for liability of the character involved") (emphasis added).

*Second*, even assuming the Excess Purchase Price provision constitutes a legally viable "indemnification agreement" between Kuban and the ESOP, there is no indication that the parties to the Limitation Agreement, *i.e.*, Kuban, Reliance, and Kurt, intended this provision to protect *Defendants* as "third-party beneficiaries."[19] The plain language of the provision states that Kuban shall reimburse "*the ESOP*" in the event that a court finds that

---

[19]    Rode fairly notes that it is doubtful that the third-party beneficiary doctrine even applies here, because Reliance and the Directors were both parties to the underlying October 5, 2011 contracts and negotiations. (*See* Rode 12(b)(6) Br. at 9; *accord* Williston on Contracts § 37.1 (explaining that the "third-party beneficiary doctrine" allows "an individual *who is not a party to a contract* [to] nonetheless enforce" the contract) (emphasis added).) For purposes of this opinion, however, the Court will assume, without deciding, that Defendants can invoke the doctrine.

the at-issue transaction was for less than "adequate consideration." And, in other provisions of the contract (or in accompanying contracts, in the case of the Directors), Defendants received explicit indemnification guarantees (with respect to ERISA liability) from Kurt, *not* Kuban. (*See supra* at 12-13.) In light of both the plain language of the provision and the accompanying contractual context, then, the only sensible interpretation of the Excess Purchase Price provision is that the provision exists to protect the ESOP, and the ESOP alone. In other words, it would *not* make sense to interpret the Excess Purchase Price provision as a sweeping promise of indemnification from Kuban to Defendants, *on top of* the explicit indemnification guarantees Kurt already provided to Defendants. *Cf. Art Goebel v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 516 (Minn. 1997) ("By entering into an agency agreement containing a clear and unambiguous indemnity clause, [the parties] expressed their intent to have the clause provide [the party's] *exclusive* right to indemnity.") (emphasis added). Accordingly, because neither the Excess Purchase Price provision nor the "surrounding circumstances" of the Limitation Agreement express an "objective manifestation of intent to benefit" Defendants through the provision, Defendants are not third-party beneficiaries to the provision. *Hickman*, 695 N.W.2d at 370 n.7.

*Third*, as a practical matter, even assuming Defendants were third-party beneficiaries to the Excess Purchase Price provision, and were thus entitled to directly seek indemnification from Rode in the amount of their losses to DOL, Defendants would almost certainly be unable to enforce the provision. That is, if either (or both) Defendants are found liable under DOL's theory of the case, and are forced to reimburse the ESOP for its

losses, that would mean that the Court determined that Defendants breached their fiduciary duties under ERISA. And, if Defendants breached their fiduciary duties under ERISA, by law, Rode could not indemnify them for losses arising out of that misconduct. (*See supra* at 12-13 (noting this law); *see also J&D Enter. of Duluth*, 955 F. Supp. at 1157 ("Indemnity is not permitted . . . where its application would contravene public policy.").) Indeed, Defendants' own indemnification agreements with Kurt contain this very limit, and thus highlight the irrationality of allowing Defendants to receive through the Excess Purchase Price provision what they could not receive through their own (specifically negotiated) indemnification agreements. (*See, e.g.*, *supra* at 12 (the "Special Indemnification" agreement between Kurt and Reliance) ("[Reliance] shall have *no right* to be indemnified to the extent prohibited by Section 410 of ERISA *for its own* gross negligence, *breach of fiduciary duty*, or willful misconduct as determined by a court of competent jurisdiction.") (emphasis added).) Of course, this is not to say that the Excess Purchase Price provision would be *per se* unenforceable were this Court to rule that the ESOP paid more than "adequate consideration" for Kuban's share of Kurt. Rather, the Court is simply observing that, no matter how one cuts it, the ESOP is the *only* party legally entitled to enforce the Excess Purchase Price provision against Kuban.

### c. *Promissory Estoppel and ERISA Co-Fiduciary Liability*

Finally, Defendants also advance claims of "promissory estoppel" and, in the case of the Director Defendants, "co-fiduciary liability" under ERISA. These claims miss the mark, too.

Defendants' promissory estoppel claim fails because the question of indemnification is governed by the October 5, 2011 contracts, and because Defendants have not pointed to any "clear or definite" promise of indemnification arising outside those contracts. *See HomeStar Prop. Sols., LLC v. Safeguard Props., Inc.*, 370 F. Supp. 3d 1020, 1028 (D. Minn. 2019) ("[B]ecause promissory estoppel is an equitable doctrine that implies a contract in law where none in fact exists . . . an express contract covering the same subject matter will preclude the doctrine's application.") (cleaned up).

The Directors' ERISA claim[20] fails because the claim appears to be a thinly disguised claim for co-fiduciary indemnification/contribution, and is thus prohibited under the Eighth Circuit's decision in *Travelers*. (*See, e.g.*, Directors' Third-Party Compl. ¶ 42 ("If the Directors breached their fiduciary liability by failing to monitor Reliance to prevent ERISA breaches, then Kuban is liable as a co-fiduciary because he knew of and enabled this failure yet did nothing to correct it."); *see also supra* n.17 (observing that *Travelers* applies both as a matter of state law preemption and as a matter of federal common law).) Moreover, even if the Directors could bring an ERISA breach of fiduciary duty claim against Rode, the claim is now barred by ERISA's six-year statute of repose. *See* 29 U.S.C. § 1113 (requiring plaintiffs to bring their ERISA breach of fiduciary duty claim either "six years after the date of the last action which constituted a part of the breach or violation,"

---

[20]     Although the Directors' third-party complaint technically assert two "claims" under ERISA – one under the remedial section of the statute, 29 U.S.C. § 1132(a)(3), and one under the substantive section of the statute, 29 U.S.C. §§ 1104-05 – the Directors are essentially just asserting a single "co-fiduciary breach of fiduciary duty" claim against Rode, and then using § 1132(a)(3) as the cause of action by which to enforce that alleged violation. Accordingly, the Court uses the singular "claim" here.

or "three years after the earliest date on which the plaintiffs had actual acknowledge of the breach or violation," whichever comes "earlier"); *accord Fulghum v. Embarq Corp.*, 785 F.3d 395, 413-16 (10th Cir. 2015) (describing this six-year limit as a "statute of repose," and noting that "statutes of repose operate to extinguish a plaintiff's cause of action whether or not the plaintiff should have discovered within that period that there was a violation or an injury").

* * * *

For all of these reasons, the Court grants Rode's motion to dismiss the third-party complaints.

## III.  ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that the Directors' Motion for Judgment on the Pleadings [Doc. No. 105] is **DENIED**, and that Rode's Motion to Dismiss the Third-Party Complaints [Doc. No. 109] is **GRANTED**.

Dated:  August 9, 2019                             **/s/ Susan Richard Nelson**
                                                     SUSAN RICHARD NELSON
                                                     United States District Judge