## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Eugene Scalia,[1] Secretary of Labor, U.S. Department of Labor, | Case No. 17-cv-4540 (SRN/ECW) |
| Plaintiff, | |
| v. | **ORDER** |
| Reliance Trust Company, Steven R. Carlsen, Paul A. Lillyblad, Kelli Watson, and Kurt Manufacturing Company, Inc., Employee Stock Ownership Plan, | |
| Defendants. | |

This matter is before the Court on Plaintiff Eugene Scalia, Secretary of Labor's (the "Secretary"), Motion to Compel Defendant Directors to Produce Documents and a Privilege Index and to Compel Compliance with Subpoena for Production of Documents Directed to Third-Party Thomas M. Hughes, Ltd. (Dkt. 143.) For the reasons set forth below, the Motion to Compel is denied.

## I.   BACKGROUND

### A.   Factual Background

The factual background in this case is largely undisputed; the Court sets forth the following allegations from the pleadings and the exhibits filed in connection with the Motion. This case involves the October 5, 2011 sale of Kurt Manufacturing Company,

---

[1]   By operation of law, Eugene Scalia is substituted *sub nom.* for former Acting Secretary of Labor Patrick Pizzella. *See* Fed. R. Civ. P. 25(d).

Inc. ("Kurt") stock (the "ESOP Transaction").  (Dkt. 46 ¶ 2 (the "Amended Complaint");

Dkt. 100 ¶ 2 ("Def. Directors' Am. Answer")).)  Kurt, a Minnesota corporation

headquartered in Minneapolis, is a manufacturer of various industrial products and

services.  (Dkt. 46 ¶ 12; Dkt. 100 ¶ 7.)  Before the ESOP Transaction, Defendant Kurt

Manufacturing Company, Inc. Employee Stock Ownership Plan ("the ESOP") owned

24% of Kurt's stock, and William G. Kuban[2] owned the remaining 76%.  (Dkt. 46 ¶¶ 63-

64; Dkt. 100 ¶ 30.)

In January 2011, Kurt explored selling the company to a third party but was

advised by Chartwell Business Valuation, LLC ("Chartwell") that likely buyers would be

private equity firms, which would find greater value in "breaking Kurt apart to sell in

pieces."  (Dkt. 46 ¶ 32; Dkt. 100 ¶ 13.)  Around March 2011, Kurt engaged with

Chartwell to discuss "the potential sale, or redemption, of all non-ESOP shareholders'

stock in the company, *i.e.*, the ESOP transaction, and about Chartwell serving as Kurt's

financial advisor in connection with the ESOP transaction."  (Dkt. 46 ¶ 31; Dkt. 100 ¶

13.)

On April 28, 2011, Chartwell presented to Kurt's Board of Directors (the "Board")

"detailed information about valuation methodologies, share value, and share pricing, and

funding for the transaction."  Chartwell recommended a 100% sale of the outstanding

shares of Kurt to the ESOP, and estimated that the equity purchase value for the Kuban

---

[2]      William G. Kuban was the former President and a director of Kurt.  (Dkt. 46 ¶ 14;
Dkt. 100 ¶ 9.)

shares was $28.7 million. (Dkt. 46 ¶ 34; Dkt. 100 ¶ 14.)[3] After Chartwell's presentation, the Defendant Directors retained Steven Potach, who was Kurt's regular outside corporate counsel, and third-party Thomas M. Hughes of Thomas M. Hughes, Ltd. ("Hughes"), who was Kurt's "corporate ERISA counsel." (Dkt. 100 ¶ 14.)

On June 3, 2011, Kurt entered into an agreement with Chartwell, which provided, among other things, that Chartwell would direct the coordination and execution of the ESOP Transaction. (Dkt. 46 ¶ 35; Dkt. 100 ¶ 15.)

On July 11, 2011, Chartwell sent the Board an email with a "final lender material packet" valuing the equity redemption price for the Kurt stock from Kuban at $39.1 million. (Dkt. 46 ¶ 37; Dkt. 100 ¶ 15.) Chartwell's $39.1 million evaluation was equivalent to $85.22 per share. (Dkt. 46 ¶ 58; Dkt. 100 ¶ 26.) Prior evaluations by Willamette Management Associates ("Willamette") valued Kurt stock between $13.71 and $33.44 per share between 1999 and 2010. (Dkt. 46 ¶¶ 25-30; Dkt. 100 ¶¶ 11-12.)

At all relevant times, Defendant Steven Carlsen was the President and a director of Kurt, Defendant Paul Lillyblad was the Vice President of Finance and a director of Kurt, and Defendant Kelli Watson was the Vice President of Human Resources and a director of Kurt. (Dkt. 46 ¶¶ 16-18; Dkt. 100 ¶ 10.)[4] Carlsen, Lillyblad, and Watson

---

[3] The Defendant Directors claim that this valuation was only "an initial estimate based on incomplete information and due diligence items had not yet been provided by Kurt." (Dkt. 100 ¶ 14.)

[4] Lillyblad's and Watson's corporate officer titles recently changed to Chief Financial Officer and Chief Administrative Officer, respectively. (Dkt. 100 ¶ 10.) The Defendant Directors remained substantially involved in communications with Chartwell

(collectively, "the Director Defendants") were trustees of the ESOP before the ESOP

Transaction.  (*See* Dkt. 167-2 (Defendant Directors resigning as trustees effective July

22, 2011).)  Upon the recommendation of Chartwell, Defendant Reliance Trust Company

("Reliance") was appointed to replace the Defendant Directors as a trustee for the ESOP.

(Dkt. 100 ¶¶ 5-6.)  On July 18, 2011, in his capacity as Kurt's President, Carlsen signed

an engagement letter with Reliance, which required Reliance to serve as the ESOP's

trustee in connection with the ESOP Transaction.  (Dkt. 46 ¶ 42; Dkt. 100 ¶ 19.)  As part

of the agreement, Reliance agreed to "assume fiduciary responsibility as a discretionary

trustee for determining, in consultation with its advisors, the prudence of the [ESOP's]

purchase, that the purchase price in the Proposed Transaction [did] not exceed 'adequate

consideration' as that term is defined [in ERISA] and that the Proposed Transaction [was]

fair to the ESOP from a financial viewpoint."  (*Id.*)  Reliance was also given "complete

and absolute discretionary authority in investigating and evaluating the Proposed [ESOP]

Transaction."  (*Id.*)

On July 22, 2011, the Defendant Directors resigned as "Trustees of the ESOP" and

"executed a Written Resolution, appointing Reliance as the Trustee of the ESOP."  (Dkt.

46 ¶ 52; Dkt. 100 ¶ 23; Dkt. 167-2.)

On the same day, Reliance hired Stout Risius Ross ("SRR") "to provide certain

financial advisory services related to the ESOP transaction, with Gray Plant Mooty as

legal counsel to Reliance."  (Dkt 46 ¶ 48; Dkt. 100 ¶ 22.)  Specifically, SRR agreed to

---

and Reliance regarding the terms of the ESOP throughout the execution of the ESOP
Transaction.  (Dkt. 46 ¶ 53; Dkt. 100 ¶ 24.)

produce "a written opinion, as of the transaction date, that the consideration to be paid by the ESOP for its shares of Company stock pursuant to the terms of the Transaction is not greater than the fair market value of such shares," and "the terms of the loan from the Company to the ESOP are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from negotiations between independent parties." (Dkt. 46 ¶ 48; Dkt. 100 ¶ 22.)

On August 19, 2011, SRR issued a report called "Analysis of Transaction Fairness for the October 5, 2011 Transaction." (Dkt. 46 ¶ 54; Dkt. 100 ¶ 25.) The report showed that the fair market value of Kurt's equity, excluding what the ESOP already owned, was "between $34.2 million and $43.1 million, with a midpoint of $39 million." (Dkt. 46 ¶ 56; Dkt. 100 ¶ 26.) In its report, "SRR identified the price to be paid by the ESOP for the stock, $39 million, or $85.22 per share." (Dkt. 46 ¶ 58; Dkt. 100 ¶ 26.)

On August 26, 2011, Reliance and SRR entered into a second agreement, in which SRR would provide a "written fairness opinion" on the ESOP purchase of Kuban's shares for an aggregate purchase price of $39 million. (Dkt. 46 ¶ 50; Dkt. 100 ¶ 22.) This opinion included whether "the fair value and present fair saleable value of the Company's assets would exceed the Company's stated liabilities; the Company should be able to pay its debts as they become absolute and mature; and the Company should not have unreasonably small capital for the business in which the Company is engaged." (*Id.*)

On October 5, 2011, the ESOP purchased all of Kuban's shares of Kurt for $85.22 per share or an aggregate purchase price of $39 million. (Dkt. 46 ¶ 2; Dkt. 100 ¶ 2.) The ESOP Transaction purchase agreement "was signed by Kuban as the selling shareholder,

Reliance as ESOP Trustee, and by Carlsen as Kurt President."  (Dkt. 46 ¶ 64; Dkt. 100 ¶ 30.)  The ESOP borrowed $20 million from Kurt and $19 million from Kuban to finance the transaction.  (Dkt. 45 ¶¶ 66-67; Dkt. 100 ¶¶ 31-32.)  As part of the ESOP Transaction, the Board "established a Stock Appreciation Rights ('SARs') plan for key officers," including the Defendant Directors.  (Dkt. 46 ¶ 70; Dkt. 100 ¶ 35.)  In addition, the Defendant Directors executed a Price Support Agreement ("PSA").  (Dkt. 46 ¶ 71; Dkt. 100 ¶ 36.)  The Secretary alleges that the purpose of the PSA was "to ensure that eligible ESOP participants and beneficiaries will receive the greater of the 'Support Price' or the fair market value of a share," after the ESOP Transaction.  (Dkt. 46 ¶ 71.)  The Defendant Directors allege that the purpose of the PSA was "to protect near-term retirees who would be impacted due to the projected share price drop as a result of increased debt resulting from the ESOP Transaction."  (Dkt. 100 ¶ 36.)  For purposes of the PSA, "Fair Market Value" was defined as "the most recent valuation of the Shares determine[d] in accordance with the terms of the ESOP with the advice of an independent appraiser."  (Dkt. 46 ¶ 72; Dkt. 100 ¶ 37.)  Kurt's board and Reliance executed the PSA at $55.29 per share.  (*Id.*)  After the ESOP Transaction, the ESOP owned 100% of all outstanding shares of Kurt stock.  (Dkt. 46 ¶ 2; Dkt. 100 ¶ 2.)

On October 28, 2011, the Board executed a Written Action terminating Reliance as the ESOP's trustee.  (Dkt. 46 ¶ 74; Dkt. 100 ¶ 38.)  The Board appointed Bremer Trust, N.A. ("Bremer") as the ongoing trustee for the ESOP.  (Dkt. 90 ¶ 22 ("Reliance Third-Party Compl.").)

### B.      Procedural Background

On October 4, 2017, the Secretary filed his initial Complaint asserting claims against Defendants under the Employee Retirement Income Security Act of 1974 "ERISA") for breach of fiduciary duty and prohibited transactions.  (Dkt. 1.)[5]

On August 20, 2018, the Secretary filed an Amended Complaint, which is now the operative complaint in this matter.  (Dkt. 46.)  Count I alleges a breach of fiduciary duty ERISA claim against Reliance and the Defendant Directors in violation of ERISA § 404 (a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A)-(B).  (Dkt. 46 ¶¶ 80-83.)  Count II alleges a "prohibited transaction" ERISA claim against Reliance and the Defendant Directors in violation of ERISA §§ 406(a)(1)(A) and (D), 29 U.S.C §§ 1106(a)(1)(A)&(D).  (*Id.* ¶¶ 84-90.)  Count III alleges an "exculpatory provision" ERISA claim in violation of ERISA § 410, 29 U.S.C. § 1100(a).  (*Id.* ¶¶ 91-94.)

The Secretary seeks the following forms of relief in the Amended Complaint: (1) that Reliance and the Defendant Directors "restore all losses caused to the ESOP as a result of their fiduciary breaches," (2) that Reliance and the Defendant Directors "disgorge all profits, fees, and costs, including legal fees that they or their agents received from Kurt, the ESOP, or any other source for all services related to the ESOP and any litigation related to their fiduciary breaches alleged herein," (3) that Reliance and the Defendant Directors be removed "from all fiduciary or service provider positions they may now have in connection with the ESOP," (4) that the Court enjoin Reliance and the

---

[5]      The Secretary is empowered to bring such an action, *see* 29 U.S.C. § 1132(a)(2) and (a)(5).

Defendant Directors "from acting as a fiduciary or service provider to any ERISA-covered plan," and (5) that the Court appoint an "independent fiduciary to distribute all recoveries made to the ESOP" and to require Reliance and the Defendant Directors to "pay for all fees and expenses related to such appointment."  (Dkt. 46 at 22.)

On or about August 14, 2019, the Secretary issued a Subpoena Duces Tecum (the "Original Subpoena") to Hughes.  (Dkt. 167 ¶ 11; Dkt. 167-3, Ex. 3.)  The Original Subpoena sought to obtain two primary categories of documents, which are set forth below.

1.   All Documents relating to the October 5, 2011 transaction whereby the ESOP acquired 100% of Kurt stock, including:

   a.  All work papers, notes and other Documents;

   b.  All Communications, emails correspondence, memoranda, minutes, notes and recordings of meetings, both internally and between and amongst any service provider to Kurt or the Kurt ESOP; and

   c.  All Documents on which you relied on in providing services.

2.   All Documents relating to Hughes' September 6, 2011 email to the members of the Kurt Board of Directors informing them, "The fact that the directors have been involved in discussions that reflected current significantly higher per share valuations while they were redeeming out people at the $33.44 per share last ESOP value adds greater risk to the directors," including:

   a.  All work papers, notes and other Documents;

      b.  All Communications, emails correspondence, memoranda, minutes,

          notes and recordings of meetings, both internally and between and

          amongst any service provider to Kurt ESOP; and

      c.  All Documents on which you relied on in providing services.

(Dkt. 167-3, Ex. 3 at 9-10.)

On August 26, 2019, Hughes responded via letter stating his intention to object to the Original Subpoena under the attorney-client privilege.  (Dkt. 167 ¶ 13; Dkt. 167-4, Ex. 4 ("August 26 Letter").)  On August 29, 2019, Hughes formally objected to the Original Subpoena.  (Dkt. 168-1, Ex. 1.)

On September 5, 2019, the Secretary issued an Amended Subpoena to Hughes. (Dkt. 148-9, Ex. I at 3-12 ("First Amended Subpoena").)  The First Amended Subpoena sought to obtain nearly identical documents as the Original Subpoena.  (*Compare* Dkt. 167-3, Ex. 3, *with* Dkt. 148-9, Ex. I.)  On September 16, 2019, Hughes objected to the First Amended Subpoena.  (Dkt. 168-2, Ex. 2 ("September 16 Letter").)  On September 23, 2019, Hughes served Amended Objections to the First Amended Subpoena on the grounds that information sought by the Secretary included protected information under the attorney-client privilege.  (Dkt. 168-3 at 2.)  Among other things, Hughes indicated that he was preparing a privilege log, which had been delayed due to a high volume of privileged documents sought by the First Amended Subpoena.  (*Id.*)  On November 4, 2019, Hughes produced his privilege log and also supplemented his document production to the Secretary.  (Dkt. 168-4, Ex. 4 ("November 4 Letter").)

On December 16, 2019, the Secretary filed a Motion to Compel Defendant Directors to Produce Documents and a Privilege Index and to Compel Compliance with Subpoena for Production of Documents Directed to Third-Party Thomas M. Hughes, Ltd. (Dkt. 143.)  In its motion, the Secretary asks this Court to order the following: (1) Defendant Directors to produce unredacted copies of "Redacted Exhibit A"[6]; (2) Defendant Directors to produce a privilege index; and (3) Hughes to produce unredacted versions of Redacted Exhibit A, documents related to Redacted Exhibit A, and to update its privilege index.  (Dkt. 144 at 1.)

On December 20, 2019, the Secretary and Defendant Directors filed a stipulation to extend the deadline for Director Defendants to file their response to the Secretary's Motion to Compel (Dkt. 143).  (Dkt. 150.)  On December 1, 2017, the Court ordered Defendant Directors to respond to the Motion by January 7, 2019.  (Dkt. 152.)

On December 27, 2019, the Secretary and Hughes filed a stipulation to extend the extension of the deadline for Hughes to file his response to the Secretary's Motion to Compel (Dkt. 143).  (Dkt. 154.)  On December 30, 2017, the Court ordered Hughes to respond to the Motion by January 7, 2019.  (Dkt. 157.)

The Director Defendants filed their opposition on January 7, 2020, along with supporting materials.  (Dkts. 159, 160, 161, 162.)  With their opposition, they filed representative documents for *in camera* review as Exhibits A-F attached to the

---

[6]     "Redacted Exhibit A" is a compilation of the redacted documents produced by the Defendant Directors, which was filed as Docket No. 148-1.  Because certain representative documents were filed for *in camera* review as "Exhibit A" (Dkt. 162-1), the Court refers to the compilation filed at Docket No. 148-1 as "Redacted Exhibit A."

Declaration of Maria P. Brekke ("Brekke Declaration").  (*See* Dkt. 161 ¶¶ 1-4; Dkt. 162

(Exhibits A-F).)  Exhibits A-E consist of documents selected by the Defendant Directors

and Exhibit F consists of documents identified by the Secretary from Docket Entry No.

148-1, which contains all the documents the Secretary seeks to have produced in

unredacted form.[7]  (Dkt. 161 ¶¶ 1-4.)  Hughes also filed its opposition and supporting

materials on January 7, 2020.  (Dkts. 166, 167, 168.)

On January 21, 2020, the Court held a hearing on the Secretary's motion to

compel, at which counsel presented their arguments.  (Dkt. 173.)  Because the Secretary

cited caselaw from the Fifth Circuit at the hearing that was not mentioned in his briefing,

the Court gave the Defendant Directors and Hughes until January 28, 2020 to file an

optional short letter on CM-EFC with additional authority.  (*Id.*)  On January 27, 2020,

Defendant Directors filed supplemental authority.  (Dkt. 179.)  Shortly thereafter, Hughes

joined in the letter filed by Defendant Directors.  (Dkt. 180.)

## II.    LEGAL STANDARD

### A.    Scope of Discovery

Federal Rule of Civil Procedure 26 sets forth the scope of discovery in general:

Parties may obtain discovery regarding any nonprivileged matter that is
relevant to any party's claim or defense and proportional to the needs of the
case, considering the importance of the issues at stake in the action, the
amount in controversy, the parties' relative access to relevant information,
the parties' resources, the importance of the discovery in resolving the issues,
and whether the burden or expense of the proposed discovery outweighs its
likely benefit.

---

[7]    The Secretary selected 20 documents, three of which the Defendant Directors
conceded should be produced in unredacted form, and then did so.  (Dkt. 161 ¶ 3.)

Fed. R. Civ. P. 26(b)(1).

Federal Rule of Civil Procedure 45 permits a party to request the production of documents, electronically stored information, or tangible things from the responding person.  Fed. R. Civ. P. 45(a)(1)(D).  When a non-party does not comply with an otherwise valid subpoena, "the serving party may move the court . . . for an order compelling production or inspection."  Fed. R. Civ. P. 45(d)(2)(B)(i).  The serving party must avoid imposing an undue burden or expense, and the Court must enforce this duty. Fed. R. Civ. P. Rule 45(d)(1).

**B.    Attorney-Client Privilege**

The attorney-client privilege protects disclosure of confidential communications between a client and attorney made for the purposes of obtaining legal advice or legal services.  *See Upjohn v. United States*, 449 U.S. 383, 394-95 (1981); *see also United States v. Yielding*, 657 F.3d 688, 707 (8th Cir. 2011).  The party asserting the attorney-client privilege bears the burden of establishing the documents at issue meet the requirements of the privilege.  *See Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 609 (8th Cir. 1978) (en banc); *Triple Five of Minnesota, Inc. v. Simon*, 212 F.R.D. 523, 528 (D. Minn. 2002).  "The party asserting the attorney-client privilege cannot rest on conclusory arguments in their memorandum of law in support of their invocation of the attorney-client privilege, but instead must rely on competent evidence, such as the explanatory affidavit from counsel setting forth facts under oath establishing the privileged nature of a communication."  *Krueger v. Ameriprise Fin., Inc., LLC*, No. CV

11-2781 (SRN/JSM), 2014 WL 12597432, at *10 (D. Minn. May 7, 2014) (citing *Triple Five of Minnesota, Inc.*, 212 F.R.D. at 528).  The attorney-client privilege does not protect communications where the attorney is acting as a business advisor.  *United States v. Spencer*, 700 F.3d 317, 320 (8th Cir. 2012).

"[P]reliminary drafts of contracts are generally protected by attorney-client privilege, since preliminary drafts may reflect not only client confidences, but also the legal advice and opinions of attorneys, all of which is protected by the attorney-client privilege."  *Krueger*, 2014 WL 12597432, at *10 (cleaned up).  "However, the premise for this protection is that the draft reflects legal advice as to the drafting of the agreement, as opposed to simple editorial changes."  *Id.*

## C.    Fiduciary Exception

Courts have found an exception to attorney-client privilege when a trustee obtains legal advice related to the exercise of fiduciary duties.  *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 165 (2011).  "In such cases, courts have held, the trustee cannot withhold attorney-client communications from the beneficiary of the trust."  *Id.*  "Under [the fiduciary] exception, which courts have applied in the context of common-law trusts, a trustee who obtains legal advice related to the execution of fiduciary obligations is precluded from asserting the attorney-client privilege against the beneficiaries of the trust."  *Id.* at 167.  This exception has two possible justifications: (1) under the theory that the fiduciary client has a duty to disclose; or (2) under the rationale that the fiduciary client is not the "real client" but rather a representative of the beneficiaries' interests.  *Carr v. Anheuser-Busch Cos.*, 791 F. Supp. 2d 672, 675 (E.D.

Mo. 2011), *aff'd*, 495 F. App'x 757, 767-68 (8th Cir. 2012).  The analysis for the fiduciary exception is the same for work product protection.  *Id.* at 675.  The content and context of each communication is examined to determine if the fiduciary exception applies.  *Id.*; *see also Krueger*, 2014 WL 12597432, at *14-29 (analyzing several communications to determine whether each specific communication fell within the fiduciary exception during an *in camera* review).

To identify the "real client" for purposes of applying the fiduciary exception, the Supreme Court in *Jicarilla Apache Nation* looked at the following factors: (1) "whether the advice was bought by the trust corpus;" (2) "whether the trustee had reason to seek advice in a personal rather than a fiduciary capacity;" and (3) "whether the advice could have been intended for any purpose other than to benefit the trust."  564 U.S. at 172 (citing *Riggs Nat. Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709, 711-12 (Del. Ch. 1976)); *see also Solis v. Principal Financial Group, Inc.*, No. 4:10-MC-00045-TJS, 2011 WL 13290335, at *1 (S.D. Iowa Sept. 6, 2011), *R&R adopted*, No. 4:10-MC-00045-TJS, 2011 WL 13290334 (S.D. Iowa Oct. 31, 2011) (summarizing the fiduciary exception test as "if the context and content show that the purpose of the communication was to help the trustee fulfill a fiduciary duty for the benefit of the beneficiaries, it falls under the fiduciary exception.  Conversely, if the context and the content show that the purpose of the communication was to help the trustee perform a non-fiduciary function for its own benefit, then the attorney-client privilege should remain.").

A number of circuit courts of appeals have applied the fiduciary exception in the context of ERISA fiduciaries.[8]  While the Eighth Circuit has yet to expressly adopt the fiduciary exception in the ERISA context, it has considered its application in an ERISA case, *see Carr*, 495 F. App'x at 767-68, and several courts in this District have applied the fiduciary exception in the ERISA context, *see Christoff v. Unum Life Ins. Co. of Am.*, 2018 WL 1327112 (D. Minn. March 15, 2018); *see also Krueger*, 2014 WL 12597432. "[I]n the ERISA context, the fiduciary exception provides that an employer acting in the capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan beneficiaries on matters of plan administration." *Mett*, 178 F.3d at 1063 (cleaned up).  "The employer's ability to invoke the attorney-client privilege to resist disclosure sought by plan beneficiaries turns on whether or not the communication concerned a matter as to which the employer owed a fiduciary obligation to the beneficiaries." *In re Long Island Lighting*, 129 F.3d at 272.  In addition, "when the same lawyer gives advice to the employer (i) as employer on matters that are non-fiduciary under ERISA, and (ii) as plan fiduciary, the privileged consultation on non-fiduciary matters does not defeat the fiduciary exception that allows beneficiaries to discover the otherwise privileged communications on fiduciary matters." *Id.* at 272.

The fundamental question for whether the fiduciary exception applies is whether the communication is on matters of plan administration.  *See Carr*, 791 F. Supp. at 675

---

[8]     *In re Long Island Lighting Co.*, 129 F.3d 268, 272 (2d Cir. 1997); *Solis v. Food Emplrs. Labor Relations Ass'n*, 644 F.3d 221, 226 (4th Cir. 2011); *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 645 (5th Cir. 1992); *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 787-88 (7th Cir. 2005); *United States v. Mett*, 172 F.3d 1058, 1063 (9th Cir. 1999).

(quoting *Mett*, 178 F.3d at 1064 ) ("The fiduciary exception applies only to communications that involve plan administration."); *see also Christoff*, 2018 WL 1327112 at *3 ("Courts applying the [fiduciary] exception in ERISA cases attempt to differentiate between situations in which an ERISA fiduciary obtains legal advice about matters of plan administration, which must be disclosed, and those where the fiduciary seeks advice for non-fiduciary matters, which remain privileged.").

"Drawing the line between matters of plan administration (which are not protected from disclosure) and communications involving legal advice on non-fiduciary matters (which remain protected) requires 'a fact-specific inquiry, examining both the content and context of the specific communication.'" *Christoff*, 2018 WL 1327112 at *3 (quoting *Smith v. Jefferson Pilot Fin. Ins. Co.*, 245 F.R.D. 45, 48 (D. Mass. 2007)). "Fiduciary functions include matters of plan management and administration, such as discretionary decisions regarding investment or liquidation of plan assets, communications to plan beneficiaries, and plan benefits claim and review . . . ." *Tatum v. R.J. Reynolds Tobacco Co.*, 247 F.R.D. 488, 496 (M.D.N.C. 2008) (internal citations omitted); *see also Krueger*, 2014 WL 12597432, at *11.

One type of communication which does not fall within the fiduciary exception is when the fiduciary acts in a manner "analogous to the settlor of a trust." *Krueger*, 2014 WL 12597432, at *11 (quoting *Schultz v. Windstream Commc'ns, Inc.*, 600 F.3d 948, 951 (8th Cir. 2010)).  Examples of settlor functions include adopting, modifying, or terminating a plan. *Id.*; *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999) ("ERISA's fiduciary duty requirement simply is not implicated where [an

employer], acting as the Plan's settlor, makes a decision regarding the form or structure

of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how

such benefits are calculated."); *Anderson v. Resolution Trust Corp.*, 66 F.3d 956, 960 (8th

Cir. 1995) ("An employer's decision to amend . . . an employee benefit plan is

unconstrained by the fiduciary duties that ERISA imposes on plan administration.").

Another communication which does not fall within the fiduciary exception is

referred to as the "liability exception." *Krueger*, 2014 WL 12597432, at *12. "The

liability exception 'recognizes that a fiduciary who seeks the advice of counsel for its

own personal defense in anticipation of adversarial proceedings against its beneficiaries

retains the attorney-client privilege because, in such situations, the beneficiaries are

clearly not the 'real' client.'" *Hill v. State Street Corp.*, Civ. No. 09-10750-DJC, 2013

WL 6909524, at *3 (D. Mass. Dec. 30, 2013) (quoting *Cottillion v. United Refining Co.*,

279 F.R.D. 290, 301 (W.D. Pa. 2011)). "[T]he key factor driving the Court's analysis of

the application of the liability exception to the fiduciary exception, after taking into

account the context and contents of the communication, is whether and 'when the

interests of the ERISA plan fiduciary and the plan beneficiaries have diverged

sufficiently such that the fiduciary . . . [is acting] in its own interest to defend itself

against the plan beneficiaries . . . .'" *Krueger*, 2014 WL 12597432, at *13 (quoting

*Tatum*, 247 F.R.D. at 497).

## III.   <u>DISCUSSION</u>

The Secretary makes several arguments in support of his Motion to Compel.  First,

he contends that because the ESOP was a minority shareholder of Kurt at the time of the

ESOP Transaction, the ESOP participants are privy to Hughes' legal advice.  (Dkt. 144 at 5, 7.)  Second, the Secretary contends that the fiduciary exception applies to the communications at issue, that no exclusions to the fiduciary exception apply, and that the work product doctrine does not apply to the communications at issue.  (*Id.* at 7-13.)  Finally, the Secretary also argues that the Defendant Directors should be required to produce unredacted versions of Redacted Exhibit A because they had not produced a privilege index as of the date of the Motion.  (*Id.* at 13-14.)  The Secretary also contends that Hughes should produce unredacted versions of Redacted Exhibit A, as well as related documents to Redacted Exhibit A, and should update its privilege index (*id.* at 14), but did not make any separate argument as to Hughes in his brief other than to note that "Hughes did not produce a single redacted version of the documents it asserted a privilege over, the Secretary cannot tell if the disputed documents are the same as [Redacted] Exhibit A" (*id.* at 3).

The Defendant Directors respond that Hughes was corporate counsel for Kurt, not the ESOP, and that there is no indication the ESOP was the "real client" of Hughes.  (Dkt. 159 at 5-6.)  They also contend that the communications do not fall within the scope of the fiduciary exception because none of the Defendant Directors were trustees of the ESOP at the time of the communications.  (*Id.* at 7.)  The Director Defendants also contend that even if the Court found the fiduciary exception applies to non-trustees, the communications do not contain advice about fiduciary functions, but rather contain routine legal advice from Hughes, as corporate counsel, to Kurt, involve settlor functions, or involve advice as to the Defendant Directors' liability.  (*Id.* at 7-15.)  They also

contend that they produced a privilege log that moots the portion of the motion seeking an order compelling them to produce such a log.  (Dkt. 159 at 4 n.2.)

Hughes argues that the communications contain advice to Kurt relating to the ESOP Transaction and its effect on Kurt and that the communications do not relate to matters of plan administration or discretionary decisions.[9]  (Dkt. 166 at 9-15.)  Hughes also contends that the subpoena is unduly burdensome because it is duplicative of discovery sought from the Defendant Directors, is overly broad, and seeks irrelevant documents, and notes that Hughes is required by the Minnesota Rules of Professional Conduct to protect Kurt's confidential information.  (*Id.* at 15-21.)  Finally, Hughes contends that the Secretary has not asserted any objections to Hughes' privilege log.  (*Id.* at 8 n.5.)

The Court considers the parties' arguments below.

## A.    Privilege Logs

The Court first addresses the privilege logs.  As discussed above, Hughes served a privilege log before the Motion was filed and the Director Defendants served a privilege log after the Motion was filed and before filing their opposition.  At the January 21, 2020 hearing, the Court instructed the parties to meet and confer with respect to the sufficiency of the Defendant Directors' and Hughes' privilege logs and directed the Secretary to file a new motion relating to those logs if necessary.  The Secretary has not sought any

---

[9]     Hughes also contends that the Secretary did not challenge the applicability of the attorney-client privilege to the communications, but rather focused on whether the fiduciary exception applies.  (Dkt. 166 at 8.)

subsequent relief with respect to the privilege logs, nor did the Secretary identify any

specific deficiency with respect to Hughes' pre-hearing log in his brief or at the hearing

or any specific deficiency with respect to the Defendant Directors' log at the hearing.

Accordingly, the Court denies the motion as moot insofar as it seeks relief with respect to

the Defendant Directors' and Hughes' privilege logs.[10]

**B.      The ESOP as Kurt's Minority Shareholder**

The Court next considers the Secretary's argument that the ESOP's participants,

and the Secretary, when acting for the benefit of those participants, are privy to Hughes'

legal advice because Hughes was acting as the ERISA attorney for Kurt, and the ESOP

was a shareholder of Kurt.[11]   (Dkt. 144 at 7.)   The Secretary argues, "As an owner of

Kurt, the Plan participants are privy to the legal advice from Hughes, who 'was advising

Kurt with respect to the ESOP' and 'only counseled on ESOP matters.'"   (Dkt. 144 at 7

(quoting Dkt. 148-15, Ex. O at 5:16-18; 7:22-24).)   At the hearing, the Secretary raised

for the first time the Fifth Circuit cases of *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th

---

[10]      The Secretary also maintained that the Defendant Directors and Hughes have
failed to meet their burden of establishing that the attorney-client privilege and work-
product protection relate to the unredacted documents at issue because the Director
Defendants had not produced a privilege log when the Motion was filed.   (Dkt. 144 at 13-
14.)   The Defendant Directors produced a privilege log after the Motion was filed, and
the Secretary has not challenged any assertion of privilege in that log—only whether the
documents are subject to the fiduciary exception.   Moreover, based on the Court's review
of the representative documents, the Court concludes that they constitute confidential
communications between a client (Kurt) and an attorney (Hughes) made for the purposes
of obtaining legal advice or legal services.   *See Upjohn*, 449 U.S. at 394-95.

[11]      There does not appear to be a dispute that the Secretary has standing to assert the
fiduciary exception on behalf of the ESOP.   (*See* Dkt. 144 at 6-7.)

Cir. 1970), and *In re Occidental Petroleum Corp.*, 217 F.3d 293 (5th Cir. 2000), in support of this argument.  The Secretary argues that documents at issue should be provided without redactions because they include "Plan-related communications paid for and provided for the benefit of the ESOP as an owner of Kurt."  (*Id.*)

In response, the Defendant Directors contend that Hughes was paid by Kurt, not by the ESOP, and therefore the ESOP's beneficiaries were not the "real clients" receiving advice.  (Dkt. 159 at 6 (citing *Jicarilla Apache Nation*, 564 U.S. at 172).)  The Defendant Directors also contend that *Garner* and *In re Occidental Petroleum* are not binding on this Court and that the Secretary has not shown good cause to preclude invocation of the attorney-client privilege even if the Court applied those decisions in this case.

The Court first considers which entity was the "real client" of Hughes at the time of the communications at issue.  All of the communications at issue occurred after the Director Defendants resigned as trustees in July 2011.  (*See* Dkt. 148-1, Ex. A (redacted communications at issue).)  Carlson submitted an affidavit representing, "Thomas M. Hughes at all times acted as corporate ESOP counsel for Kurt, not counsel for the ESOP plan or its trustees.  At all times his fees were paid by Kurt Manufacturing Company." (Dkt. 160 ¶ 2.)  There is nothing in the record suggesting Hughes' services were paid for by the ESOP or Reliance Trust (the ESOP's trustee at the time of the communications). The undisputed evidence that Kurt paid Hughes' fees is a "strong indication" that the real client was Kurt—not the ESOP—and is a "significant factor" in determining who ought to have access to the legal advice.  *See Jicarilla Apache Nation*, 564 U.S. at 179 (quoting *Riggs Nat. Bank of Washington, D.C.*, 355 A.2d at 712).  Further, given that the Director

21

Defendants were not trustees of the ESOP at the time of the communications at issue, and

based on the Court's review of the representative communications as discussed in

Sections III.C.3-8, the Court finds that the communications were for the benefit of Kurt,

not the ESOP.  The Court therefore concludes that Kurt was the "real client" of Hughes.

Having concluded that Kurt was the "real client" of Hughes, the Court considers

the Secretary's argument, based on *Garner* and *In re Occidental Petroleum*, that the

ESOP and Secretary are entitled to the communications simply because the ESOP was a

shareholder of Kurt (24%) when the communications occurred.  In *Garner*, the Fifth

Circuit outlined the scope of the limited attorney-corporate client privilege as follows:

> The attorney-client privilege still has viability for the corporate client.  The
> corporation is not barred from asserting it merely because those demanding
> information enjoy the status of stockholders.  But where the corporation is in
> suit against its stockholders on charges of acting inimically to stockholder
> interests, protection of those interests as well as those of the corporation and
> of the public require that the availability of the privilege be subject to the
> right of the stockholders to show cause why it should not be invoked in the
> particular instance.

*Garner*, 430 F.2d at 1103-04.  Then, in *In re Occidental Petroleum*, the Fifth Circuit

applied *Garner*'s "good cause" analysis to employee stock ownership plan beneficiaries.

217 F.3d at 297-98.

This Court is not bound by the decisions of the Fifth Circuit.  Further, as the

Defendant Directors point out, at least one court in this District has questioned *Garner*'s

persuasiveness and viability in view of subsequent Supreme Court precedent.  (*See* Dkt.

179 (citing *Opus Corp. v. Int'l Bus. Machines Corp.*, 956 F. Supp. 1503 (D. Minn.

1996)).)  In *Opus*, the court stated, "According to our research . . . neither the blanket

assertion of a 'fiduciary exception,' . . . nor the more qualified treatment that is commended by *Garner*, has been endorsed by the Minnesota Supreme Court, by this Court, or by our Court of Appeals."  956 F. Supp. at 1509 n.9 (cleaned up).  The *Opus* court went on to note that "the rule espoused in *Garner* may no longer reflect viable authority in view of more recent holdings by the United States Supreme Court, which implicate the attorney-client privilege."  *Id.*  The Court recognizes that the Fifth Circuit applied the principles of *Garner* in the ERISA context in the *In re Occidental Petroleum* case after the *Opus* court questioned *Garner*'s viability.  However, in the absence of any court in the Eighth Circuit applying *Garner*, the Court declines to apply *Garner*'s holding regarding stock ownership in this instance.[12]

## C.    Application of the Fiduciary Exception

The parties make a number of arguments as to whether the fiduciary exception applies to the documents in Redacted Exhibit A and identified documents for *in camera* review to assist the Court in its decision, which were submitted as Exhibits A-F to the Brekke Declaration.  The parties' arguments and the Court's findings follow.

### 1.    Summary of the Parties' Fiduciary Exception Arguments

The Secretary argues that the fiduciary exception to the attorney-client privilege applies to the documents related to the ESOP Transaction because they involve plan management, including investing ESOP assets by purchasing the remaining 76% of Kurt

---

[12]    Based on the Court's review of the representative documents as described in Section III.C.3-8, even if the Court applied *Garner*, it would not find good cause to preclude invocation of the attorney-client privilege for the communications at issue.

stock. (Dkt. 144 at 9.) The Secretary also contends that none of the exclusions to the fiduciary exception apply. (*Id.* at 10-11.)[13] Therefore, the Secretary argues he is "entitled to all documents and communications between and among the Defendant Directors and Hughes relating to ESOP administration, the Kurt ESOP transaction, and all other actions to which ERISA's duties attach."[14] (*Id.* at 10.)

In response, the Defendant Directors argue that the fiduciary exception does not apply to the communications between Hughes and the Director Defendants because Hughes was corporate counsel to Kurt, not counsel for the ESOP, and the communications therefore contained legal advice to Kurt (even if related to the ESOP). (Dkt. 159 at 5-6.) They further argue that because Kurt was the "real client"—not the ESOP, the fiduciary exception is not implicated by the communications. (*Id.* at 6-7 & n.3.) The Defendant Directors also contend that the fiduciary exception does not apply because the Director Defendants were not trustees of the ESOP at the time of the

---

[13]    The Secretary argues that the first exclusion to the fiduciary exception, communications involving non-fiduciary functions, does not apply because "Hughes was advising Kurt with respect to the ESOP," Hughes was "corporate ESOP counsel," and "Hughes only counseled on ESOP matters." (Dkt. 144 at 11 (quoting Dkt. 148-15, Ex. O at 5:16-18; 6:20-24; 7:22-24).) As to the second and third exclusions, the Secretary asserts neither exclusion applies to this case because it does not involve benefit claims by participants. (Dkt. 144 at 11.)

[14]    The Secretary claimed the Defendant Directors and Hughes have improperly objected based on work-product protection because Hughes' legal advice concerns the ESOP Transaction, not litigation. (*Id.* at 11-12.) Hughes' privilege log does not appear to withhold communications on work product grounds. (*See* Dkt. 168-4, Ex. 4.) The Director Defendants produced a privilege log after the Motion was filed, and the Secretary did not bring a subsequent motion with respect to those logs. Thus, it is unclear to the Court to which work product objections the Secretary is referring or if there were in fact any communications withheld on work product grounds.

communications and the fiduciary exception primarily applies to communications with plan trustees.  (*Id.* at 7.)  According to the Defendant Directors, even if the Court finds that the fiduciary exception could apply to communications with non-trustees, the redacted communications at issue are privileged and do not fall within the scope of the fiduciary exception "because they do not contain advice about fiduciary functions."  (*Id.* at 7.)  The Director Defendants submitted representative documents for *in camera* review.  (*See* Dkt. 161 ¶¶ 1-4; Dkt. 162 (Exhibits A-F).)  Exhibits A-E consist of documents selected by the Defendant Directors and Exhibit F consists of documents identified by the Secretary from Redacted Exhibit A, which contains all the documents the Secretary seeks to have produced in unredacted form.[15]  (Dkt. 161 ¶¶ 1-4.)

Hughes joins the Defendant Directors arguing that communications with Kurt relating to the ESOP Transaction are not subject to the fiduciary exception.  (Dkt. 166 at 1 & n.1, 11.)  Hughes asserts that he "communicated with Kurt regarding the possible impacts of the [ESOP Transaction] on Kurt's business and did not communicate with Kurt regarding its fiduciary obligations, if any, relating to the ESOP."  (*Id.* at 11; Dkt. 167 ¶ 6.)  Hughes also argues that he was engaged by Kurt as the ESOP plan sponsor, that a plan sponsor is not a fiduciary to an employee benefits plan as defined in 29 U.S.C. § 1002(16)(B), and that he did not provide any advice to Kurt pursuant to its role as a plan administrator.  (Dkt. 166 at 12-13.)  Thus, Hughes contends that any argument

---

[15]    The Secretary selected 20 documents, three of which the Defendant Directors conceded should be produced in unredacted form, and did so.  (Dkt. 161 ¶ 3.)

asserting that the fiduciary exception applies by virtue of Kurt's status as plan sponsor or administrator should be rejected.  (*Id.* at 13.)  With respect to the Secretary's argument that the ESOP's investment through the purchase of Kurt's outstanding stock constitutes a discretionary decision, Hughes argues that the Secretary has not provided any authority to support such a "broad application of the fiduciary exception."  (*Id.* at 14.)  Hughes contends that such a broad application would undermine the attorney-client privilege and contradict the general rule that "hard cases should be resolved in favor of the privilege."  (*Id.* at 14 (quoting *Moss v. Unum Life Ins. Co.*, 495 F. App'x 583, 596 (6th Cir. 2012)).)  Finally, Hughes argues that the communications at issue are privileged because they concern settlor functions, not fiduciary functions.  (Dkt. 166 at 14.)[16]

### 2.    Whether the Director Defendants' Non-Trustee Status Controls

The Court first considers the Director Defendants' argument that the fiduciary exception should not apply to the communications at issue because the Director Directors were not trustees of the ESOP when the communications occurred.  Although the Director Defendants correctly note that the majority of cases involving the fiduciary exception do so in the context of communications with a trustee—which the Defendant Directors were not at the relevant time, they concede that at least one court has applied the fiduciary exception to corporate officers who were not trustees.  (Dkt. 159 at 7 (citing *Solis*, 2011 WL 13290335, at *3-5).)  In *Solis*, after a lengthy discussion of the history

---

[16]    Like the Defendant Directors, Hughes notes that communications pertaining to amendments to the ESOP and selecting a new trustee for the ESOP constitute settlor functions not subject to the fiduciary exception.  (Dkt. 166 at 15.)

and the purpose of the fiduciary exception, 2011 WL 13290335, at *1-6, the court

summarized the "modern rules as follows":

> if the context and content show that the purpose of the communication was
> to help the trustee fulfill a fiduciary duty for the benefit of the beneficiaries,
> it falls under the fiduciary exception.  Conversely, if the context and the
> content show that the purpose of the communication was to help the trustee
> perform a non-fiduciary function for its own benefit, then the attorney-client
> privilege should remain.  In the end, the outcome of an individual case
> involves the balancing of the competing interests to determine the purpose
> of the communication and particularly who it will benefit.  As the interests
> are balanced, the strong fiduciary duty established by the ERISA must be
> maintained.

*Id.* at *6.  The *Solis* court then applied these rules to documents selected for *in camera*

review.  *Id.* at *6-9.

The Court finds the approach taken in *Solis* to be appropriate for this Motion.

Thus, rather than relying solely on the fact that the Defendant Directors were not trustees

at the time of the communications, the Court analyzes the representative documents

submitted for *in camera* review to determine whether each communication's context and

content show that the purpose of the communication was to help Kurt fulfill a fiduciary

duty for the benefit of the ESOP or help Kurt perform a non-fiduciary function for its

own benefit.  *See id.* at *6.  The Court also considers the guidance in *Krueger* that when

employers adopt, modify, or terminate plans, including making decisions regarding the

form or structure of a plan, such as who is entitled to receive plan benefits and in what

amounts, or how such benefits are calculated, they are acting in a manner analogous to

the settlors of a trust, and thus do not implicate the fiduciary exception.  2014 WL

12597432, at *11.

27

The Court's analysis as to Exhibits A-F to the Brekke Declaration follows.

### 3.      Exhibit A

The Defendant Directors characterize the documents in Exhibit A to the Brekke Declaration as communications involving general and routine advice of corporate counsel to the directors of the corporation.  (Dkt. 161 ¶ 2.a; *see* Dkt. 162-1.)  The Director Defendants contend that these communications regarding general corporate functions are only tangentially related to the administration of the ESOP, and they should remain protected on that basis.  (Dkt. 159 at 9.)  Exhibit A consists of two email chains between Hughes, Kurt's general corporate counsel Steve Potach, and the Director Defendants involving requests for information in connection with drafting and/or revising documents relating to the ESOP Transactions and reflecting confidential communications between Hughes and Kurt regarding the same.  Based on the emails' content and the context, they do not appear to be for purposes of helping Kurt or the Director Defendants fulfill any fiduciary duty for the benefit of the ESOP and do not implicate administration of the ESOP.  They are privileged and are not subject to the fiduciary exception.

### 4.      Exhibit B

The Defendant Directors characterize the documents in Exhibit B to the Brekke Declaration as communications involving advice of corporate counsel to the directors of the corporation about draft documents.  (Dkt. 161 ¶ 2.b.)  The Director Defendants contend that these communications involve legal advice relating to drafts of the transaction documents relating to the October 2011 sale of the Company.  (Dkt. 159 at 9-10.)  Exhibit B consists of two email chains, one seeking and providing legal advice

relating to draft ESOP Transaction documents and the other providing responses to counsel's requests for information needed for his analysis of revisions made to a draft ESOP Transaction document.  (*See* Dkt. 162-2.)  They are not for the purpose of helping Kurt or the Director Defendants fulfill any fiduciary duty for the benefit of the ESOP and do not implicate administration of the ESOP.  The Court concludes they are privileged and do not fall within the scope of the fiduciary exception.

### 5.     Exhibit C

The Defendant Directors characterize the documents in Exhibit C to the Brekke Declaration as communications involving advice of corporate counsel, Steven Potach, to the directors of the corporation.  (Dkt. 161 ¶ 2.c.)  However, Hughes was copied on these communications.  (*See* Dkt. 162-3.)  Exhibit C contains an email and an email chain.  The email contains legal advice provided by Potach to the Director Defendants relating to a draft ESOP transaction document and the email chain contains communications between Potach and the Director Defendants relating to a draft of another document associated with the ESOP Transaction.  Based on their content and the context, they are for the benefit of Kurt, not the ESOP, and do not relate to administration of the ESOP.  They are privileged and not subject to the fiduciary exception.

### 6.     Exhibit D

The Defendant Directors describe the documents in Exhibit D to the Brekke Declaration as communications involving settlor functions.  (Dkt. 161 ¶ 2.d.)  They argue Exhibit D contains communications relating to the form and structure of the ESOP and choosing a new trustee (Bremer Bank) for the ESOP.  (Dkt. 159 at 10-11.)  Exhibit D

appears to consist of four email chains between Hughes, Potach, and the Director

Defendants.  (Dkt. 162-4.)  Two of them involve a request for and the provision of legal

advice relating to choosing a new ESOP trustee and the others involve legal advice

regarding proposed amendments to the ESOP.  The Court agrees that these

communications involve settlor functions and are therefore not subject to the fiduciary

exception.  *See Hughes Aircraft*, 525 U.S. at 444 ("ERISA's fiduciary duty requirement

simply is not implicated where [employer], acting as the Plan's settlor, makes a decision

regarding the form or structure of the Plan such as who is entitled to receive Plan benefits

and in what amounts, or how such benefits are calculated."); *Anderson*, 66 F.3d at 960

("An employer's decision to amend . . . an employee benefit plan is unconstrained by the

fiduciary duties that ERISA imposes on plan administration.").

### 7.    Exhibit E

The Defendant Directors describe the documents in Exhibit E as communications

involving advice to the Defendant Directors related to their own liability or for their own

protection or for the protection of Kurt.  (Dkt. 161 ¶ 2.e.)  One of the email chains in

Exhibit E contains legal advice from Hughes to Potach and the Director Defendants

relating to liability and protection of Kurt, and the other contains legal advice from

Hughes to the Director Defendants and Potach regarding revisions to an agreement

associated with the ESOP Transaction.  (Dkt. 162-5.)  Neither fulfills any fiduciary duty

for the ESOP, nor do they implicate ESOP administration.  They are privileged and are

not subject to the fiduciary exception.

8.      **Exhibit F**

Exhibit F consists of documents selected by the Secretary for *in-camera* review.
(Dkt. 161 ¶ 3.)  Of the 76 pages of documents (Dkt. 162-6), the Director Defendants
contend that pages 1-8, 13-16, 27-30, 35-37, and 61-66 are documents involving legal
advice relating to drafts of the documents relating to the ESOP Transaction; pages 60 and
69-70 are communications between Potach and the Defendant Directors that are not
subject to the fiduciary exception; pages 9-12, 14-21, and 71-73 relate to settlor
functions, namely amendments to the ESOP, and pages 74-76 relate to choosing a new
trustee; and pages 67-68 recommend steps Kurt should take to limit liability and protect
Kurt and the Defendant Directors.[17]  (Dkt. 159 at 8-15.)

Pages 1-8, 13-16, 27-30, 35-37, and 61-66 consist of handwritten notes and several
email chains.  Pages 1-8 consist of two email chains, where pages 1-2 include legal
advice from Hughes to the Director Defendants regarding draft documents relating to the
ESOP Transaction and pages 3-8 are a second chain containing requests for information
from Potach for the purpose of providing legal advice regarding a draft ESOP
Transaction document and legal advice from Hughes regarding that document, where the
requests for information from Potach are related to an email chain in Exhibit B.  Pages
13-16 are emails containing strategy relating to draft documents regarding the ESOP
transaction.  Pages 27-30 are two days' worth of handwritten notes, where one day's
notes reflect legal advice relating to a draft ESOP Transaction document and the other

---

[17]      The pagination in this Order is one page less than the corresponding ECF page due
to the exhibit cover sheet; *e.g.*, page 1 as recited in this Order would be ECF page 2.

day's reflect legal advice relating to several draft documents associated with the ESOP Transaction.  Pages 35-37 are a duplicate of an email chain in Exhibit E and contain legal advice from Hughes to the Director Defendants and Potach regarding revisions to a draft ESOP Transaction document.  Pages 61-66 contain two email chains, one of which is a duplicate of emails in Exhibit E that contain legal advice from Hughes to Potach and the Director Defendants relating to liability and the protection of Kurt and the other contains Hughes' legal advice relating to documents associated with the ESOP Transaction.  None of these documents were for purposes of fulfilling a fiduciary duty for the ESOP, and they do not implicate administration of the ESOP.  They are privileged and are not subject to the fiduciary exception.

The Court turns to pages 60 and 69-70.  The Court is unable to discern any reason why the email beginning on page 59 and continuing to page 60 (Dkt. 162-6 at ECF pages 60-61) that was sent by Potach at 11:36 a.m. on September 15, 2011 ("11:36 a.m. Potach email") is redacted.  The 11:36 a.m. Potach email, like other emails that are unredacted in the email chain, is simply a communication forwarding a draft document (which is not privileged) and arranging a time to discuss "company-related issues" that might be presented in the "latest SPA draft," as stated in the unredacted email sent by Potach at 11:49 a.m. on September 15, 2011 (Dkt. 162-6 at ECF pages 59-60).  The Court concludes that the 11:36 a.m. Potach email is not privileged, and should be produced in unredacted form.  Any other document in Exhibit A containing a redacted version of the 11:36 a.m. Potach email should be re-produced with the redaction of the 11:36 Potach a.m. email removed.  However, the email from Potach at pages 69-70 contains Potach's

legal opinion regarding a draft document associated with the ESOP Transaction, and is privileged.  It was not sent for purposes of fulfilling a fiduciary duty for the ESOP, and is not subject to the fiduciary exception.

The Director Defendants contend that pages 9-12, 14-21, 71-73 and 74-76 relate to settlor functions.  (Dkt. 159 at 13.)  One of the email chains (pages 17-21) is a continuation of an email chain in Exhibit D containing legal advice relating to plan amendments, and the remaining contain legal advice relating to ESOP amendments. Pages 74-76 contain legal advice relating to choosing a new trustee.  As such, they relate to settlor functions, not plan administration.  These documents are attorney-client privileged and were not sent for purposes of fulfilling a fiduciary function for the ESOP. They are not subject to the fiduciary exception.

Finally, pages 67-68 contain legal advice provided by Hughes to Potach and the Director Defendants regarding steps Kurt should take to limit liability and protect Kurt and the Defendant Directors.  This document does not fulfill any fiduciary duty for the ESOP and is not subject to the fiduciary exception.

\* \* \*

Having reviewed the representative documents submitted by the Director Defendants for in camera review, the Court denies the Motion to Compel as to the Director Defendants except insofar as it seeks an unredacted copy of the 11:36 a.m. Potach email.

**D.  The First Amended Subpoena**

Hughes produced non-privileged documents responsive to the First Amended Subpoena, along with a privilege log, on November 4, 2019.  (Dkt. 168-4, Ex. 4.)  The Court now addresses the Motion to Compel to the extent it seeks an order compelling Hughes to produce unredacted versions of Redacted Exhibit A, documents related to Redacted Exhibit A, and to update its privilege index.  (Dkt. 144 at 1.)  The Request at issue in the First Amended Subpoena is:

REQUEST NO. 1: All Documents relating to the October 5, 2011 transaction whereby the ESOP acquired 100% of Kurt stock, including:

    a.  All work papers, notes and other Documents;

    b.  All Communications, emails, correspondence, memoranda, minutes, notes, and recordings of meetings, both internally and between and amongst any service provider to Kurt or the Kurt ESOP; and

    c.  All Documents on which you relied on in providing services.

(Dkt. 143 ¶ 4.)

In addition to arguing the documents sought by the Secretary are privileged, as discussed above, Hughes contends the subpoena is unduly burdensome and duplicative. (Dkt. 166 at 16-20.)   The Secretary did not present any separate analysis as to Hughes' documents in its brief or address this argument.

"A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena."  Fed. R. Civ. P. 45(c)(1).  A court must limit discovery when "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from

some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C).

The Secretary seeks unredacted copies of the documents in Redacted Exhibit A and documents "related to" the Redacted Exhibit A documents.  It is unclear to the Court what those "related to" documents would comprise, and based on the Court's review of the representative documents from Redacted Exhibit A, it appears that (except as to the 11:36 a.m. Potach email), the sought-after documents are privileged and not subject to the fiduciary exception.  To the extent there are additional documents "related to" Redacted Exhibit A, the Court also denies the motion because it appears those additional "related to" documents are unreasonably cumulative and duplicative of the discovery sought from the Director Defendants.  Indeed, the Secretary concedes that issuing the subpoena to Hughes was "[i]n a further effort to obtain the communications between Kurt and Hughes . . . ."  (Dkt. 144 at 2.)  For these reasons, the Court denies the Motion to the extent it seeks documents from Hughes.  The Court also denies the Motion to the extent it seeks a privilege log, as Hughes has provided a privilege log and the Secretary did not raise any issues with that log or explain why it needed an additional log after the Court invited him to do so at the hearing.

## IV.   ORDER

For the reasons stated above, and based upon all the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1. The Secretary's Motion to Compel is **DENIED**, except insofar as it seeks

    production of an unredacted version of the email beginning on page 59 and

continuing to page 60 (Dkt. 162-6 at ECF pages 60-61) that was sent by Potach at

11:36 a.m. on September 15, 2011 ("11:36 a.m. Potach email").  The Director

Defendants shall produce an unredacted version of the 11:36 a.m. Potach email

within seven (7) days of the date of this Order.  To the extent any other document

in Exhibit A contains a redacted version of the 11:36 a.m. Potach email, that

document should be re-produced by the Director Defendants with the redaction of

the 11:36 a.m. Potach email removed within seven (7) days of the date of this

Order.


DATED: May 4, 2020                          _s/Elizabeth Cowan Wright_
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge