## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

EUGENE SCALIA, Secretary of Labor, U.S.
Department of Labor,

      Plaintiff,

vs.

RELIANCE TRUST COMPANY, STEVEN
R. CARLSEN, PAUL A. LILLYBLAD,
KELLI WATSON, and KURT
MANUFACTURING COMPANY, INC.,
EMPLOYEE STOCK OWNERSHIP PLAN,

      Defendants.

Civil Action File
No.  0:17-CV-04540 (SRN-ECW)

### DECLARATION OF STEPHEN A. MARTIN

I, Stephen A. Martin, state under the penalty of perjury:

1.

I am over 18 years old. The information contained in this declaration is true and correct and based upon my personal knowledge.

### Background and Work Experience.

2.

I joined Reliance Trust Company ("***Reliance***") in 2006. During the time period relevant to this litigation, I was a Senior Vice President/ Senior Fiduciary Consultant at Reliance.

3.

Approximately 95% of my work at Reliance related to ESOPs, ESOP transactions, and ESOP trustee services.

4.

I have more than 30 years of experience in the trust and investment industries.

5.

I have held senior fiduciary and investment management positions at several major banks and trust companies, including C&S Trust (now Bank of America), Wachovia (now Wells Fargo), Northern Trust, U.S. Trust, and Barclays.

6.

I have also held senior leadership positions at record-keeping and administration firms such as Hazelhurst and INVESCO/AMVESCAP.

7.

I am a member of several ESOP trade organizations including, the ESOP Association, the National Center for Employee Ownership, and the Employee-Owned S Corporations of America, and have been a frequent speaker on fiduciary topics.

8.

By 2011, while at Reliance, I had been responsible for some of the largest ESOPs in the nation, including Avis, Polaroid, and Northern Trust.

**Reliance's Background and Experience in the ESOP Industry.**

9.

In 2011, Reliance was the largest independent trust company in the United States, with approximately $85 billion under management.

10.

Reliance was highly regarded and had a national reputation as a premier ESOP trustee.

11.

By 2011, Reliance had served as trustee or custodian for more than 18,000 retirement plans, and its assets under management included more than $2 billion of company stock in

ESOPs for which Reliance served as an ongoing trustee.

### Reliance as a Transactional Trustee vs. Ongoing Trustee.

12.

Reliance provided ESOP trustee services in two different capacities: (i) transactional trustee; or (ii) ongoing trustee.

13.

A transactional trustee serves as the ESOP trustee for the sole purpose of evaluating a proposed transaction and determining whether the transaction is fair and in the best interests of the ESOP participants.  Throughout its history as an ESOP trustee, Reliance reviewed and closed many proposed ESOP transactions. Simply because a transaction was closed, however, does not mean it was not: (i) thoroughly and diligently reviewed; or (ii) negotiated in earnest and at length to secure favorable terms for the ESOP.

14.

An ongoing trustee is retained to serve as a trustee for an existing ESOP not in connection with a transaction. An ongoing trustee is retained to meet and confer with the management of the company, to monitor operations and financial performance, review the company's financial statements, and to value the company's stock on an annual basis.

### Reliance's Presentation to the Kurt Board, and Kurt's Retention of Reliance as Transactional Trustee.

15.

On June 22, 2011, at the invitation of Chartwell Capital Solutions ("*Chartwell*"), I made a presentation to the board of Kurt Manufacturing Company, Inc. ("*Kurt*" or "*the Company*") about Reliance's trustee services in connection with a possible sale of William Kuban's ("*Kuban*") shares to Kurt's existing ESOP.

16.

At no point in time was I ever privy to Chartwell's communications with Kurt's lenders or prospective lenders.

17.

Chartwell never shared with me any slide decks, presentation materials, or any communications it had with any lenders or prospective lenders for Kurt.

18.

On or about July 12, 2011, Kurt notified Reliance it had been selected as the discretionary transactional trustee for the proposed transaction.

**The Trustee Team's Meeting with Kurt's Senior Management Team.**

19.

I along with representatives of Stout Risius Ross ("*SRR*") and Gray Plant Mooty ("*GPM*") (the "*trustee team*") met with Kurt's senior management and Chartwell on July 22nd at Kurt's headquarters.

20.

The primary purpose of the meeting was for us to interview Kurt's senior management regarding the Company's historical performance, business model, financials, projections, and the Company's strengths, weaknesses, and challenges, among other topics.

21.

Kurt's management made a comprehensive presentation about the company. Kurt's management team walked us through an overview of the Company's history, factors they believed differentiated the Company, the Company's philosophy, its customer relationships, any competitive concerns, challenges and weaknesses the Company faced, and any active litigation

4

in which the Company was involved (none at the time).

22.

The trustee team actively participated in this presentation, interviewing Kurt's management about the topics presented.

**Reliance's Negotiation of Kuban's Salary.**

23.

Early in the due diligence process, Reliance flagged Kuban's compensation as a real concern.   Kuban, however, resisted Reliance's efforts to negotiate a lower chairman's salary.

24.

I was in regular contact with SRR's Jeffrey Buettner during this process.  As part of those discussions, Buettner verbally advised me about the range of fair market value that SRR was deriving for Kuban's shares. At some point early in the negotiation process Buettner told me that SRR had derived a range of fair market value for Kuban's shares with a midpoint of $36 million. That range of value assumed no changes to Kuban's chairman salary, which was then $486,000.

25.

On August 12th, I communicated a counter-proposal to Chartwell to purchase Kuban's shares for $36 million, with Kuban's salary still an issue to be addressed. I made it clear that the price and other material terms of the counter-proposal were subject to approval by Reliance's Investment Policy Subcommittee (the "*Subcommittee*"). Chartwell's Greg Fresh tentatively agreed to the $36 million price, but pushed back on any adjustments to Kuban's salary.

26.

On August 17th, I sent an email to GPM's Susan Lenczewski expressing the trustee team's concerns about the potential exposure that would arise from paying excess compensation to Kuban.  I noted that one option was to tell Chartwell we would pay $35 million and that

Kuban's compensation would have to be dealt with or we would have to strip it out and add it back in.

27.

In this context, what I meant by "stripping" Kuban's compensation and "adding it back" was that his salary would be reduced and a corresponding adjustment would be made to the Company's financial statements to reflect increased cash flow.

### Reliance's August 19th Subcommittee Meeting.

28.

After I had reached a tentative agreement with Chartwell as to the purchase price for Kuban's shares, I instructed SRR to update its valuation report.

29.

SRR forwarded its Analysis of Transaction Fairness ("*Fairness Analysis*"), with updated valuation exhibits, to Reliance on the afternoon of August 18th, and it was circulated to the members of Reliance's Subcommittee. GPM also forwarded a Due Diligence Memorandum in advance of the Subcommittee meeting.

30.

The Subcommittee met to consider the Kurt ESOP's proposed purchase of Kuban's shares on August 19th.

31.

During this meeting I summarized the history of the Company, its products, and the industries it serves. I explained the proposed transaction and noted that it had been "a challenging transaction to negotiate" and that we had arrived at a structure that I believed was favorable to the ESOP and the Company on a long term basis. I then walked through the

specifics of the negotiations with Chartwell for the Subcommittee.

## Reliance's Insistence on a Floor Price Protection

32.

Because of the new debt that the Company was expecting to incur, Reliance insisted that the proposed transaction include an element of "floor price protection" (also referred to as "price support") (hereinafter "*FPP*") to protect the interests of any near-term distributees.

33.

In order to understand what the ESOP's existing shares were worth, I requested that SRR prepare a calculation of the per share value of the ESOP's shares. SRR calculated the value of the Company shares on a non-controlling basis to be worth $74.95/share.

34.

I advocated for a price that approximated the value of the pre-transaction price – specifically the $74.95/share calculated by SRR – and I shared that view with Chartwell. Eide of GPM advocated for a FPP amount fixed at $33.44/share, which was the last appraised value of the ESOP's shares (on a non-control, minority basis) prepared by Willamette as of October 31, 2010.

35.

Chartwell forwarded a middle-ground compromise proposal on behalf of the Company on September 26th, proposing to offer FPP at $55.29/share for three years subject to certain caps.

36.

On September 30th, I spoke with Chartwell's Fresh about the Company's FPP proposal of $55.29/share for three years subject to certain caps. Despite SRR's criticisms as to

Chartwell's proposed methodology, and its application of that methodology, I understood that the Company was not willing to pay more than $55.29/share, subject to the caps in September 26th proposal, and I agreed in principle to that negotiated FPP price.

37.

It was my belief that the negotiated FPP price also represented a fair balance between the interests of: (i) the ESOP participants who might be eligible for a near-term distribution; and (ii) the remaining ESOP participants.

### Kurt's Post-Transaction Retention of Bremer Trust as Ongoing Trustee.

38.

After the ESOP transaction closed, on or about October 28, 2011, Kurt appointed Bremer Trust as the ongoing trustee, and Reliance's role as the transactional trustee ended.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed this 25th day of August, 2020.

Stephen A. Martin

8