## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Eugene Scalia, *Secretary of Labor* (now Al Stewart, *Acting Secretary of Labor*), *United States Department of Labor*, | Case No. 17-cv-4540 (SRN/ECW) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| Reliance Trust Company; Steven R. Carlsen; Paul A. Lillyblad; Kelli Watson; and Kurt Manufacturing Company, Inc., Employee Stock Ownership Plan, | |
| Defendants. | |

Elizabeth Arumilli, Ruben R. Chapa, Arsalan A. Nayani, and Kevin M. Wilemon, United States Department of Labor, Office of the Solicitor, 230 South Dearborn Street, Suite 844, Chicago, IL 60604, for Plaintiff.

William B. Brockman and Aiten McPherson, Bryan Cave Leighton Paisner LLP, 1201 West Peachtree Street, Fourteenth Floor, Atlanta, GA 30309, and Bradley R. Armstrong and Taylor D. Sztainer, Moss & Barnett PA, 150 South Fifth Street, Suite 1200, Minneapolis, MN 55402, for Defendant Reliance Trust Company.

Maria Brekke, Casey D. Marshall, Jonathan P. Norrie, and Alan I. Silver, Bassford Remele PA, 100 South Fifth Street, Suite 1500, Minneapolis, MN 55402, for Defendants Steven R. Carlsen, Paul A. Lillyblad, and Kelli Watson, and Defendant Kurt Manufacturing Company, Inc., Employee Stock Ownership Plan.

SUSAN RICHARD NELSON, United States District Judge

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment [Doc. No. 204], Defendants Steven R. Carlsen, Paul A. Lillyblad, and Kelli Watson's Motion for Summary Judgment [Doc. No. 215], Defendant Reliance Trust

Company's Motion for Partial Summary Judgment [Doc. No. 224], Defendants' Joint Motion to Exclude Expert Testimony of Dr. Mark Johnson [Doc. No. 207], and Plaintiff's Motion to Exclude Expert Testimony of Corey Rosen [Doc. No. 228]. For the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment is **DENIED**; Defendants Carlsen, Lillyblad, and Watson's Motion for Summary Judgment is **DENIED**; Defendant Reliance's Motion for Partial Summary Judgment is **DENIED**; Defendants' Joint Motion to Exclude Expert Testimony of Dr. Mark Johnson is **DENIED**; and Plaintiff's Motion to Exclude Expert Testimony of Corey Rosen is **DENIED**.

## I.     BACKGROUND

This case concerns the propriety of a sale of stock by William Kuban ("Kuban"), the then-majority shareholder and board chairman of Kurt Manufacturing, Inc. ("Kurt"), a closely held Minnesota company, to Kurt's employee stock ownership plan, or "ESOP," on October 5, 2011. As a result of the sale, the ESOP gained ownership of 100% of the stock of Kurt. The ESOP entered this transaction ("the Transaction") after the non-Kuban-related members of Kurt's board of directors—Defendants Carlsen, Lillyblad, and Watson ("the Directors")—vetted the transaction, and then appointed an independent trustee—Defendant Reliance Trust Company ("Reliance")—to negotiate the final price on the ESOP's behalf.

In the view of the United States Department of Labor ("DOL"), however, in orchestrating the Transaction, Defendants (both the Directors and Reliance) failed to abide by the fiduciary duties they owed the ESOP, as set forth in the Employee Retirement Income Security Act of 1974 ("ERISA"). Specifically, DOL contends that Defendants

2

breached their duties of loyalty and prudence to the ESOP because they approved the Transaction despite being aware of evidence suggesting that Kuban's selling price was unreasonably high. As a result, DOL claims, the ESOP paid far more for Kuban's share of the company than it should have, and thus enriched Kuban (and Defendants) at the expense of Kurt employees. Defendants argue, to the contrary, that the ESOP did not overpay for Kuban's share of the company and that they acted with loyalty and prudence to the ESOP at all relevant times.

### A. The Parties

The Plaintiff DOL is a federal agency tasked with enforcing ERISA, among other statutes. Congress has authorized DOL to bring civil suits against persons who fail to comply with ERISA. *See* 29 U.S.C. §§ 1132(a)(2), (a)(5).

Defendants include certain of the participants in the Transaction. For ease of reference, however, the Court will treat the "Defendants" as three distinct entities.

The first group of Defendants are the non-Kuban-related members of Kurt's Board of Directors. At all relevant times, Steven R. Carlsen ("Carlsen") was Kurt's President. Paul A. Lillyblad ("Lillyblad") was Kurt's Vice President of Finance, and Kelli Watson ("Watson") was Kurt's Vice President of Human Resources. (Am. Compl. [Doc. No. 46] ¶¶ 16-18; Directors' Am. Answer [Doc. No. 100] ¶ 10 (noting that all three individuals are still executives at Kurt, albeit with slightly different titles).) In October 2011, these three individuals, together with Kuban and Gretchen Kuban Rode (Kuban's daughter), comprised the entirety of Kurt's five-member board of directors.

The second defendant is Reliance, an independent trust company based in Atlanta, Georgia. (Am. Compl. ¶ 2.)

The third and final defendant is Nominal Defendant Kurt Manufacturing Company, Inc. Employee Stock Ownership Plan ("ESOP"), which is a "pension plan" subject to ERISA's regulatory scheme. *See also Martin v. Feilen*, 965 F.2d 660, 664 (8th Cir. 1992) (explaining that ESOPs are pension plans that invest in "stock of the employer creating the plan," and are therefore intended to be "both an employee retirement benefit plan and a technique of corporate finance that encourage[s] employee ownership").) Until October 5, 2011, the ESOP owned 24.4% of Kurt's stock, and Kuban owned the remaining 75.6% of Kurt's stock. (*See* Wilemon Decl. [Doc. No. 206] Ex. 2 at 49.) After the sale, the ESOP became the owner of 100% of Kurt's stock. (*Id.*)

## B. The ESOP

From December 2009 until at least July 22, 2011, the Directors were trustees of the ESOP. (Wilemon Decl. [Doc. No. 206] Ex. 6 ("ESOP Document"); Ex. 5, Carlsen Dep. at 28, 66-67; Ex. 3, Lillyblad Dep. at 26; Ex. 4, Watson Dep. at 27.) The ESOP Document requires the trustee, or trustees, to hold and invest the trust. (ESOP Document, art. X, § 10.2.) It further provides that Kurt may "at any time … remove a Trustee and appoint a successor thereto," subject to any relevant trust agreement. (*Id.*) DOL, the Directors, and Reliance all agree that the ESOP is a pension plan under ERISA, 29 U.S.C. § 1002(2). (*See* Am. Compl. [Doc. No. 46] ¶ 5; Reliance's Answer [Doc. No. 88] ¶ 5; Directors' Am. Answer ¶ 4.)

4

### C. Willamette's Annual Valuations of Kurt

From at least 2006 through 2010, Willamette Management Associates, an appraisal firm ("Willamette"), provided annual valuations of Kurt stock to the trustees of the ESOP. (*See* Wilemon Decl. [Doc. No. 206] Exs. 8-12.) The purpose of such annual appraisals was "to provide an independent opinion of the fair market value of Kurt's common stock." (*Id.*) Willamette performed these valuations of Kurt stock "on a marketable, minority basis." (*Id.*)

Willamette's valuations of Kurt's stock price fluctuated between $13.71 and $33.44 during the five years leading up to the Transaction. Specifically, Willamette's valuations were: $13.71 as of October 31, 2006; $23.08 as of October 31, 2007; $21.79 as of October 31, 2008; $13.86 as of October 31, 2009; and $33.44 as of October 31, 2010. (Wilemon Decl. [Doc. No. 206] Ex. 8 at 3; Ex. 9 at 3; Ex. 10 at 3; Ex. 11 at 4; Ex. 12 at 3.)

In addition to valuating Kurt's stock price, Willamette calculated Kurt's "market value of invested capital"[1] for those same years, which were: $26.2 million as of October 31, 2006; $39 million as of October 31, 2007; $39.3 million as of October 31, 2008; $38.7 million as of October 31, 2009; and $41.5 million as of October 31, 2010. (*Id.*)

On April 7, 2011, LarsonAllen LLP, Kurt's independent auditor, emailed Director Watson to ask if the increase in Kurt stock price from $13.86 as of October 31, 2009 to $33.44 as of October 31, 2010 in the Willamette valuations was "accurate" because "it just

---

[1] The "market value of invested capital" measures "the sum of the value of the equity of the company plus the value of the interest-bearing debt of the company." (Wilemon Decl. [Doc. No. 213] Ex. 79 at 67-68.)

seems like a very significant increase considering the [economic] times we are in."
(Wilemon Decl. [Doc. No. 213] Ex. 78 at 2.)

### D. Kurt's Exploration of a Private Sale with Mesirow

In November or December 2010, Mesirow Financial, Inc., an investment banking firm ("Mesirow"), contacted Kuban about the possibility of selling his stake in Kurt. (Norrie Decl. [Doc. No. 218] Ex. B, Carlsen Dep. at 39-40.) In December 2010, Mesirow gave a presentation to Kurt management regarding the merger-and-acquisition market for a company like Kurt. (Wilemon Decl. [Doc. No. 206] Ex. 5, Carlsen Dep. at 38-39; Ex. 13.) On January 18, 2011, Mesirow presented to Kurt its "Strategic Discussion Materials," which provided a more detailed analysis of the merger-and-acquisition market for Kurt as well as a "preliminary valuation analysis." (Wilemon Decl. [Doc. No. 206] Ex. 16.) Mesirow's "preliminary valuation analysis" concluded that Kurt's total enterprise value would range from $58 to $67 million if Kurt was broken up and sold in parts. (*Id.* at 31.) If Kurt was purchased as a whole, however, Mesirow concluded that Kurt's enterprise value would range from $50 to $60 million. (*Id.*)

Subsequently, to avoid a transaction that could ultimately result in breaking up Kurt, Kurt began exploring the possibility of an ESOP transaction. (Carlsen Decl. [Doc. No. 219] ¶ 2.) In April 2011, at Lillyblad's request, Mesirow sent Kurt an "Illustrative Proceeds Analysis." (*See* Wilemon Decl. [Doc. No. 210] Exs. 17, 18.) In this analysis, and assuming Kurt was sold as a whole, Mesirow estimated that Kurt had an enterprise value of $47.5 million and an equity value of $29.8 million. (*Id.*)

### E. Kurt's Engagement of Chartwell and The Events Leading Up to Kurt's Appointment of Reliance as Trustee

In March or April 2011, Kurt's board began working with Chartwell Business Valuation, LLC, a financial advisory company ("Chartwell"), on a potential sale of Kuban's stock to the ESOP. (*See* Am. Compl. ¶¶ 31-33; Directors' Am. Answer ¶ 13.) Kuban introduced Chartwell to Kurt as an organization that had the experience to "provide services to plan and execute an ESOP transaction." (Norrie Decl. [Doc. No. 218] Ex. A, Lillyblad Dep. at 45.) On April 28, 2011, Chartwell made a presentation to Kurt's board regarding the structure of a potential ESOP transaction. (Wilemon Decl. [Doc. No. 210] Ex. 27.) In its presentation, Chartwell estimated that Kuban's Kurt stock was worth $28.7 million. (*Id.* at 26.) Chartwell's presentation noted that the benefits of an ESOP transaction included the Directors' retention of their positions and supplemental incentive compensation for them. (*Id.* at 17.) On his copy of the presentation, Lillyblad noted the following regarding Willamette's and Chartwell's valuations: "WILLAMETTE – LOW SIDE" and "CHARTWELL (GREG) HIGH." (*Id.* at 20.)

On June 3, 2011, Kurt hired Chartwell to provide financial advisory and investment banking services regarding the sale of Kuban's stock to the ESOP. (Norrie Decl. [Doc. No. 218] Ex. A, Lillyblad Dep. Ex. 16.) The parties' agreement split Chartwell's advisory services with respect to the Transaction into two phases. In the first phase, Chartwell agreed to assess, *inter alia*, whether an ESOP transaction would be viable for Kurt and its shareholders. (*Id.* at 1; Norrie Decl. [Doc. No. 218] Ex. A, Lillyblad Dep. at 52-53.) Indeed, Lillyblad testified that "if [Kuban's] asking price was well in excess of what [Kurt] could

finance, [Kurt] couldn't do the transaction and it wouldn't be the right thing to do. And just because the financing could support it doesn't necessarily mean that's the right number that [the] ESOP should pay as well." (Norrie Decl. [Doc. No. 218] Ex. A, Lillyblad Dep. at 53-54.) He further testified that, in April 2011, "there was some conversation or note that an equity value [that] was being looked at was 34 million or maybe 28 million at that point. The number moved." (*Id.* at 53.) The second phase of Chartwell's advisory services to Kurt included assisting with the execution of the ESOP transaction. (Norrie Decl. [Doc. No. 218] Ex. A, Lillyblad Dep. Ex. 16 at 2.)

Moreover, Chartwell agreed to complete the Transaction "on an expedited basis, … on or before August 5, 2011." (*Id.* at 1.) Kuban set this expedited time frame because "he wanted to get it done." (Wilemon Decl. [Doc. No. 206] Ex. 5, Carlsen Dep. at 59.) Chartwell's compensation included an initial $50,000 work fee and a $500,000 transaction success fee—minus the work fee—to be paid at the closing of the Transaction and only if the Transaction closed. (Norrie Decl. [Doc. No. 218] Ex. A, Lillyblad Dep. Ex. 16 at 3.) Stephen Martin, a Senior Vice President at Reliance, testified that Chartwell was "negotiating on behalf of Mr. Kuban" during the ESOP transaction negotiations. (Wilemon Decl. [Doc. No. 246] Ex. 20, Martin Dep. at 283.)

Sometime between April and July 2011, Kurt provided current financial statements and updated ten-year financial projections to Chartwell. (*See* Wilemon Decl. [Doc. No. 210] Ex. 29 at 14; Ex. 30 at 47, 50, 109, 137.) These revised projections "caus[ed] [Chartwell's] [Discounted Cash Flow] value to increase ~$10 million … and the equity

value jumped [from $34 million] to $38 million." (Wilemon Decl. [Doc. No. 213] Ex. 32 at 3; *see* Wilemon Decl. [Doc. No. 246] Ex. 31, Lang Dep. 190-92.)

Chartwell presented several valuations of Kuban's stock throughout June and July of 2011. On June 13, 2011, Chartwell calculated a "Control Equity Value" of $43.8 million, but its chart did not clarify whether this figure accounted for the Kurt shares that the ESOP already owned. (Norrie Decl. [Doc. No. 218] Ex. A, Lillyblad Dep. Ex. 37 at 26.) Notably, under the heading "Key Highlights of the Proposed Transaction," Chartwell's June 13 presentation provided that "shareholders and management are pursuing [a] sale of the Company's equity to an ESOP," and that management will receive "Stock Appreciation Rights" ("SARs"), "subject to plan currently in development." (*Id.* at 6.) On June 24, 2011, Chartwell estimated Kuban's stock value to be $34.1 million. (Wilemon Decl. [Doc. No. 210] Ex. 30 at 131, 135.) On June 30, 2011, Chartwell estimated Kuban's stock value to be $38.6 million. (*Id.* at 102, 106.) On July 7, 2011, Chartwell noted an "Equity Purchase Price" of "~$38 million" for Kuban's stock. (Wilemon Decl. [Doc. No. 213] Ex. 33 at 4.) On July 11, 2011, Chartwell's estimated value of Kuban's stock was $39.1 million. (Wilemon Decl. [Doc. No. 210] Ex. 30 at 44.) On July 15, 2011, Chartwell noted an "Equity Purchase Price" of $38 million. (Norrie Decl. [Doc. No. 218] Ex. A, Lillyblad Dep. Ex. 42 at 7.)

On July 11, 2011, Chartwell sent Lillyblad a "final lender material packet," reflecting a $39.1 million price for Kuban's stock. (Wilemon Decl. [Doc. No. 213] Ex. 43 at 5 (showing proposed "Equity Redemption" of $39.1 million); Ex. 44.) On July 15, 2011, Lillyblad told Douglas Schultze, Vice President of Premier Bank, that the Kurt board

"approved the structure of the transaction" and that the targeted closing date was August 15, 2011. (Wilemon Decl. [Doc. No. 213] Ex. 34 at 213.) Three days later, on July 18, 2011, Lillyblad told Schultze that Kurt's "net worth will be negative at closing due to the inside loan between Kurt Manufacturing and the ESOP for $39M." (*Id.* at 216.)

### F. Obtaining Financing for the Transaction

Before the Directors appointed Reliance as trustee, they engaged several banks to finance the Transaction. At Kuban's request, Kurt decided to use U.S. Bank for the primary financing of the ESOP transaction. On May 9, 2011, U.S. Bank sent Kurt a proposed term sheet, describing almost $28 million in facilities for the Transaction. (Wilemon Decl. [Doc. No. 213] Ex. 42.) On July 27, 2011, U.S. Bank sent Kurt a revised term sheet, agreeing to extend about $35 million in facilities to Kurt for the Transaction. (*Id.*, Ex. 40 at 216.)

Kurt also used Premier Bank to finance the Transaction. On July 6, 2011, Premier Bank's Schultze sent a loan proposal for $2 million to Lillyblad, which Lillyblad signed. (*Id.*, Ex. 34 at 211-12.) On July 18, 2011—four days before the Directors resigned as trustees of the ESOP—Schultze noted that the projections on which Chartwell's valuations were based were "very aggressive when compared to past performance" and observed that the "figures considerably exceed actual performance for each of the last 6 years." (*Id.* at 216-17.) Nevertheless, on August 4, 2011, Lillyblad signed a Commitment Letter with Premier, accepting Premier's $2 million loan. (*Id.* at 201-10.)

## G. Kurt's Retention of Reliance as Trustee for the Transaction and the Subsequent Negotiations

Chartwell recommended to Kurt that it retain Reliance to serve as trustee for the Transaction. (Wilemon Decl. [Doc. No. 206] Ex. 5, Carlsen Dep. at 60-61; Ex. 3, Watson Dep. at 68-69; [Doc. No. 210] Ex. 20, Martin Dep. at 38; [Doc. No. 213] Ex. 45, Fresh Dep. at 29.) On June 22, 2011, the Kurt board interviewed Reliance for this role. (Brockman Decl. [Doc. No. 239] Ex. R-2, Lillyblad Dep. at 199.)

According to Director Watson, the Kurt board only considered and interviewed Reliance to serve as trustee for the Transaction. (Wilemon Decl. [Doc. No. 206] Ex. 4, Watson Dep. at 45.) Before the Directors interviewed Reliance, Chartwell provided Reliance a list of potential questions, so it would "know what the questions might be and be in a position to respond to questions." (Wilemon Decl. [Doc. No. 210] Ex. 20, Martin Dep. 189-90.) These questions included whether Reliance would be "comfortable engaging" Stout Risius Ross ("SRR") as its valuation firm and Gray Plant Mooty ("GPM") as its legal advisor. (Wilemon Decl. [Doc. No. 213] Ex. 48 at 5-6.) Reliance's Martin became the parties' point of contact at Reliance. (Wilemon Decl. [Doc. No. 210] Ex. 20, Martin Dep. at 9, 74.)

On July 18, 2011, Kurt and Reliance executed an engagement agreement, wherein Reliance agreed to serve as the discretionary trustee for the ESOP with respect to the proposed Transaction. (Brockman Decl. [Doc. No. 239] Ex. R-3.) On July 22, 2011, the Directors resigned as trustees of the ESOP, and that same day, the Kurt board appointed Reliance as trustee of the ESOP. (Brockman Decl. [Doc. No. 239] Exs. R-4, R-5.)

11

On July 22, 2011, Reliance retained SRR as its financial advisor for the proposed Transaction through an engagement agreement. (*See* Norrie Decl. [Doc. No. 218] Ex. A, Lillyblad Dep. Ex. 47; Brockman Decl. [Doc. No. 239] Ex. R-8.) Reliance had hired SRR as its valuation firm for ESOP transactions in the past and was familiar with its qualifications and capabilities through a Request for Proposal process earlier in 2011. (Brockman Decl. [Doc. No. 239] Ex. R-6, Cotter Dep. at 39; Ex. R-7 at Interrog. Resps. 2(b), 9(b).) In the engagement agreement, SRR agreed to render a written opinion, as of the Transaction's closing date, as to whether "the consideration to be paid by the ESOP for its shares of [Kurt] stock pursuant to the terms of the Transaction is not greater than the fair market value of such shares," and whether "the terms of the loan from [Kurt] to the ESOP are at least as favorable to the ESOP as would be the terms of a comparable loan resulting from negotiations between independent parties." (Norrie Decl. [Doc. No. 218] Ex. A, Lillyblad Dep. Ex. 47 at 1.) Reliance retained GPM as its legal advisor for the proposed Transaction. (*See* Brockman Decl. [Doc. No. 239] Ex. R-9, Eide Dep. at 52.)

On July 22, 2011, Reliance's Martin and representatives from SRR and GPM met with Kurt's senior management and Chartwell at Kurt's headquarters. (Brockman Decl. [Doc. No. 239] Ex. R-11; Martin Decl. [Doc. No. 240] ¶¶ 19-20.) The primary purpose of this meeting was for Reliance, SRR, and GPM to learn about, *inter alia*, Kurt's past performance, business model, and projections. (Martin Decl. [Doc. No. 240] ¶¶ 20-22; *see* Brockman Decl. [Doc. No. 239] Ex. R-12.)

At this same July 22, 2011, meeting, Chartwell, on behalf of Kuban, presented its initial offer of $45 million to Reliance for Kuban's stock. (Wilemon Decl. [Doc. No. 213]

Ex. 51 at 35; *see* Wilemon Decl. [Doc. No. 210] Ex. 20, Martin Dep. at 196.) In its presentation explaining this offer, Chartwell provided detailed Comparable Public Company and Discounted Cash Flow analyses, concluded Kurt's enterprise value was $75 million, and, after applying several adjustments—including a control premium—determined that Kuban's stock was worth $45 million. (Wilemon Decl. [Doc. No. 213] Ex. 51 at 10-35.)

Subsequently, Chartwell uploaded a large swath of due diligence materials to an online "data room" and gave Reliance, SRR, and GPM access to it. (Brockman Decl. [Doc. No. 239] Ex. R-14, Fresh Dep. at 45; Ex. R-1, Martin Dep. at 48, 162-63; Ex. R-9, Eide Dep. at 81.) SRR reviewed the materials in the "data room" and asked follow-up questions to Chartwell. (*See, e.g.*, *id.*, Exs. R-15, R-16.) GPM did the same. (*See, e.g.*, *id.*, Exs. R-17, R-18, R-19.) Moreover, Martin "frequently" spoke with SRR to ensure that it had the financial due diligence materials that it needed. (*Id.*, Ex. R-1, Martin Dep. at 37-38, 81-82, 91-92.) Among other materials, Martin reviewed Willamette's past valuations of Kurt, and Jeffrey Buettner, a Director at SRR, testified that it was "customary to review" such materials. (*Id.* at 255; *id.*, Ex. R-20, Buettner Dep. at 108.)

During its review of the due diligence materials, Reliance expressed concerns regarding Kuban's compensation. In an August 1, 2011, email to GPM's Susan Lenczewski, Martin wrote that Kuban "made $486,000 in 2010 so as the seller he does not need to continue to collect a half million bucks going forward as a consultant to the company." (Brockman Decl. [Doc. No. 239] Ex. R-22.) In an August 17, 2011, email to Martin, Lenczewski discussed several advantages that reducing Kuban's compensation

would have for Kuban, Kurt, and the ESOP. (*See id.*, Ex. R-23.) For example, Lenczewski noted that: (1) paying nearly $500,000 in compensation to Kuban would be a "red flag" to the DOL and an "easy target" for the DOL to argue that such compensation violated ERISA's exclusive benefit rule; (2) a DOL action challenging excess compensation would target Reliance, Kurt, and Kuban, and could seek restitution of excessive compensation for the benefit of the ESOP trust; (3) the IRS could view Kuban's $500,000 salary as excess compensation, which might prompt the IRS to review Kurt for years both before and after the Transaction closing; and (4) the IRS could disallow salary deductions while Kurt was a C corporation, and could determine that Kuban's excess compensation constituted a "second class of stock," which would disallow its planned S corporation election. (*Id.* at RTC-Kurt_00008472.) According to Martin, Kuban "resisted Reliance's efforts to negotiate a lower chairman's salary." (Martin Decl. [Doc. No. 240] ¶ 23.)

According to Martin, on August 12, he communicated a counteroffer to Chartwell to purchase Kuban's stock for $36 million, with Kuban's salary to remain an open issue that the parties would address later. (Martin Decl. [Doc. No. 240] ¶ 25; Wilemon Decl. [Doc. No. 210] Ex. 20, Martin Dep. at 196.) Gregory Fresh, a Managing Director at Chartwell, "tentatively agreed to the $36 million price, but pushed back on any adjustments to Kuban's salary." (*Id.*) Reliance's Martin testified that Kuban "was adamant about not doing anything below 39 and there would be no deal if we couldn't agree to that. … So [Reliance] felt like [it] need[ed] to try to negotiate a transaction that was acceptable and would be a positive end benefit for the participants." (Wilemon Decl. [Doc. No. 213] Ex. 20, Martin Dep. at 196.) He also testified that Reliance never offered $34.2 million—the

low end of SRR's fair market value range in its draft valuation report—because Kuban "would not go below 39." (Wilemon Decl. [Doc. No. 213] Ex. 20, Martin Dep. at 101.)

On August 12, Chartwell emailed a "Transaction Structure Update" document to SRR's Buettner, who in turn forwarded the document to Reliance's Bob Socol and GPM's Eide that same day. (Brockman Decl. [Doc. No. 239] Ex. R-25.) The "Transaction Structure Update" stated that the ESOP "will purchase substantially all outstanding stock" and Kurt "will redeem remaining shares." (*Id.*) It also provided that the "Equity Sale Price" will be "$39.0 million on a non-discounted basis, $36.0 million on a NPV/FMV basis" and was "[a]greed to (subject to Reliance Committee approval)." (*Id.*)

On August 15, SRR's Buettner emailed to Reliance's Martin drafts of SRR's valuation exhibits, which showed a range of value for Kuban's stock from $32.5 million to $40 million with a midpoint of $36 million. (Brockman Decl. [Doc. No. 239] Ex. R-24.) According to Martin, Buettner "verbally advised [Martin] about the range of fair market value that SRR was deriving for Kuban's shares," and "at some point early in the negotiation process," Buettner "told [Martin] that SRR had derived a range … with a midpoint of $36 million," assuming Kuban's salary remained unchanged at $486,000. (Martin Decl. [Doc. No. 240] ¶ 23.)

On August 15, Buettner forwarded Chartwell's August 12 "Transaction Structure Update" to Reliance's Martin. (Brockman Decl. [Doc. No. 239] Ex. R-25.) Later that day, Martin sent Chartwell's Fresh an email, stating, *inter alia*, the following:

> You know [Kuban] is being dinged on value to maintain his comp and that will go away when he retires or is no longer actively involved. I want you to know any counter changes we ask for are to help protect [Kuban,] [Kurt,]

and Reliance from the DOL. If there is any element they deem to be in excess of [fair market value] they will file a claim. That will be tough to defend and I want you to make sure [Kuban] and Kurt understand so you are not the bad guy. We did agree on the [$]36 million but I did not see the proposed new terms until today. I am not sure why the email did not surface until this morning. We have been trying to consider different approaches that looked better and accomplished the goal.

(*Id.*, Ex. R-26.)

Also on August 15, GPM's Eide sent an email to Chartwell, among others, stating that:

The [August 12 Transaction Structure Update] proposes a revised purchase price and describes the price as "agreed to (subject to Reliance Committee approval)." This statement implies that Steve Martin had agreed to the price and would present that price to the Committee. This is not accurate. [Martin] had not seen or agreed to the proposal before it was released on Friday.

(*Id.*, Ex. R-27.)

In a "Transaction Structure Update" dated August 18, 2011, Chartwell included an "Updated ESOP Transaction Summary," reflecting an "[a]greed to (subject to Reliance Committee approval) Equity Sale Price" of $39 million and a reduction in Kuban's salary from $486,000 to $100,000. (Wilemon Decl. [Doc. No. 213] Ex. 64 at 2.) It also provided that the ESOP "will purchase all outstanding stock." (*Id.*)

In an August 18th email to Lenczewski, Martin commented on Chartwell's most recent "Transaction Structure Update":

[W]e just got off the phone with [Chartwell's Fresh] and SRR and here is the counter proposal they made which I think is acceptable. Two things we have asked for to be changed is the PIK [("paid-in-kind")] rate on Tranche B to be 3% just like Tranche A and also to move the SAR pool to 7.5% if our committee feel strongly about it. So I indicated to [Fresh] I thought this was

16

a good approach. We also took [Kuban's] salary to $100K less than half of what Steve Carlson makes. The $39 million price should be right around the midpoint of the SRR range of FMV so I think we have been successful in getting to a common ground on the terms.

(Brockman Decl. [Doc. No. 239] Ex. R-28.)

### H. SRR's Draft Analysis of Transaction Fairness and GPM's Draft Due Diligence Summary

Director Lillyblad sent Kurt's financial projections for SRR's use to Chartwell, and in turn, Chartwell "reformatted them and forwarded those" to SRR. (Wilemon Decl. [Doc. No. 206] Ex. 3, Lillyblad Dep. at 126.) On August 18, 2011 at 4:34 PM, SRR sent Martin its "Analysis of Transaction Fairness," which was marked "Draft | Subject to Further Review" and dated August 19, 2011. (Wilemon Decl. [Doc. No. 206] Ex. 1; *see* Wilemon Decl. [Doc. No. 213] Ex. 65.)

The Analysis of Transaction Fairness provided a detailed overview of Kurt and the proposed Transaction. It concluded that the fair market value of Kuban's stock was between $34.2 million and $43.1 million, with a midpoint of $39 million. (Wilemon Decl. [Doc. No. 206] Ex. 1 at 61; [Doc. No. 213] Ex. 62 at 1.) Further, it identified the price of Kuban's stock as $39 million and concluded that this price did not exceed the fair market value of the stock. (Wilemon Decl. [Doc. No. 206] Ex. 1 at 11, 67.)

The Analysis of Transaction Fairness contained a detailed Financial Statement Analysis. It noted that Kurt's adjusted EBITDA margins during the five years preceding the Transaction were: 6.4% for the fiscal year ending October 31, 2006; 8.3% for October 31, 2007; 6.7% for October 31, 2008; 2.6% for October 31, 2009; 7.8% for October 31,

2010; and 9.2% for 2011, as of July 31, 2011. (*Id.* at 40.) SRR's projections of Kurt's adjusted EBITDA margins for the next five years were: 10.5% as of October 31, 2011; 10.5% as of October 31, 2012; 10.8% as of October 31, 2013; 11.0% as of October 31, 2014; and 11.1% as of October 31, 2015. (*Id.* at 43.) Reliance's Martin testified that Kurt's projections were "reasonable" and "not overly aggressive." (Wilemon Decl. [Doc. No. 210] Ex. 20, Martin Dep. at 86.)

The Analysis of Transaction Fairness also discussed Kurt's performance during the Great Recession and thereafter. For example, SRR noted that "net sales increased from $100.9 million in fiscal [year] 2006 to $108.9 million in fiscal [year] 2008 before decreasing significantly to $67.8 million in fiscal [year] 2009 in conjunction with recessionary macroeconomic conditions. However, more recently, net sales increased to $97.2 million for the latest twelve months ended July 31, 2011 (the 'LTM Period')." (Wilemon Decl. [Doc. No. 206] Ex. 1 at 38.) SRR further noted that "Kurt's Contracting Solutions segment has experienced an increase in net sales since fiscal [year] 2009 primarily due to improved sales in the semiconductor, aerospace, agriculture, and defense industries, while its Product Solutions segment benefitted from significant growth from Kurt Kinetics," which has the highest margin within Kurt. (*Id.* at 21, 38.)

Further, the Analysis of Transaction Fairness discussed Kurt's gross profit and operating income. SRR noted that Kurt's gross profit increased annually from $16.4 million, or 16.3% of net sales, in fiscal year 2006, to $20.6 million, or 18.9% of net sales, in fiscal year 2008. (*Id.* at 38.) In fiscal year 2009, Kurt's gross profit decreased to $8.8 million, or 12.9% of net sales, in conjunction with the Great Recession. (*Id.*) In response

to the decrease in net sales in fiscal year 2009, Kurt implemented several cost savings measures, including layoffs, a 10% pay reduction for employees, mandatory work furloughs, participation in state worksharing programs, and the automation of certain manufacturing processes. (*Id.*) Since fiscal year 2009, gross profit increased annually to $16.7 million, or 17.1% of net sales, in the LTM Period. (*Id.*) Further, since fiscal year 2009, Kurt's operating income increased annually to $5.3 million of net sales, or 5.4% of net sales, in the LTM Period. (*Id.*) And as the economy improved after the Great Recession, Kurt restored employee compensation and weekly hours worked but maintained many of the operational efficiency initiatives implemented in fiscal year 2009, which improved margins as revenues increased. (*Id.*) Kurt's operating income and margins also benefitted from shifting its product mix to higher margin segments and automating certain manufacturing processes. (*Id.*)

SRR further analyzed Kurt's projected financial trends. It determined that Kurt's net sales were projected to increase to $100 million in fiscal year 2011, which represented a 2.8% increase from the LTM Period. (*Id.* at 41.) Thereafter, SRR expected net sales to increase to $114.7 million in fiscal 2015, or at a compounded annual growth rate of 3.5%. (*Id.*) Further, SRR projected that Kurt's gross profit would increase from $18.8 million, or 18.8% of net sales, in fiscal year 2011 to $20.4 million, or 17.8% of net sales, in fiscal year 2015. (*Id.*) According to SRR, although Kurt's margins appeared to be decreasing annually, the decrease in gross profit margin was primarily related to the accounting effects of Kurt's underfunded pension plan. (*Id.*) Excluding these accounting effects, SRR noted, would result in slightly increasing margins on an annual basis. (*Id.*) SRR expected Kurt's margins

to continue to improve due to its product mix, economies of scale, operational efficiencies, and automation that it had implemented in past years. (*Id.*)

SRR calculated a range of value for Kuban's stock using two appraisal methods: the Guideline Company Method and the Discounted Cash Flow Method. (*Id.* at 45-57.) Upon combining the results of these two methods, SRR reached an Enterprise Value for all of Kurt's stock, on a controlling basis, of $65.6 million to $79 million. (*Id.* at 61.) After applying certain adjustments and discounts, SRR concluded that the fair market value for Kuban's stock ranged from $34.2 million to $43.1 million, with a midpoint of approximately $39 million. (*Id.*)

Director Watson testified that the Directors asked to see the Analysis of Transaction Fairness but that SRR, Reliance, and Chartwell declined to share it with them "because it was a conflict of interest for [the Directors] to see it." (Norrie Decl. [Doc. No. 218] Ex. C, Watson Dep. at 107-08.)

On August 19 at 9:40 AM, GPM sent Reliance's Martin a "draft due diligence summary," which was a "work in progress." (Brockman Decl. [Doc. No. 239] Ex. R-31.) This "draft due diligence summary" provided an overview of the parties' negotiations and summarized the due diligence materials that GPM reviewed. (*Id.*) It ultimately concluded that, except for potential environmental issues and change-in-control provisions in certain agreements, there were no significant issues with respect to the proposed Transaction, although GPM encouraged Reliance to obtain certain documents that had not yet been provided to GPM in its due diligence requests. (*Id.*)

20

### I.   Control of Kurt

SRR's draft Analysis of Transaction Fairness sought "to value Kurt on a controlling ownership basis interest." (Wilemon Decl. [Doc. No. 206] Ex. 1 at 77.) According to SRR, "[o]ne of the primary benefits of control is the ability to change the capital structure of the firm to achieve efficiencies in the cost of capital to the company. This factor was considered in [SRR's] selection of the appropriate control premium." Specifically, SRR's draft Analysis of Transaction Fairness "applied a 10.0% control premium to the stock prices of the guideline companies used in the Guideline Company Method to account for any enhanced benefits that may be realized by a controlling shareholder of Kurt." (*Id.* at 78.)

Under the ESOP Document, ESOP participants can direct the trustee how to vote their shares only "[i]f a corporate matter involves the voting of Company stock with respect to the approval or disapproval of any corporate merger or consolidation, recapitalization, liquidation, dissolution, sale of substantially all assets of a trade or business, or such similar transaction as the Secretary of Treasury may prescribe in regulations …." (ESOP Document § 10.6.)

Reliance's Martin testified that he thought it would be a "good idea" to add "at least one independent or outside director" to Kurt's board. (Wilemon Decl. [Doc. No. 210] Ex. 20, Martin Dep. at 236-37; Ex. 38 at 4). In fact, Martin told GPM's Eide and Lenczewski the following:

> Kuban's daughter did not want off the board and [Kuban] did not want to remove[] her. I am not sure where that came from but that was mistake [*sic*]. Post closing I will need to impress on them they need to add some outside director(s) because it is currently all in the family so to speak. So that will be

redlined out of the agreement. I would not be opposed to it as I have other ESOP [*sic*] with all inside directors we just maintain a higher level of involvement with them due to the lack of outside influence or any oversight.

(Wilemon Decl. [Doc. No. 213] Ex. 85.)

The members of Kurt's board did not change as a result of the Transaction. (Wilemon Decl. [Doc. No. 210] Ex. 25, Hughes Dep. at 67.) Kurt's bylaws were not amended to grant the ESOP any additional control of Kurt as a result of the Transaction. (*See* Wilemon Decl. [Doc. No. 206] Ex. 2 at 89-103.) However, under the Investor Rights Agreement, an agreement reached in connection with the closing of the Transaction, Kurt granted Kuban the right to designate one of Kurt's board members until Kurt finished paying off its debt to him. (*Id.* at 317.)

## J. Reliance's Subcommittee Vote to Approve the Transaction

Reliance used an Investment Policy Subcommittee (the "Subcommittee") to review and approve proposed ESOP transactions in which it served as discretionary trustee. (Wilemon Decl. [Doc. No. 210] Ex. 20, Martin Dep. at 36-37; Ex. 22, Thayer Dep. at 15; Wilemon Decl. [Doc. No. 213] Ex. 46 at 352; Brockman Decl. [Doc. No. 239] Ex. R-32, Thayer Dep. at 15.) The Subcommittee was comprised of members of Reliance's investment team, among others. (Brockman Decl. [Doc. No. 239] Ex. R-6, Cotter Dep. at 14-15.) As of 2011, the Subcommittee had no standard operating procedures. (Brockman Decl. [Doc. No. 239] Ex. R-32, Thayer Dep. at 15.) Richard Thayer, who formerly served as chair of Reliance's Investment Policy Committee (the "Committee"), testified that that the Subcommittee reported its ESOP activities to the Committee on a monthly basis. (*Id.*)

In general, the Subcommittee received the valuation report and legal due diligence for a particular proposed transaction "a day or two" before it voted on such a transaction. (Wilemon Decl. [Doc. No. 210] Ex. 23, Cotter Dep. at 37.) Here, Martin forwarded SRR's draft Analysis of Transaction Fairness to Reliance's Subcommittee on August 18, 2011, at 9:26 PM. (Wilemon Decl. [Doc. No. 213] Ex. 65.) Martin received GPM's "draft due diligence summary" on August 19 at 9:40 AM. (Brockman Decl. [Doc. No. 239] Ex. R-31.)

On August 19, 2011, the Subcommittee convened at 10:00 AM to consider the proposed ESOP Transaction. (Wilemon Decl. [Doc. No. 213] Ex. 38; Norrie Decl. [Doc. No. 218] Ex. D, Martin Dep. at 221.) Committee members who comprised the Subcommittee were present at this meeting, as were Reliance's Martin, SRR's Buettner, and GPM's Eide. (Wilemon Decl. [Doc. No. 213] Ex. 38.) At the beginning of the meeting, Martin provided an overview of Kurt and the proposed Transaction. (*Id.* at 1.) Next, Buettner summarized SRR's draft Analysis of Transaction Fairness. (*Id.* at 2-5.) Then, Eide and another GPM attorney summarized GPM's legal due diligence, noting that there were concerns regarding Kurt's environmental compliance and documentation that GPM requested but had not yet received. (*Id.* at 6.) During the discussion of legal due diligence, Martin added that Reliance objected to Kurt's proposed August 15th closing date, and that the closing date had been rescheduled to August 24th, but he expected the Transaction would actually close around September 2nd. (*Id.*)

Subsequently, the Subcommittee asked certain questions, which, according to the Meeting Minutes, were "answered to the satisfaction of the Committee." (*Id.*) It accepted

SRR's draft Analysis of Transaction Fairness, "subject to the satisfactory resolution of the Committee's concerns regarding environmental issues as well as further exploration of the question regarding the structure of [Kurt's] bank debt." (*Id.*) Finally, the Subcommittee approved the $39 million purchase price for the Transaction, "assuming that the assumptions in SRR's report do not materially change from now until the closing of the Transaction." (*Id.*; *see* Norrie Decl. [Doc. No. 218] Ex. D, Martin Dep. at 221.) The meeting adjourned at 12:05 PM. (Wilemon Decl. [Doc. No. 213] Ex. 38 at 7.)

### K. Reliance's Efforts to Address the Environmental and Bank Debt Issues

Sometime on August 19, 2011, Martin had a call with someone from the seller's side to discuss the bank financing for the Transaction. (*See* Brockman Decl. [Doc. No. 239] Ex. R-34.) The person with whom Martin spoke explained that Chartwell "went to great lengths to get more term debt" and that the seller-side had performed a stress-test in the event revenue declines. (*Id.*) They also discussed the structure of the revolver note and that the seller-side approached twelve banks and "the terms offered by U.S. Bank were the best offered." (*Id.*)

On August 26, 2011, Reliance, Chartwell, Kurt, and GPM held a meeting to discuss GPM's environmental concerns with Kurt. (Brockman Decl. [Doc. No. 239] Exs. R-36, R-37, R-38.) At this meeting, the parties discussed certain potential environmental liabilities at various of Kurt's facilities. (*See id.*, Ex. R-36.) Later, on September 3rd, in an email to Reliance's Martin, GPM's Eide identified four specific Kurt facilities that raised potential environmental liability issues. (*Id.*, Ex. R-40.) According to Martin, GPM recommended

that Reliance conduct Phase 1 and Phase 2 environmental testing at the identified sites. (*See id.*, Ex. R-1, Martin Dep. at 134.)

Nevertheless, Reliance and Kurt declined to conduct any environmental studies as a part of the Transaction. Specifically, Martin testified that Reliance "didn't see a need to go looking for problems" and that Reliance "made sure [it] had an indemnification cap should problems ever occur." (*Id.* at 133-35.) According to GPM's Eide, Kurt refused to conduct any environmental testing "because of the time it would take and the expense," even though such testing could lead to "a more … definite idea of what we were dealing with in terms of the risk." (*Id.*, Ex. R-9, Eide Dep. at 157.)

The parties eventually addressed the environmental concerns by including warranty and indemnification provisions in the final agreement for the Transaction. Specifically, the parties included: (1) a warranty in the Stock Purchase and Sale Agreement that all properties were free of environmental contamination; and (2) a corresponding indemnification from Kuban that he would indemnify Kurt and the ESOP for 75.6% of any losses resulting from a breach of that warranty. (*Id.*, Ex. R-41 § 5.20 (warranty provision), §§ 8.1, 8.2 (indemnification provisions).)

### L.  SRR's Solvency Opinion

On August 26, 2011, Reliance and SRR entered into another agreement, wherein SRR agreed to prepare a solvency opinion regarding the ESOP's purchase of Kuban's stock, assuming "an aggregate purchase price of approximately $39 million." (Wilemon Decl. [Doc. No. 213] Ex. 55.) In this agreement, SRR agreed to render a written opinion as to: (1) whether the fair value and present fair saleable value of Kurt's assets would

exceed Kurt's liabilities; (2) whether Kurt should be able to pay its debts as they become absolute and mature; and (3) whether Kurt should not have unreasonably small capital for the business in which Kurt is engaged. (*Id.* at 1.)

Reliance did not always request a solvency opinion in ESOP transactions. (Brockman Decl. [Doc. No. 239] Ex. R-1, Martin Dep. at 122.) However, Reliance requested one for the Kurt Transaction because it was a "second stage transaction" (*i.e.*, a transaction where an ESOP already owns a portion of company stock and is acquiring an additional block of such stock) and because Kurt was set to take on significant debt from Kuban and its outside lender. (*Id.*)

On September 16, 2011 at 11:00 AM, Reliance's Subcommittee met to review SRR's "Solvency Opinion," which was dated September 16, 2011. (Wilemon Decl. [Doc. No. 213] Ex. 73.) SRR's Buettner presented the Solvency Opinion to the Subcommittee. (*Id.* at 1.) The Solvency Opinion examined Kurt's solvency using three tests: (1) the Balance Sheet Test; (2) the Cash Flow Test; and (3) the Reasonable Capital Test. (Wilemon Decl. [Doc. No. 213] Ex. 74 at 12-19.) SRR determined that Kurt passed each test and, accordingly, concluded that: (1) the fair value and present fair saleable value of Kurt's assets would exceed Kurt's stated liabilities, including identified contingent liabilities and liabilities assumed as part of the Transaction; (2) Kurt should be able to pay its debts as they become absolute and mature; and (3) Kurt should not have unreasonably small capital for the business in which it is engaged. (*Id.* at 21.) The Subcommittee asked certain questions regarding the Solvency Opinion, and such questions "were answered to the

satisfaction" of the Subcommittee. (*Id.*, Ex. 73 at 2.) Accordingly, the Subcommittee approved the Solvency Opinion at the September 16, 2011 meeting. (*Id.*)

Reliance's Meeting Minutes from this September 16th Subcommittee meeting provide that the meeting ended at 11:26 AM. (*Id.*) Martin, however, contends that the 11:26 AM time of adjournment in the Meeting Minutes "has to be a typo" and that "[t]here's no way it only lasted 26 minutes" because the Solvency Opinion "was a pretty robust analysis" and the Subcommittee "could not have reviewed that in 26 minutes." (Brockman Decl. [Doc. No. 239] Ex. R-1, Martin Dep. at 223-24.)

Relatedly, and closer to the Transaction's closing on October 4, 2011, RSM McGladrey, Inc., Kurt's outside auditor ("McGladrey"), issued a valuation of Kurt, concluding that, if the Transaction closed as proposed, Kurt's assets would exceed its liabilities, including contingent liabilities. (*See* Norrie Decl. [Doc. No. 218] Ex. A, Lillyblad Dep. Ex. 59 at 7.)

### M. Floor Price Protection and the Price Support Agreement

Because of the new debt Kurt expected to incur as result of the Transaction, the parties anticipated that Kurt's stock price would decline in the short-term. (*See* Brockman Decl. [Doc. No. 239] Ex. R-9, Eide Dep. at 57-60; Ex. R-1, Martin Dep. at 53-54.) Accordingly, the parties recognized that this drop in value could severely impact existing ESOP participants who may be eligible for a distribution of their account balances soon after the Transaction's closing due to death, disability, or retirement. (*Id.*, Ex. R-9, Eide Dep. at 57-58.) According to Martin, Reliance wanted to protect ESOP participants who may become eligible for a distribution in the near-term by instituting "floor price

protection" ("FPP") for their shares through a Price Support Agreement as a part of the Transaction. (*Id.*, Ex. R-1, Martin Dep. at 53-54, 68.)

To understand what the ESOP's existing shares were worth, Martin asked SRR to calculate the share value of the ESOP's shares on a pre-Transaction basis. (*Id.* at 281-82; *see id.*, Ex. R-44.) SRR calculated Kurt's share value to be $74.95 per share on pre-Transaction and non-controlling bases, which were consistent with the ESOP's minority ownership position before the Transaction. (*Id.*, Ex. R-44.)

According to GPM's Eide, there is "no clear guideline" as to what companies should do with respect to FPP mechanisms. (*Id.*, Ex. R-9, Eide Dep. at 57-58.) Martin advocated for a FPP value of $74.95 per share based on the calculations he received from SRR. (*Id.* at 61-62; *see id.*, Exs. R-45, R-46.) In contrast, Eide advocated for a FPP value of $33.44 per share, which was based on Willamette's last appraised value of the ESOP's shares— on a non-control, minority basis—as of October 31, 2010. (*Id.*, Ex. R-9, Eide Dep. at 61-62; Ex. R-47.)

According to Reliance, two factors informed the FPP value. First, there were competing interests between the participants who may request distributions in the near-term and the remaining participants. (*Id.*, Ex. R-9, Eide Dep. at 57-60.) The participants that could be eligible to receive a distribution of their account balances in the near-term due to death, disability, or retirement would want to receive a higher FPP price. (*Id.*) However, since the near-term distributions would be paid through stock redemptions, Kurt would be required to expend cash to meet those redemptions, which would harm the interests of the remaining ESOP participants. (*Id.*) Second, Reliance could not unilaterally

impose a FPP value because Kurt would ultimately have to pay it to any participants who request distributions in the near-term, so the FPP value had to be acceptable to Kurt. (*Id.* at 62-63.)

On September 26, 2011, Chartwell, on behalf of Kurt, offered a proposal for the FPP mechanism. (*See* Wilemon Decl. [Doc. No. 213] Ex. 81.) Specifically, Chartwell proposed to offer FPP at $55.29 per share for three years subject to certain caps: (1) $30 for fiscal-year-ended 2012; (2) $20 for fiscal-year-ended 2011; and (3) $10 for fiscal-year-ended 2013.[2] (*Id.* at 6.) To reach these values, Chartwell updated Willamette's latest valuation and applied "consistent methodologies as [Willamette]." (Wilemon Decl. [Doc. No. 213] Ex. 81 at 6.) Chartwell explained that the theory underlying its proposal was "what would be the proforma administrative value [of Kurt stock] as of the transaction date if the transaction had not occurred." (*Id.*)

Martin sent Chartwell's FPP proposal to SRR's Buettner, and Buettner replied to Martin with a critique of Chartwell's FPP methodology and application of that methodology. (Brockman Decl. [Doc. No. 239] Ex. R-49.) For example, regarding Chartwell's FPP methodology, Buettner argued that a minority (*i.e.*, non-control) valuation derived from the more recent valuations performed by SRR and Chartwell would better reflect the ESOP's pre-transaction share price:

---

[2] Notably, on September 6, 2011, Thomas Hughes, Kurt's ESOP legal counsel, warned the Directors that "[Kuban's] projected sale price" for his stock is a "fact to which" all ESOP participants "can compare themselves and feel treated unfairly." (Wilemon Decl. [Doc. No. 213] Ex. 87 at 3.)

Both Chartwell and SRR have performed an independent valuation of [Kurt] and have fully negotiated a transaction that implies an Enterprise Value (EV) of approximately $73 million on a controlling interest basis. Based on a 10% control premium consistent across both SRR and Chartwell implies [*sic*] an EV of approximately $65 million on a minority interest basis. Since the company has historically been valued on a minority interest basis for ESOP administrative purposes under the premise of FMV (willing buyer and willing seller), it seems as if the negotiated price would better approximate the value of the company for admin purposes consistent with the premise of FMV absent the transaction. (FYI, an EV of $65 million results in a per share price between $70 and $75 per share all else being equal).

(*Id.*)

Buettner also criticized Chartwell's application of its proposed FPP methodology and provided several examples of how Chartwell's calculations were inconsistent with valuation principles or based on inappropriate data sets, resulting in an artificially lower proposed FPP price. (*Id.*) For example, Buettner noted that "Chartwell's LTM Revenue and EBITDA metrics are based on financial performance through July (EBITDA = $8.4 million)," and he countered that "August financials are now available. Since [Kurt] had a fantastic month in August, it is likely that EBITDA is significantly higher than $8.4 million through August 2011. All else being equal, this would result in a higher indicated EV for the LTM period." (*Id.*)

On September 30, 2011, Martin spoke with Chartwell's Fresh about Kurt's FPP proposal. (Martin Decl. [Doc. No. 240] ¶ 36.) Despite SRR's criticisms of Chartwell's proposed methodology, and application of that methodology, Martin understood that Kurt was not willing to pay more than $55.29 per share, subject to the caps in Chartwell's September 26th proposal, and Martin agreed in principle to the FPP value of $55.29 per

share. (*Id.*) Martin believed that a FPP value of $55.29 represented a fair balance between the interests of: (1) the ESOP participants who may be eligible for a near-term distribution; and (2) the remaining ESOP participants. (*Id.* ¶ 37.)

Reliance and Kurt ultimately entered into the Price Support Agreement as part of the Transaction's closing on October 5, 2011. (Brockman Decl. [Doc. No. 239] Ex. R-50.) The Price Support Agreement provides that Kurt will subsidize the value of existing ESOP shares for eligible participants such that the participant receives the greater of: (1) $55.29 per share; or (2) the most recent fair market value as determined by the annual appraisal for the ESOP. (*Id.* § 1.) Kurt's subsidy is also subject to the caps provided in Chartwell original September 26th proposal. (*Id.*)

### N. SRR's Updated Valuation Exhibits

On September 21, 2011, SRR updated its valuations for Kurt and Kuban's shares. (Brockman Decl. [Doc. No. 239] Ex. R-51.) SRR's exhibits showed Kurt's updated financial results through August 31, 2011. (*Id.*) Kurt's trailing 12-month sales increased from approximately $97.2 million as of July 31st to approximately $100.4 million by August 31st, and Kurt's trailing 12-month adjusted EBITDA increased from approximately $8.98 million as of July 31st to approximately $9.97 million as of August 31st. (*Compare id.*, Ex. R-30 at RTC_002126, *with* Ex. R-51 at STOUT_KURT_000006.)

However, the low, high, mean, and median EBIT and EBITDA market multiples that SRR used in its Guideline Company Method over the LTM Period generally dropped across the board. (*Compare id.*, Ex. R-30 at RTC_002138, *with* Ex. R-51 at STOUT_KURT_0000017.) Nevertheless, SRR's estimated range of Enterprise Values

31

under the Guideline Company Method remained the same. (*Compare id.*, Ex. R-30 at RTC_002138, *with* Ex. R-51 at STOUT_KURT_0000017.)

In its conclusion, SRR's updated valuation resulted in a wider range of fair market value for Kuban's shares, with the low end of the range staying at $34.2 million and the high end of the range increasing slightly to $43.4 million, and the "Purchase Price" was listed as $39 million. (*Compare id.*, Ex. R-30 at RTC_002147, *with* Ex. R-51 at STOUT_KURT_000001.)

Martin testified that he was "not aware of any" policies or procedures that Reliance had in place that would allow Reliance to learn if any assumptions in SRR's draft Analysis of Transaction Fairness changed between the time the Subcommittee approved the $39 million price on August 19, 2011, and the Transaction's closing on October 5, 2011. (Wilemon Decl. [Doc. No. 210] Ex. 20, Martin Dep. at 243-44.) However, Martin testified that he expected SRR to alert Reliance if SRR's assumptions in its analysis changed in a material way. (Brockman Decl. [Doc. No. 239] Ex. R-1, Martin Dep. at 242.)

On October 3, 2011, Will Bloom, a Principal at Chartwell, and Chartwell's Fresh exchanged the following email messages:

> Bloom: "I think SRR will push back pretty hard on the formula—they want it exercised at FMV."
>
> Fresh: "Are you saying the transaction wasn't FMV?"
>
> Bloom: "No, but at the time of exercise, my guess is that they will require the price to be FMV. Given market multiples fluctuate and their valuation method utilizes going market multiples, they won't want to assume risk to the downside … just my opinion, perhaps you will convince them. You have been successful on many occasions before …."

(Wilemon Decl. [Doc. No. 213] Ex. 83 at 1.)

### O. The Directors' Efforts to Monitor Reliance

After appointing Reliance as trustee, the Directors relied on Chartwell to hold discussions with Reliance and report back to them. Director Lillyblad testified that the Directors "had weekly updates on the transaction status involving all the service providers … [Reliance] reported back to Chartwell and Chartwell would report to us on how they're progressing in their transaction. We asked the question on numerous occasions, how is it coming along." (Wilemon Decl. [Doc. No. 206] Ex. 3, Lillyblad Dep. at 76-77.) Lillyblad further testified that the Directors monitored Reliance by "answer[ing] their questions that would come up along the way." (*Id.* at 78.) Director Watson took notes at several of these weekly meetings with Chartwell. (*See* Norrie Decl. [Doc. No. 218] Ex. C, Watson Dep. at Ex. 78.)

> At his deposition, Lillyblad had the following exchange with an attorney from DOL:
>
> Q: […] So besides the meetings with Chartwell … was there any other method that was used to monitor Reliance?
>
> A: It was a pretty dynamic situation. A lot of things going on during that whole transaction.
>
> Chartwell was providing guidance for the transaction, Reliance was doing the things that it was supposed to be doing, and all the hundreds of lawyers surrounding the deal were doing what they were supposed to do.
>
> Q: How do you know that Reliance was doing what it was supposed to be doing?
>
> A: I think a couple of factors. First of all, they are a trust company that in the business – that is their business. That is what they are supposed to do.

> By agreement they agreed that they would perform that duty and had the
> reputation and ability, we believed, to do that appropriately. So maybe trust
> is part of the conclusion that you draw.

(*Id.* at 69-70.) Lillyblad further testified that the Directors "were told that [they] weren't able to be involved with any of the negotiations, and [they] didn't feel it was appropriate for [them] to be involved in any of the negotiations." (*Id.* at 78.)

Based on Director Watson's handwritten notes, it appears the Directors attended five meetings from late July through September 2011 that included various seller-side representatives—usually at least Chartwell representatives and Kuban—and Reliance's Martin, among others from the buyer-side. (*See* Norrie Decl. [Doc. No. 250] Ex. M, Watson Dep. Ex. 78 at KURT10539, KURT10561, KURT10717, KURT10722-23, and KURT10781-82.)

As a general matter, these meetings can be grouped into three categories: (1) the pitch meeting; (2) the environmental meeting; and (3) the closing meetings. (*See id.*) On July 22, 2011, Kuban, the Directors, Chartwell's Fresh, Tim Lang (a Senior Analyst at Chartwell), SRR's Buettner, and Reliance's Martin attended a pitch meeting where Kurt presented an overview of its business and Chartwell presented its initial offer for the Transaction to Reliance. (*Id.* at KURT10561-609.) On August 26, 2011, GPM's Eide, "Nancy B." (presumably GPM's "Nancy Burke"), "Tim" (presumably Chartwell's "Tim Lang"), "Steve," Kuban, "Jim R.," Chartwell's Fresh, Kuban's attorney, and Martin held a meeting to discuss the environmental issues relating to the Transaction. (*See id.* at KURT10781-82.)

The final three meetings occurred toward the end of September and covered a variety of topics relevant to moving the Transaction to closing. On September 23, 2011, the Directors, Chartwell's Fresh, "Deb Linder," "Steve Potach," "Ryan B.," GPM's Eide, Kuban, Chartwell's Lang, "Jim Rikkers," and Martin discussed a list of items that needed to be completed before the closing. (*Id.* at KURT10722-23.) On September 26, 2011, Steve Potach, Thomas Hughes, Reliance's Martin, GPM's Eide, "Ryan B.," Chartwell's Fresh, Chartwell's Bloom, Chartwell's Lang, Deb Linder, and the Directors discussed SRR's Solvency Opinion, among other items related to closing the Transaction. (*Id.* at KURT10539.) On September 28, 2011, Kuban, GPM's Lenczewski, the Directors, "Jim R.," "Ryan," Deb Linder, Steve Potach, Thomas Hughes, and Martin discussed a few issues relating to the Stock Purchase Agreement, Kuban's employment, and the FPP. (*Id.* at KURT10717.)

Martin testified that he was "not aware of any" monitoring that Kurt performed with respect to Reliance. (Wilemon Decl. [Doc. No. 210] Ex. 20, Martin Dep. at 276.)

## P.  Closing the Transaction

On October 5, 2011, the ESOP purchased all 457,623 of Kuban's Kurt shares—representing about 75.6% of outstanding shares—for a total purchase price of $39 million, or approximately $85.22 per share. (Wilemon Decl. [Doc. No. 206] Ex. 2 at 49.) Kuban, Reliance's Martin, and Director Carlsen all signed the Stock Purchase and Sale Agreement. (Wilemon Decl. [Doc. No. 206] Ex. 2 at 78-80.) As a result of the Transaction, the ESOP owned 100% of the outstanding Kurt stock. (Wilemon Decl. [Doc. No. 206] Ex. 2 at 49.)

In connection with the closing, on October 5, 2011, SRR issued a Fairness Opinion, concluding, *inter alia*, that: (1) the consideration paid by the ESOP is not greater than the fair market value of the shares; and (2) the terms and conditions of the Transaction, taken as a whole, are fair to the ESOP from a financial point of view. (Brockman Decl. [Doc. No. 239] Ex. R-52.)

Moreover, as part of the closing, Kurt paid Kuban's attorneys' fees associated with closing the Transaction, although Kuban later reimbursed Kurt for this expense. (*See* Wilemon Decl. [Doc. No. 206] Ex. 3, Carlsen Dep. at 176; Norrie Decl. [Doc. No. 250] Ex. L, Lillyblad Dep. Errata Sheet.)

## Q. The Directors' Compensation

As a part of the Transaction closing, the Directors received an enhanced compensation package through a "Stock Appreciation Rights Plan." (*See* Wilemon Decl. [Doc. No. 206] Ex. 2 at 358-59.) The Directors became eligible to receive SARs units annually, based on certain performance criteria. (*Id.*) The Directors were aware that the SARs were going to be included in the Transaction. (*See* Wilemon Decl. [Doc. No. 206] Ex. 3, Lillyblad Dep. at 136.)

Moreover, at some time, the Directors received raises in their base salaries: Carlsen's base salary rose by approximately 15.5%, and Lillyblad's and Watson's base salaries each rose by approximately 7.1%. (*Compare* Wilemon Decl. [Doc. No. 206] Ex. 2 at 106, 118, 130, *with* Wilemon Decl. [Doc. No. 213] Ex. 86 at 7.) According to DOL, the Directors received these raises as a part of the Transaction's closing; however, Director

Lillyblad stated that those salary increases went into effect in May 2011 and were not part of the Transaction. (Lillyblad Decl. [Doc. No. 220] ¶ 7.)

## II.    PROCEDURAL HISTORY

On October 4, 2017, nearly six years after the Transaction, DOL filed its initial complaint in this action. (*See* Compl. [Doc. No. 1].) On August 20, 2018, DOL filed an Amended Complaint, which is the operative complaint in this case. (*See* Am. Compl. [Doc. No. 46].) The Amended Complaint alleges several violations of ERISA: (1) in Count I, claims for breach of the fiduciary duties of loyalty and prudence against both Reliance and the Directors, *see* 29 U.S.C. § 1104(a)(1)(A)-(B); and (2) in Count II, a "prohibited transaction" claim against Reliance for agreeing to the Transaction and against the Directors as co-fiduciaries and knowing participants in the Transaction, *see* 29 U.S.C. § 1106(a).

The Amended Complaint seeks the following equitable relief from Defendants: (a) that Reliance and the Directors "restore all losses caused to the ESOP as a result of their fiduciary breaches"; (b) that Reliance and the Directors "disgorge all profits, fees, and costs, including legal fees that they or their agents received from Kurt, the ESOP, or any other source for all services related to the ESOP and any litigation related to their fiduciary breaches alleged herein"; (c) that the Court remove Reliance and the Directors "from all fiduciary or service provider positions they may now have in connection with the ESOP"; (d) that the Court enjoin Reliance and the Directors "from acting as a fiduciary or service provider to any ERISA-covered plan"; and (e) that the Court appoint an "independent fiduciary to distribute all recoveries made to the ESOP" and require Reliance and the

Directors to "pay for all fees and expenses related to such appointment." (Am. Compl., Prayer for Relief; *accord* 29 U.S.C. § 1109 (permitting ERISA plaintiffs to seek this relief for breaches of fiduciary duty).)

On July 27, 2020, the parties filed cross-motions for summary judgment as well as *Daubert* motions seeking to exclude the opinions of certain experts.

DOL moves for partial summary judgment (as to liability only) as follows:

(1) Under Count I, that the Directors violated their duties of loyalty and prudence under 29 U.S.C. § 1104(a)(1)(A) and (B);

(2) Under Count I, that Reliance violated its duty of loyalty under 29 U.S.C. § 1104(a)(1)(A);

(3) Under Count II, that Reliance caused the ESOP to enter into a prohibited transaction in violation of 29 U.S.C. § 1106(a)(1)(A) and (D);

(4) Under Count II, that the Directors are liable as co-fiduciaries under 29 U.S.C. § 1105(a)(2) for enabling Reliance to enter into a prohibited transaction; and

(5) Under Count II, that the Directors are liable as knowing participants in the prohibited transaction, allowing DOL to obtain equitable relief from the Directors under 29 U.S.C. § 1132(a)(5).

The Directors move for summary judgment on the duty of prudence and duty of loyalty claims against them in Count I and on the co-fiduciary claim against them in Count II. Reliance moves for partial summary judgment on the duty of prudence claim asserted against it in Count I.

The parties also filed *Daubert* motions. Defendants jointly move to exclude the expert testimony of DOL's duty-of-prudence expert, Mark Johnson. DOL moves to exclude the expert testimony of Defendants' duty-of-prudence expert, Corey Rosen.

## III.   DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material'" if it may affect the outcome of the lawsuit. *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). Likewise, an issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing a lack of any genuine issue of material fact in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and the Court must view the evidence and any reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B.  Motions to Exclude Expert Testimony

#### 1.  The Law

Under Federal Rule of Evidence 702, a witness who is qualified as an expert by "knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," the testimony "is based on sufficient facts or data," is "the product of reliable principles and methods" and the expert "has reliably applied the principles and methods to the facts of the case."

The Rule 702 inquiry is "a flexible one," designed to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 152 (1999) (citation omitted). The factors under Rule 702 do not constitute a "definitive checklist or test"; the court's gatekeeping inquiry must be "tied to the facts" in any particular case. *Id.* at 150 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591, 593 (1993)).

"The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1408 (8th Cir. 1994). When considering expert testimony, a court must ensure that the testimony "is both reliable and relevant." *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1000 (8th Cir. 2019) (quoting *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (internal quotation marks and citations omitted)). Put another way, the trial court must exercise a gatekeeping role in order to ensure that expert testimony meets the requirements of Rule 702. *See id.* (citing *Daubert*, 509 U.S. at 589). The proponent of the expert testimony must show, by a preponderance of the evidence, that the expert is qualified to render the opinion offered, and that his or her methodology is valid. *Id.* (citation omitted).

While it is true that "under *Daubert*, liberal admission" of expert testimony "is prevalent," *id.* at 1001 (citing *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014)), and "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility," *id.* (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457

F.3d 748, 757 (8th Cir. 2006)), it is also true that courts must not overlook their gatekeeping role. *Id.* (citing *Daubert*, 509 U.S. at 589). Even under *Daubert*'s "liberal admission" standard, "[e]xpert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Id.* (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000)).

Additionally, "expert testimony on legal matters is not admissible" because "[m]atters of law are for the trial judge." *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (citing *United States v. Klaphake*, 64 F.3d 435, 438-39 (8th Cir. 1995)); *see also Farmland Indus. v. Frazier-Parrott Commodities, Inc.*, 871 F.2d 1402, 1409 (8th Cir. 1989) (noting that "[t]he special legal knowledge of the judge [rendered] the witness'[s] testimony" on legal questions "superfluous" (quoting *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977))). Still, expert testimony that bears on facts that support a legal conclusion may be admissible. As one court put it:

> In distinguishing admissible testimony from inadmissible [legal] testimony, the task for the Court is to ask whether the expert's opinions bear on some factual inquiry or whether they bear solely on the legal conclusions that are urged. In other words, an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied.

*Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 238 (S.D. Iowa 2010) (citing *Woodard v. Andrus*, No. 03-2098, 2009 U.S. Dist. LEXIS 6431, at *2 (W.D. La. Jan. 20, 2009)) (internal quotation marks omitted). Whether a legal standard has been met is for the

Court—and the Court alone—to decide, not an expert. *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) (excluding expert testimony on whether officer conduct was reasonable under Fourth Amendment standards).

### 2. Defendants' Joint *Daubert* Motion to Exclude the Expert Opinions of DOL's Duty-of-Prudence Expert Mark Johnson

The Defendants jointly move to exclude the expert opinions of DOL's duty-of-prudence expert, Dr. Mark Johnson, on the grounds that he: (1) lacks the necessary qualifications to testify as to the duty of prudence of ESOP fiduciaries; (2) failed to adequately review the evidentiary record; (3) offers opinions that embrace the ultimate issue in this case and thus invade the province of the Court; (4) fails to identify the correct standard for evaluating prudence; and (5) fails to identify the correct standard for evaluating the Directors' duty to monitor Reliance. The Court considers each ground in turn.

#### a. Whether Johnson Has the Requisite Education, Training, and Experience to Offer Expert Testimony in This Case

Johnson has a long track record of industry experience with ERISA plans. For approximately sixteen years, he worked for American Airlines in the areas of benefits and pensions, including eight years as the Managing Director of Benefits Compliance & Pensions. (*See* Nayani Decl. [Doc. No. 235] Ex. 1 ("Johnson Report") at Ex. I.) As Managing Director, he managed ERISA-covered plans and exercised "full discretionary authority over the plans, with the exception that [he] could not amend the plans." (Nayani Decl. [Doc. No. 235] Ex. 2, Johnson Dep. at 31-32.) After leaving American Airlines,

Johnson opened his own consulting firm, ERISA Benefits Consulting, Inc., and has provided professional ERISA consulting and expert services for approximately seventeen years. (*See id.*) Indeed, he has offered ERISA-related expert opinions in many prior cases. (*See* Johnson Report, Ex. I.)

Defendants contend that Johnson is unqualified to render an expert opinion in this case because he has no—or at most, very limited—professional experience with ESOPs. (Defs.' Mem. in Supp. of Jt. Mot. to Exclude Testimony of Mark Johnson ("Defs.' *Daubert* Mem.") [Doc. No. 209] at 11-15.) Specifically, Defendants note that Johnson's only prior professional experience relating to ESOPs specifically was supplying expert testimony in one prior case. (*Id.*) The DOL responds that the same standard of prudence applies to all ERISA fiduciaries, including ESOP fiduciaries, and so Johnson's professional experience makes him well-qualified to offer opinions in this case. (DOL Mem. in Opp'n to Jt. Mot. to Exclude Testimony of Mark Johnson ("DOL *Daubert* Opp'n") [Doc. No. 234] at 12-14.) The Court agrees with DOL and finds that Johnson's education, training, and experience are sufficient to qualify him as an expert in this case.

### b.   Whether Johnson Adequately Reviewed the Evidentiary Record

Defendants seek to exclude Johnson's expert opinions on the ground that he failed to adequately review the evidentiary record, thus rendering his opinions unreliable. Courts analyze reliability from a flexible, case-specific standpoint. *Kumho Tire*, 526 U.S. at 150. "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual

43

basis for the opinion in cross-examination." *Bonner v. Isp Techs.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Id.*

Johnson identified everything that he reviewed before rendering his opinions in this case, including: (1) the pleadings; (2) certain written discovery responses; (3) minutes of several of Reliance's Investment Policy Committee meetings; and (4) the deposition transcripts of the Directors, Reliance's Martin and Thayer, Chartwell's Fresh and Lang, SRR's Buettner, Premier Bank's Schultze, Andrew Carolus, and Robert Schweihs. (*See* Johnson Report, Ex. I.) He later clarified that he had also received the deposition transcripts of Nicolas Cotter, Adam Oakley, and GPM's Eide. (*See* Johnson Decl. [Doc. No. 236] ¶ 4.) In addition, he reviewed "Deposition Exhibits 1-160"; he recalled seeing documents prepared by Chartwell; and he recalled seeing documents that were prepared by SRR. (*See* Johnson Report, Ex. I; Nayani Decl. [Doc. No. 235] Ex. 2, Johnson Dep. at 202-04.)

Defendants contend nonetheless that Johnson only reviewed a small portion of the entire evidentiary record, hand-picked by DOL, that he was unable to recall certain facts at his deposition, and that he failed to review documents produced by certain key players in the Transaction, such as Chartwell and GPM, rendering his opinions unreliable. (Defs.' *Daubert* Mem. at 16-22.) In support, Defendants point to *Carlson v. C.H. Robinson Worldwide, Inc.*, No. CIV.02-3780 JNE/JGL, 2005 WL 758601, at *4 (D. Minn. Mar. 30, 2005). There, the court determined that an expert's limited review of the evidentiary record

rendered her report unreliable because the very category of evidence she failed to review formed the "cornerstone" of her expert opinion. *Carlson*, 2005 WL 758601, at \*4.

In response, DOL contends that Johnson adequately reviewed the evidentiary record and asked for additional documents when needed. (DOL *Daubert* Opp'n at 16-20.) To the extent that Defendants believe that Johnson overlooked portions of the record, DOL argues that those concerns go to the weight, rather than the admissibility, of his opinions.

Here, unlike in *Carlson*, however, it appears that Johnson has in fact reviewed significant portions of the evidentiary record relevant to his opinions. At trial, the Defendants will have a full opportunity to cross-examine Johnson as to any relevant portions of the record he did not review and then argue to the Court that his failure to review those portions of the record renders his opinions unreliable. Indeed, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner*, 259 F.3d at 929 (quoting *Hose*, 70 F.3d at 974).

### c. Whether Johnson Impermissibly Offers Legal Opinions that Invade the Province of the Court

An expert witness may give testimony that embraces an ultimate issue to be decided by the trier of fact, Fed. R. Evid. 704(a), but an expert cannot render a legal opinion. *In re Acceptance Ins. Companies Securities Litigation*, 423 F.3d 899, 905 (8th Cir. 2005). For example, an expert may testify about the duty of prudence, the applicable standard of care, and how a party's conduct measured up to the standard of care, but an expert may not opine on the ultimate question of whether the party violated ERISA. *See Hans v. Tharaldson*,

No. 3:05-CV-115, 2011 WL 6937598, at *5 (D.N.D. Dec. 23, 2011); *see also Troudt v. Oracle Corp.*, 369 F. Supp. 3d 1134, 1142-43 (D. Colo. 2019) ("An opinion that defendants breached their duties under ERISA leaves no room for the factfinder to do its job but essentially directs judgment in plaintiffs' favor. By contrast, testimony that defendants' actions were not prudent by the standards of the industry and in the more prosaic usage of that term allows room for argument and proof that the duty of prudence under ERISA may be informed by other considerations.").

Defendants contend that Johnson opines as to whether certain of Defendants' actions or inactions were prudent without tethering such opinions to industry standards among ESOP fiduciaries in 2011, and, therefore, such opinions are improper legal conclusions. (Defs.' *Daubert* Mem. at 22-28.) DOL responds that Defendants unfairly characterize Johnson's opinions as purely legal conclusions. To the contrary, DOL notes that Johnson never opines on the ultimate question of whether the Defendants breached their duty of prudence under ERISA. (DOL *Daubert* Opp'n at 21-23.) Rather, he opines that Defendants' conduct was imprudent, regardless of prevailing industry standards in 2011, based on Johnson's extensive experience as an ERISA plan administrator, fiduciary and consultant for many years. As another court recognized in a similar case, "just because most fiduciaries do something wrong does not mean that they satisfy the standard of care." *Perez v. Bruister*, 54 F. Supp. 3d 629, 640-41 (S.D. Miss. 2014), *aff'd as modified*, 823 F.3d 250 (5th Cir. 2016); *see also Pledger v. Reliance Tr. Co.*, No. 1:15-CV-4444-MHC, 2019 U.S. Dist. LEXIS 45668, at *29 (N.D. Ga. Feb. 25, 2019) ("No doubt Defendants will illustrate to the Court … how [the expert's] best practices differ from alleged industry

practice. These purported flaws, however, do not make [the expert] opinion inadmissible."). The Court finds that Johnson's opinions, as stated, are not impermissible legal conclusions.

### d.     Whether Johnson Applied the Correct Standard of Prudence to the Acts of the ERISA Fiduciaries

ERISA requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

Defendants contend that Johnson erroneously requires ERISA fiduciaries to exceed what is required of them under this section of the statute—that is, to be "experts" in their field. (Defs.' *Daubert* Mem. at 28-29.) DOL responds that Defendants misunderstand Johnson's opinions in this regard. (DOL *Daubert* Opp'n at 23-26.) It clarifies that Johnson's position is that the prudence of a "prudent fiduciary" is measured by what a "prudent man acting in a like capacity and familiar with such matters" would have done in like circumstances. In other words, Johnson notes that the standard requires that the fiduciary have some level of expertise—that is, that the fiduciary be "familiar with such matters."

This Court does not understand Johnson to be proposing a standard of prudence that exceeds that set forth in the statute.

### e.     Whether Johnson Applied the Correct Legal Standard to the Directors' Duty to Monitor

ERISA requires persons responsible for appointing and removing plan fiduciaries to "monitor the activities of their appointees" "at reasonable intervals." *Howell v. Motorola, Inc.*, 633 F.3d 552, 572-73 (7th Cir. 2011) (citing 29 C.F.R. § 2509.75-8). Admittedly, this duty is a narrow one and does not require such persons "to review all business decisions of Plan administrators because that standard would defeat the purpose of having [fiduciaries] appointed to run a benefits plan in the first place." *Krueger v. Ameriprise Fin., Inc.*, No. 11-cv-2781 (SRN/JSM), 2012 U.S. Dist. LEXIS 166191, *51 (D. Minn. Nov. 20, 2012) (internal quotation marks and citation omitted).

Defendants maintain that Johnson misapprehends the duty of the Directors in this regard. (Defs.' *Daubert* Mem. at 29-30.) The Court disagrees. Johnson simply opines that the Directors, as appointing fiduciaries, assumed a duty to monitor at the time they appointed Reliance as a trustee, but he does not require more of them in fulfilling that duty than that required by the law.

### 3. DOL's *Daubert* Motion to Exclude the Expert Opinions of Defendants' Duty-of-Prudence Expert Corey Rosen

DOL moves to exclude the opinions of Defendants' duty-of-prudence expert, Corey Rosen, on the grounds that he: (1) is biased and fails to identify the correct legal standard for analyzing an ERISA fiduciary's duty of prudence; (2) failed to consider material facts in the record; (3) improperly offers opinions on legal matters; (4) fails to identify the correct legal standard for the fiduciary's duty to monitor; (5) improperly speculates as to the Defendants' states of mind; and (6) improperly opines on valuation matters outside the

scope of his expertise. The Court first discusses Rosen's qualifications and then turns to each of the grounds that Defendants advance.

### a.      Rosen's Qualifications

As a threshold matter, the Court finds that Rosen is qualified to render opinions as to an ERISA fiduciary's duty of prudence. DOL in fact does not contend that Rosen lacks the necessary qualifications to opine on these issues. He is a co-founder of the National Center for Employee Ownership ("NCEO") and was its director for approximately thirty years. (Silver Decl. [Doc. No. 245] Ex. I, Rosen Dep. at 15-16, 22.) One purpose of NCEO is to "advocate for ESOPs done well." (Nayani Decl. [Doc. No. 231] Ex. 2, Rosen Dep. at 23). Rosen has taken "hundreds, if not more" educational courses on ERISA topics and has taught hundreds of such courses. (Silver Decl. [Doc. No. 245] Ex. I, Rosen Dep. at 13.)

Moreover, Rosen currently serves on the ESOP committee for the SWA Group in Sausalito, California. (*Id.* at 24.) In this role, he and the other members of the committee direct the activities of the ESOP trustee. (*Id.*) Also, Rosen currently serves on six ESOP company boards of directors and has served on eight ESOP company boards of directors in total. (*Id.*)

### b.      Whether Rosen's Opinions Are Inadmissible Because of Bias and Because He Applies Incorrect Legal Standards

DOL contends that Rosen's opinions are biased in light of his professional advocacy on behalf of ESOPs. (DOL Mem. in Supp. of Mot. to Exclude Rosen Testimony ("DOL *Daubert* Mem.") [Doc. No. 230] at 7.) For instance, DOL notes that Rosen heavily relies on publications of NCEO, an organization that advocates nationally on behalf of ESOPs.

(*Id.* at 8.) In response, Defendants contend that Rosen does not support all ESOPs and that any concerns regarding Rosen's role and work at NCEO go to the weight, not the admissibility, of his testimony. (Defs.' Mem. in Opp'n to Mot. to Exclude Rosen Testimony ("Defs.' *Daubert* Opp'n") [Doc. No. 244] at 13-15.)[3]

Next, DOL argues that Rosen improperly opines that a fiduciary can act prudently by advising an ESOP to pay more than fair market value for shares of the employer's stock. (DOL *Daubert* Mem. at 10-11; *see* Nayani Decl. [Doc. No. 235] Ex. 3 ("Rosen Report") at 22.)

DOL further contends that Rosen cannot opine as to industry standards in 2011 because those opinions are based simply on anecdotal evidence—general impressions he gained at the time from discussions at conferences with certain individuals in the industry. (DOL *Daubert* Mem. at 11.) Defendants respond that, to the contrary, Rosen's testimony is based on his expert knowledge of the industry in 2011 acquired through his role leading the NCEO for over 30 years, his board service, and his personal involvement in ESOP transactions. (Defs.' *Daubert* Opp'n at 14-15.)

Finally, DOL challenges Rosen's opinion that the Directors satisfied their fiduciary obligations "simply by hiring 'a well-respected independent trustee who, in turn, obtained

---

[3] DOL also notes that the Rosen Report contains a section entitled "How They Have Performed." (DOL *Daubert* Mem. at 8-9; *see* Rosen Report 6-7.) According to DOL, this section merely discusses general statistics relating to and general arguments in favor of ESOPs and therefore provides an unreliable basis for Rosen's opinions.

If Rosen intends to offer these statistics and arguments at trial, the Court will entertain an objection and rule on their relevancy at that time.

a fairness opinion from a well-respected ESOP valuation firm.'" (DOL *Daubert* Mem. at 12-13.) DOL notes that the law required more of the Directors than simply the appointment of Reliance to serve as the trustee in this case.

The Court will not exclude Rosen's opinions at this stage of the proceedings but will assess any potential bias and the credibility of his opinions at trial based in part on the adequacy of the foundation laid by the defense for those opinions. Regarding Rosen's opinions as to what qualifies as "fair market value" in an ESOP transaction, the Court understands Rosen to be saying that "fair market value" is often expressed as a range of values and a fiduciary's guidance to pay at the upper level of the range does not breach his fiduciary duty of prudence to the ESOP. Finally, considering Rosen's opinions, as a whole, he appears to understand that the Directors' fiduciary duty to monitor Reliance extended beyond merely hiring them.

### c. Whether Rosen Failed to Consider Material Facts in the Record

First, according to DOL, Rosen failed to consider the 2010 Willamette valuation, the fact that the Directors relied on the accuracy of Willamette's annual valuations in the past, and the fact that the 2010 Willamette valuation was used to create the FPP value. (DOL *Daubert* Mem. at 14-15.) However, as Defendants note, Rosen did consider the Willamette valuations. (*See* Defs.' *Daubert* Opp'n at 15-17.) He testified that he viewed them as "useful" but that they were "done under a very different set of assumptions and circumstances." (Nayani Decl. [Doc. No. 231] Ex. 2, Rosen Dep. at 196, 198.)

Next, DOL contends that Rosen failed to address the relevance of Mesirow's preliminary valuation analysis and refused to consider Chartwell's valuation that it used to arrive at a FPP value of $55.29. (Defs.' *Daubert* Opp'n at 15.) However, as Defendants note, (*see* Defs.' *Daubert* Opp'n at 17-18), Rosen did consider Mesirow's preliminary analysis and concluded that it was not "useful" because "it's based on a different model of value," is "extremely preliminary," does not "purport to go into any depth," and was done "at a different time." (Nayani Decl. [Doc. No. 231] Ex. 2, Rosen Dep. at 218; *see* Rosen Report at 16.) Likewise, Rosen did consider Chartwell's valuation that it used to arrive at a FPP value of $55.29, but he opined that the FPP value "has nothing to do with" the final share price Kuban received in the Transaction. (Silver Decl. [Doc. No. 245] Ex. 1, Rosen Dep. at 200; *see* Defs.' *Daubert* Opp'n at 18-19.)

Finally, DOL contends that Rosen: (1) only "looked … quickly" at the ESOP Document and "didn't spend a lot of time on it," (Nayani Decl. [Doc. No. 231] Ex. 2, Rosen Dep. at 169); (2) did not review any amendments to the ESOP Document, (*id.* at 184); and (3) did not review the parties' discovery requests and responses in this case, (*id.* at 104). (DOL *Daubert* Mem. at 16.) Although DOL raises valid concerns, they go to the weight, not admissibility, of Rosen's opinions. At trial, DOL will have a full opportunity to both cross-examine Rosen on these issues and argue to the Court that he failed to adequately consider certain material facts in the record.

### d.    Whether Rosen Improperly Offers Opinions on Legal Matters

DOL is critical of Rosen's repeated references to case law and the views of various courts on the obligations of ERISA fiduciaries. (DOL *Daubert* Mem. at 17-19.) For instance, DOL notes that Rosen asserts that "the courts have consistently agreed with" his characterization of the duties of the Directors and then cites to several judicial decisions that he claims support his views. (Rosen Report at 12, 21-22.) DOL also notes that Rosen attached an Appendix to his Report that purports to "summarize[] all the cases on board monitoring." (*Id.* at 13; *see id.*, App'x 1.) He further opines that "most" of the cases in this Appendix support a particular characterization of the duty to monitor. (*Id.* at 13.)

In fact, DOL argues that at his deposition, Rosen purported to opine as to his view of the duties of fiduciaries under the case law and even opined on the ultimate issue in this case—whether the Directors complied with their fiduciary duty of prudence under ERISA. (*See* Nayani Decl. [Doc. No. 231] Ex. 2, Rosen Dep. at 49, 119-21, 224; DOL Reply in Supp. of Mot. to Exclude Rosen Testimony ("DOL *Daubert* Reply") [Doc. No. 260] at 9-10.)

In response, Defendants contend that Rosen's reference to case law is designed only to provide context for understanding industry practice. They argue that "these court opinions are not cited because Rosen is expressing legal opinions, but rather because he testified that industry practice and standards have changed over the years, in part informed by what the courts have held is required." (Defs.' *Daubert* Opp'n at 21-23.)

Rosen will not be permitted to testify at trial as to relevant case law or other legal matters. If the proper foundation is laid at trial, however, he will be able to testify as to his understanding of the prevailing industry standards at the time and whether the Directors complied with those standards. *See, e.g.*, *Hans v. Tharaldson*, No. 3:05-CV-115, 2011 WL 6937598, at *5 (D.N.D. Dec. 23, 2011).

### e.   Whether Rosen's Testimony as to Defendants' States of Mind Is Admissible

DOL contends that certain of Rosen's opinions contain improper speculation as to the Defendants' states of mind and are therefore inadmissible. "Expert testimony on the intent, motives, or states of mind of corporations ... ha[s] no basis in any relevant body of knowledge or expertise" and accordingly experts "may not proffer an opinion relating to what individuals [within a company or agency] thought with respect to certain documents or about their motivations." *In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d 902, 944 (D. Minn. 2020) (quoting *Kruszka v. Novartis Pharm. Corp.*, 28 F. Supp. 3d 920, 931 (D. Minn. 2014)). Thus, although an expert may testify to what a party did, expert testimony that speculates as to a party's "purpose or motivation," what the party "knew or thought," and what a party "would have done" is inadmissible. *Id.* at 944-45.

According to DOL, Rosen improperly speculates as to the Directors' states of mind when he opines that the Directors selected Reliance "because of its experience with ESOPs" and that the board "believed" it was better served by monitoring Reliance through Chartwell. (DOL *Daubert* Mem. at 22 (quoting Rosen Report at 9, 19).) Further, DOL contends that Rosen speculates as to Reliance's state of mind when he opines that Reliance

54

"did not want to share the numbers because it believed it could weaken its bargaining position" and that "[i]n the view of Reliance … to provide this to the board would compromise their independence, and thus potentially compromise the result." (DOL *Daubert* Mem. at 22-23 (quoting Rosen Report at 9, 12).) In response, Defendants contend that Rosen's statements are not speculative because he relies on actual statements made by the Directors in their depositions and during his interviews with them. (Defs.' *Daubert* Opp'n at 25.)

The Court notes that, in the absence of an appropriate foundation for such testimony at trial, any question that asks the witness to speculate as to the Defendants' states of mind will not be permitted. *See In re ResCap Liquidating Tr. Litig.*, 432 F. Supp. 3d at 944-45. Nor will Rosen be permitted to testify as to the statements of others, to the extent that is hearsay testimony. Nonetheless, the Court will await to rule on any particular question asked of Rosen in this regard until trial.

### f. Whether Rosen's Testimony as to Valuation Issues Is Admissible

Finally, DOL contends that certain of Rosen's opinions are inadmissible because they address valuation issues on which he is unqualified to opine. The Court must "perform its gatekeeping role by ensuring the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001). Specifically, DOL takes issue with Rosen's comments, for instance, as to the relevance of the Willamette valuations, Mesirow's proposal, and the final FPP value to the value of

Kurt's shares. (DOL *Daubert* Mem. at 23-25.) Rosen will need to take care at trial to limit his opinions to his areas of expertise and not wade into valuation issues. The Court will defer ruling on any particular inquiry until trial.

### C. Breach of Fiduciary Duty Claims

#### 1. The Law

ERISA is a comprehensive statute "designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines*, 463 U.S. 85, 90 (1983). ERISA imposes on fiduciaries the "twin duties of loyalty and prudence," requiring them to act "'solely in the interest of [plan] participants and beneficiaries' and to carry out their duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (quoting 29 U.S.C. § 1104(a)(1)). These duties require fiduciaries to act with "diligence" and with an "eye single" to the interests of the plan's participants when making decisions about the plan, even if the fiduciary is employed by the plan's sponsor in some other capacity. *Pegram v. Herdich*, 530 U.S. 211, 224-26, 235 (2000). Indeed, ERISA's fiduciary duties are "the highest known to the law." *Id.* at 598 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). Good faith does not provide a defense to a claim of a breach of these fiduciary duties because "a pure heart and empty head are not enough." *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983).

ERISA's "prudent person standard is an objective standard … that focuses on the fiduciary's conduct preceding the challenged decision." *Roth v. Sawyer-Cleater Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994) (citation omitted). In evaluating whether a fiduciary has acted prudently, the court focuses on the process by which it makes its decisions rather than the results of those decisions. *Id.* at 917-18. Moreover, determining whether a fiduciary breached its fiduciary duties often requires a "fact-intensive inquiry" that is not susceptible to summary judgment. *Id.* at 919; *accord Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 307 (5th Cir. 2000) (noting the "fact-specific nature" of the prudence inquiry under ERISA); *Harley v. Minn. Mining & Mfg. Co.*, 42 F. Supp. 2d 898, 907 (D. Minn. 1999) ("Typically, whether a fiduciary acted prudently—or in other words, as a reasonably prudent fiduciary—is a question of fact.").

A person is a "plan fiduciary," and therefore subject to these exacting duties, not only if they are named as such in a plan document, or if they are appointed as such by a prior plan fiduciary, but also "to the extent [they] exercise[] any discretionary authority or discretionary control respecting management of such plan or exercise[] any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). Thus, determining whether a person is a "fiduciary" to a plan at any given time requires a functional inquiry—the question is not whether the person was called a "fiduciary" or "trustee" on paper, but, rather, whether the person "exercised effective control over the [plan's] assets" with respect to the transaction at issue. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) ("ERISA … defines 'fiduciary' not in terms of formal trusteeship, but in functional terms of control and authority over the plan … thus expanding the

universe of persons subject to fiduciary duties [beyond traditional trust law]"); *Martin v. Feilen*, 965 F.2d 660, 669 (8th Cir. 1992) (finding that, although a company's accountants were not named fiduciaries of the company's ESOP, they were nonetheless fiduciaries under ERISA because "they recommended transactions, structured deals, and provided investment advice to such an extent that they exercised effective control over the ESOP's assets").

An ESOP is "a type of pension plan that invests primarily in the stock of the company that employs the plan participants." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 412 (2014). ESOP fiduciaries are subject to the same fiduciary duties that apply to ERISA fiduciaries in general, except that they do not have a duty to diversify the fund's assets. *Id.*

### 2. The Status of the Directors and Reliance as ERISA Fiduciaries

Under ERISA, a party is a fiduciary with respect to a plan to the extent he has "any discretionary authority or discretionary responsibility in the administration of such plan," 29 U.S.C. § 1002(21)(A)(iii), and to the extent he "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," 29 U.S.C. § 1002(21)(A)(i). *See Hewitt Assocs.*, 508 U.S. at 262.

The Court finds that the Directors were ERISA fiduciaries at all relevant times. As trustees of the ESOP, the Directors had discretionary authority over the management of and the disposition of the assets of the ESOP. *See* 29 U.S.C. § 1002(21)(A)(iii). On July 22, 2011—the same day that the Directors resigned as trustees—the Directors appointed

Reliance to serve in that capacity. As appointing fiduciaries, however, the Directors continued to have an ongoing fiduciary duty under the law to monitor the activities of Reliance. 29 U.S.C. § 1002(21)(A)(i); *see Howell v. Motorola, Inc.*, 633 F.3d 552, 572-73 (7th Cir. 2011) (explaining that "those who appoint plan administrations have an ongoing fiduciary duty under ERISA to monitor the activities of their appointees"). Notably, the Directors do not contend that their fiduciary duties ceased when they appointed Reliance as trustee. (*See generally* Directors' Mem. in Opp'n to DOL Mot. for Partial Summ. J. ("Directors' Summ. J. Opp'n") [Doc. No. 247] (acknowledging that Directors had "duty to monitor" Reliance).)

Likewise, Reliance became an ERISA fiduciary upon its appointment as trustee of the ESOP and remained as such through the date that the Transaction closed. (*See* Reliance's Answer ¶¶ 6-7 (admitting that Reliance was an ERISA fiduciary under 29 U.S.C. § 1002(21)(A) throughout the relevant time period).)

### 3. DOL's Motion for Partial Summary Judgment on its Breach of the Fiduciary Duty of Loyalty Claim Against Reliance

ERISA requires fiduciaries to act "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). "Perhaps the most fundamental duty of a [fiduciary] is that he must display … complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (internal quotation marks and citations omitted). However, "an act which has the effect of furthering the interests of a third party is fundamentally different from an

act taken with that as a goal," and the former "may well not be a violation of the duty of loyalty," but "the latter may well be." *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 804 (D. Minn. 2018) (quoting *Sacerdote v. New York Univ.*, 16-cv-6284, 2017 U.S. Dist. LEXIS 137115, at *5 (S.D.N.Y. Aug. 25, 2017)).

DOL argues that Reliance failed to act with an "eye single" to the ESOP and instead looked out for the interests of Kuban, Kurt, and itself. (DOL Mem. in Supp. of Mot. for Partial Summ. J. ("DOL Summ. J. Mem.") [Doc. No. 205] at 76-78.) First, DOL contends that Reliance breached its duty of loyalty when Martin wrote to Chartwell the following: "I want you to know any counter changes we ask for are to help protect [Kuban,] [Kurt,] and Reliance from the DOL." *Id.* Second, DOL argues that Reliance's communications with Chartwell showed that it was concerned about closing the Transaction, not obtaining the best result for the ESOP. *Id.* Specifically, when Reliance determined the $36 million price was problematic because it included Kuban's $486,000 salary, Reliance told Chartwell it was "trying to consider different approaches that looked better and accomplished the goal" of closing the deal. *Id.*

In response, Reliance contends that the DOL takes Martin's statement to Chartwell out of context and, consequently, disputed issues of material fact preclude summary judgment. (Reliance Mem. in Opp'n to DOL Mot. for Partial Summ. J. ("Reliance Summ. J. Opp'n") [Doc. No. 238] at 44-46.) According to Reliance, the contemporaneous documents show Reliance's concern that the payment of approximately $500,000 to Kuban would be a "red flag" for DOL and an "easy target" for the DOL to argue that Kuban's compensation violated ERISA's exclusive benefit rule. (*Id.* at 45.) The documents further

reflect, according to Reliance, its concern that a DOL action would target Reliance as trustee, Kurt, and Kuban, and that the DOL might even seek restitution of any excess compensation. (*Id.*) In this context, Reliance claims, it was reasonable for Martin to try to persuade Chartwell that Reliance's counteroffer on behalf of the ESOP might be in Kuban's best interests as well. (*Id.*)

The Court finds that disputed issues of material fact preclude summary judgment. Determining whether Reliance breached its duty of loyalty requires the factfinder to weigh the communications that DOL identified within the context in which the parties sent them and also alongside the other actions Reliance took in the course of the Transaction. *See Pizzella v. Vinoskey*, 409 F. Supp. 3d 473, 522-24 (W.D. Va. 2019) (finding, after a bench trial, that an ESOP fiduciary breached its duty of loyalty based on all of the evidence, including the fiduciary's statement that it sought a deal "fair to both" the seller and the ESOP). Such a fact-intensive inquiry is inappropriate for resolution at summary judgment.

DOL relies on *Chao v. Hall Holding Co.*, 285 F.3d 415, 434 (6th Cir. 2002), to support its position that summary judgment is appropriate. There, the Sixth Circuit granted summary judgment on a duty of loyalty claim against an ESOP fiduciary. *Id.* at 433. Apparently, when considering what interest rate the ESOP should pay on a loan from another trust, the fiduciary testified that she was "more concerned" about obtaining an interest rate that was favorable to the other trust. *Id.* 433-34. Here, in contrast, Martin's statements, when taken in context, may or may not establish that Reliance breached its duty of loyalty to the ESOP.

Accordingly, the Court denies DOL's motion for partial summary judgment on its duty of loyalty claim against Reliance.

### 4. Reliance's Motion for Summary Judgment on DOL's Breach of the Duty of Prudence Claim

ERISA requires fiduciaries to fulfill "their duties 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Braden*, 588 F.3d at 595 (quoting 29 U.S.C. § 1104(a)(1)).

As discussed previously, Reliance brings a *Daubert* challenge to the opinions of DOL's duty-of-prudence expert, Dr. Mark Johnson. Without admissible expert testimony, Reliance contends, DOL cannot proceed with its claim of breach of the duty of prudence, and hence summary judgment should be entered in Reliance's favor. (Reliance Mem. in Supp. of Mot. for Partial Summ. J. ("Reliance Summ. J. Mem.") [Doc. No. 225] at 2-4.)

DOL responds that Reliance's motion should be denied because: (1) Johnson's testimony should not be excluded under *Daubert*; (2) even if it were excluded, expert testimony is not required to support a finding of breach of the duty of prudence; and (3) genuine disputes of material fact preclude the entry of summary judgment. (*See* DOL Mem. in Opp'n to Reliance Mot. for Partial Summ. J. ("DOL Summ. J. Opp'n as to Reliance") [Doc. No. 237] at 3, 6-8.)

In light of this Court's ruling denying Reliance's motion to exclude the expert testimony of Johnson, the DOL will be permitted to offer his expert opinions at trial. Accordingly, in the face of conflicting expert testimony on the duty of prudence in this

case, disputed issues of material fact preclude the entry of summary judgment, and Reliance's motion is denied.

### 5. DOL's Claim for Breach of the Fiduciary Duties of Loyalty and Prudence Against the Directors

DOL and the Directors both seek summary judgment on the breach of the fiduciary duties of loyalty and prudence claims in Count I. DOL argues that the Directors breached their fiduciary duties: (1) in the course of "orchestrating" the price, structure, and financing of the Transaction; and (2) by failing to monitor Reliance after it was appointed trustee and until the Transaction closed. The Directors argue that the undisputed record establishes that they satisfied their duties and thus that they are entitled to summary judgment as a matter of law.

#### a. Whether the Directors Breached Their Fiduciary Duties in the Course of "Orchestrating" an Improper Transaction

DOL's broadest theory of fiduciary liability against the Directors is that they "orchestrated" the Transaction by arranging its price, structure, and financing in advance and then had Reliance assume the role of ESOP trustee merely to "rubberstamp" the deal. Courts have recognized that company directors can breach their fiduciary duties under ERISA by "orchestrating" an improper ESOP transaction. *See Acosta v. Saakvitne*, 355 F. Supp. 3d 908, 920-23 (D. Haw. 2019) (declining to dismiss directors from ERISA suit for their role in orchestrating improper ESOP transaction); *Keach v. United States Tr. Co., N.A.*, 234 F. Supp. 2d 872, 882-83 (C.D. Ill. 2002) (same). Indeed, "ERISA directs courts to look beyond [fiduciaries'] formal authority with respect to the plan, limited to selection

and retention of administrators, and to consider what real authority they had over plan investments by virtue of their having appointed [the specific plan administrators]." *Leigh v. Engle*, 727 F.2d 113, 134 n.33 (7th Cir. 1984).

According to DOL, specific events that occurred before the Directors appointed Reliance demonstrate that they "orchestrated" the Transaction for $39 million dollars, a price that exceeded the fair market value of the shares, in violation of their fiduciary duties to the ESOP. (DOL Mem. in Opp'n to Directors' Mot. for Summ. J. ("DOL Summ. J. Opp'n as to Directors") [Doc. No. 242] at 31-34.)

In response, the Directors point to the testimony of GPM's Eide that there was no predetermined price before July 22 and that the Transaction was not guaranteed to close. (Directors' Reply in Supp. of Mot. for Summ. J. ("Directors' Summ. J. Reply") [Doc. No. 262] at 9.) The Directors further contend that DOL's theory does not explain why Chartwell valued Kuban's stock at prices below $39 million in June and July 2011, why Kuban's opening offer was $45 million, and why Reliance's counteroffer was $36 million. (*Id.*)

It is clear to the Court that DOL's "orchestration" theory rests on disputed facts. Indeed, for example, Johnson opines that Kurt and the Directors did not consider using any firms in the Transaction other than Reliance and SRR, evidencing imprudence. (Johnson Report at 7.) According to Johnson, Kuban hired Chartwell, and Chartwell represented Kuban's interests until the Transaction closed. (*Id.*) Johnson contends that, at Chartwell's direction, the Directors retained Reliance as ESOP trustee, without considering any other transactional trustees and insured the retention of SRR and GPM as well. (*Id.*)

64

Further, in several emails sent before the Directors appointed Reliance, Lillyblad stated that the board had "approved" the structure of the Transaction and that Kurt's "net worth will be negative at closing" because of a loan between Kurt and the ESOP for $39 million, which, of course, is the price at which the Transaction ultimately closed. Also, Martin testified that Kuban "was adamant about not doing anything below 39 and there would be no deal if we couldn't agree to that. … So [Reliance] felt like [it] need[ed] to try to negotiate a transaction that was acceptable and would be a positive end benefit for the participants." He further testified that Reliance never offered the low end of SRR's fair market value range ($34.2 million) because Kuban "would not go below 39."

On the other hand, GPM's Eide, who performed due diligence for Reliance, testified that there was no predetermined price for the Transaction, and the Directors contend that the parties engaged in substantive negotiations before they ultimately settled on the final terms. The Court cannot resolve such factual disputes at this stage. *See Roth*, 16 F.3d at 919 (noting the "fact-intensive inquiry" courts engage in to determine whether a fiduciary breached its duties under ERISA).

Consequently, DOL's theory that the Directors "orchestrated" the Transaction in violation of their fiduciary duties can only be evaluated on a full evidentiary record, precluding summary judgment on this theory of breach.

### b. Whether the Directors Breached Their Fiduciary Duties by Failing to Monitor Reliance

Next, DOL contends that the Directors breached their fiduciary duties by failing to monitor Reliance as ESOP trustee. "ERISA opinions and the position of the Department

of Labor make clear that the power to appoint and remove plan fiduciaries implies the duty to monitor appointees to ensure that their performance is in compliance with the terms of the plan and statutory standards." *Krueger v. Ameriprise Fin., Inc.*, No. 11-cv-02781 (SRN/JSM), 2012 U.S. Dist. LEXIS 166191, at *50 (D. Minn. Nov. 20, 2012). This narrow duty "does not include a duty to review all business decisions of Plan administrators because that standard would defeat the purpose of having [fiduciaries] appointed to run a benefits plan in the first place." *Id.* Nevertheless, to prevent appointing fiduciaries from "passing the buck to another person and then turning a blind eye," the duty to monitor requires the appointing fiduciaries to review the performance of those they appoint "at reasonable intervals" to ensure their performance complies with plan terms and statutory standards *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011).

The Directors contend that the undisputed evidence shows that they satisfied their duty to monitor. They note that they had weekly meetings with Chartwell and that usually Chartwell met with Reliance the day before such meetings. (Directors' Mem. in Supp. of Mot. for Summ. J. ("Directors' Summ. J. Mem.") [Doc. No. 217] at 10-11.) During these meetings, according to the Directors, Chartwell updated the Directors on developments that arose in moving the Transaction forward and on what Reliance was doing. (*Id.* at 11.) Further, the Directors contend that, after they appointed Reliance, they held five meetings directly with Martin. (Directors' Summ. J. Opp'n at 10.)

Moreover, the Directors contend that at least one of them: (1) suggested that the warrants to be paid to Kuban be split into two separate tranches; (2) provided updated financial forecasts; (3) stress-tested the numbers to ensure Kurt could service the increased

leverage in the event of a downturn; (4) requested, but were not allowed to see, SRR's valuation; and (5) questioned Chartwell regarding the Transaction price. (Directors' Summ. J. Mem. at 14-15.) They also argue that the final Transaction price was consistent with Mesirow's preliminary analysis, Kurt's improvements as a company coming out of the Great Recession, and McGladrey's analysis. (*Id.* at 15-17.)

DOL asserts that the Directors failed to satisfy their fiduciary duty to monitor Reliance's performance. (DOL Summ. J. Mem. at 84.) The simple fact of the Directors' weekly meetings with Chartwell, DOL contends, was insufficient to satisfy their duty because Reliance was not in attendance at those meetings. (DOL Reply in Supp. of Mot. for Partial Summ. J. ("DOL Summ. J. Reply") [Doc. No. 258] at 4-5.) Moreover, the five meetings that the Directors and Martin attended together involved additional parties and, according to the DOL, had nothing to do with monitoring Reliance's performance. Rather, those meetings consisted of an initial pitch presentation, a meeting limited to the discussion of certain environmental issues, and several meetings limited to certain issues relevant to closing the Transaction. (*Id.* at 5.)

These issues can only be resolved on a full evidentiary record. It is of note that the cases on which the Directors primarily rely were not resolved at summary judgment but rather after a bench trial. *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346 (4th Cir. 2014); *Fish v. GreatBanc Tr. Co.*, 2016 WL 5923448 (N.D. Ill. Sept. 1, 2016). And Johnson and Rosen offer conflicting expert opinions as to whether the Directors met their fiduciary obligations in this case.

Further, DOL argues that the Directors breached their fiduciary duties by providing inflated projections to Reliance, Chartwell, and SRR. (DOL Summ. J. Mem. at 79-80). Courts have recognized that a fiduciary's failure to provide complete and accurate information to a valuation firm may constitute a breach of one's fiduciary duties. *See Chao v. Hall Holding Co.*, 285 F.3d 415, 431 (6th Cir. 2002); *see also Saakvitne*, 355 F. Supp. 3d at 923 (holding that DOL stated a claim for breach of the duty to monitor where DOL alleged that the fiduciaries "failed to monitor [their appointee] by knowingly providing him with flawed information about the Company, permitting him to overstate the value of the Company's shares, and permitting him to direct the ESOP to purchase the shares for more than they were worth").

According to DOL, the Directors provided inflated projections to Chartwell, SRR, and Reliance both while they were ESOP trustees and after Reliance replaced them as ESOP trustee, leading Chartwell and SRR to arrive at inflated valuations of Kurt, in violation of the Directors' fiduciary duties to the ESOP. (DOL Summ. J. Mem. at 79.) In response, the Directors admit that their revised projections caused the value of Kurt to increase, but they contend there was good reason for this. (Directors' Summ. J. Opp'n at 8.) Specifically, they note that sales, gross margin percentage, and operating expense percentage all fell, having the combined effect of increasing Kurt's adjusted EBITDA. (*Id.*)

DOL's theory that the Directors provided inflated projections to Reliance, Chartwell, and SRR in violation of their fiduciary duties can only be evaluated on a full evidentiary record. Critical and material issues of fact remain in dispute precluding summary judgment on this theory of breach.

68

Accordingly, both the DOL's motion for summary judgment and the Directors' motion for summary judgment as to the breach of the fiduciary duties of loyalty and prudence, as set forth in Count I, are denied.

### D. Prohibited Transaction Claim

DOL moves for summary judgment on its prohibited transaction claim against Reliance and on its co-fiduciary and knowing participant claims against the Directors in Count II. The Directors move for summary judgment as to the DOL's co-fiduciary claim against them. The Court considers these motions in turn.

### 1. The Law

Section 406(a)(1) of ERISA, 29 U.S.C. § 1106(a), "supplements the fiduciary's general duty of loyalty to the plan's beneficiaries … by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000) (quoting *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 160 (1993)). As relevant here, § 1106(a)(1)(A) forbids fiduciaries from causing a plan to engage in a direct or indirect sale or exchange of property between the plan and a "party in interest," and § 1106(a)(1)(D) forbids fiduciaries from allowing plan assets to be transferred to, or used by or for the benefit of, a "party in interest." Under ERISA, a "party in interest" includes "any fiduciary (including, but not limited to, any administrator, officer, trustee, or custodian), counsel, or employee of such employee benefit plan," an owner of 50 percent or more of the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock, and

"an employee, officer, director …, or a 10 percent or more shareholder" of an employer whose employees are covered by the plan. 29 U.S.C. § 1002(14)(A), (E)(i), (H).

ERISA, however, exempts several types of transactions from its prohibited transaction rules. *See* 29 U.S.C. § 1108. For example, and relevant here, under 29 U.S.C. § 1108(e)(1), an ESOP may purchase employer stock for "adequate consideration," defined as, "in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by the trustee," 29 U.S.C. § 1002(18)(B). This exemption is a "defense[] which must be proven by the defendant." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

Indeed, a fiduciary who engages in a transaction under § 1108(e) bears the "heavy" burden of "proving that he fulfilled his duties of care and loyalty and that the ESOP received adequate consideration." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (citing *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983); *Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978)). Courts have understood that "the focus of the adequate-consideration inquiry rests on the *conduct* of a fiduciary, as judged by ERISA's 'prudent man' standard of care." *Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763, 770 (4th Cir. 2019) (citations omitted) (emphasis in original).

Nonetheless, "[e]ven if a trustee fails to make a good faith effort to determine the fair market value of the stock, 'he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.'" *Herman v. Mercantile Bank, N.A.*, 143 F.3d 419, 421 (8th Cir. 1998) (quoting *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994)). Accordingly, if a prudent trustee would have purchased the stock

at the price for which it was purchased, then a fiduciary did not violate ERISA, "regardless of whether he made a good faith effort to determine the fair market value of the stock." *Id.*

Under § 1108(e), expert advice, like an advisor's independent valuation, can "serve as evidence of prudence in the discharge of an ESOP trustee's duties," but it "is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled." *Brundle*, 919 F.3d at 773 (internal quotation marks and citations omitted). Instead, a plan trustee "must at least show that it (1) 'investigate[d] the expert's qualifications,' (2) 'provide[d] the expert with complete and accurate information,' and (3) '[made] certain that reliance on the expert's advice was reasonably justified under the circumstances.'" *Id.* (quoting *Shay*, 100 F.3d at 1489).

## 2.  Prohibited Transaction Claim Against Reliance

DOL contends that the undisputed facts show that Reliance caused the ESOP to engage in a prohibited transaction because: (1) the ESOP's purchase of Kuban's stock was a "sale or exchange … of … property between a plan and party in interest," 29 U.S.C. § 1106(a)(1)(A), and a "transfer … of assets of the plan" to or for the benefit of a party in interest, 29 U.S.C. § 1106(a)(1)(D); and (2) Kuban was a "party in interest" under 29 U.S.C. § 1002(14)(E) and (H) because he was a 75.6% shareholder and director of Kurt. The Court agrees. Indeed, Reliance does not dispute that the Transaction was a "prohibited transaction" under ERISA; rather, it argues that the "adequate consideration" exemption applies, rendering ERISA's default prohibited transaction rules inapplicable and shielding it from liability. (*See* Reliance Summ. J. Opp'n at 26.)

71

DOL contends that Reliance fails to meet its burden of proving that the ESOP paid "adequate consideration" for Kuban's stock for several reasons. Specifically, DOL argues that Reliance: (1) failed to act independently on behalf of the ESOP by agreeing to Kuban's and the Directors' predetermined terms; (2) ignored the Willamette valuations; (3) could not have reasonably relied on SRR's draft valuation nor its Solvency Opinion; and (4) failed to engage in substantive negotiations. The Court considers these grounds in turn.

### a. Whether Reliance Failed to Act Independently on Behalf of the ESOP

DOL argues that Reliance failed to act independently when it: (1) violated its internal policies by blindly agreeing to the mandate of Kuban and the Directors that Reliance engage SRR and GPM; (2) accepted the financing that the Directors had pre-arranged at a price of $39.1 million; and (3) failed to analyze the ESOP's transactional history and Willamette's annual stock valuations, which showed that the market value of Kurt's invested capital ranged from $39 million to $41.5 million from October 2007 through October 2010 and that its stock price ranged from $23.08 to $33.44 per share during that same time while SRR's draft valuation reflected that Kurt's enterprise value ranged from $65.6 million to $79 million with a value of $85.22 per share. (DOL Summ. J. Mem. at 56-61.) According to the DOL, simply comparing the SRR draft valuation with the Willamette valuations should have made a prudent fiduciary question SRR's draft valuation.

In response, Reliance contends that: (1) SRR is a qualified firm; (2) the Willamette valuations were not relevant because they were outdated and based on different

assumptions; and (3) failing to review the Willamette valuations did not violate any internal policy of Reliance in place at that time. (Reliance Summ. J. Opp'n at 27-28.) Further, Reliance argues that even had it acquiesced to the predetermined parameters of the Transaction set by the Directors and Kuban, that alone would not be sufficient to find that it had failed to obtain "adequate consideration" for the sale of the stock. Reliance argues that even if it did not make a good faith effort to determine the fair market value of Kuban's shares, it is not subject to liability if a "hypothetical prudent fiduciary" would have purchased Kuban's shares at a price of $85.22 regardless. *See Mercantile Bank*, 143 F.3d at 421.

The Court finds that the resolution of these issues must be made on a full evidentiary record. Whether Reliance should have, for example, considered Willamette's valuations differently leading up to the Transaction is an issue upon which the parties' experts disagree. Consequently, whether a hypothetical prudent fiduciary would have used the Willamette valuations differently is a question of fact that cannot be resolved at summary judgment. *Cf., e.g.*, *Hans v. Tharaldson*, No. 3:05-cv-115, 2011 U.S. Dist. LEXIS 153504, at *36 (D.N.D. Oct. 31, 2011) ("The fair market value of the ESOP Notes is a question of fact for trial.").

### b. Whether Reliance Could Have Reasonably Relied on SRR's Draft Valuation and Solvency Opinion

*First*, DOL contends that Reliance failed to adequately review the draft Analysis of Transaction Fairness and Solvency Opinion. When reviewing a valuation, "the fiduciary is

required to make an honest, objective effort to read the valuation, understand it, and question the methods and assumptions that do not make sense." *Shay*, 100 F.3d at 1490.

According to DOL, Reliance's Subcommittee received SRR's draft Analysis of Transaction Fairness only twelve hours before the Subcommittee met to consider the Transaction, and it received GPM's draft due diligence only twenty minutes before the meeting, leaving the Subcommittee insufficient time to review the documents. (DOL Summ. J. Mem. at 62-64.) Further, DOL notes that the Solvency Opinion contains a discrepancy—namely, the numbers in the projected balance sheet differ from the numbers in the Balance Sheet Test—and despite this discrepancy, Reliance did not question the Solvency Opinion at the September 16th meeting. (*Id.* at 64-65.)

Reliance responds that, as a threshold matter, the Solvency Opinion is irrelevant to whether Reliance determined the fair market value of Kuban's stock in good faith. (Reliance Summ. J. Opp'n at 40.) Even if it were, Reliance contends that the Balance Sheet Test differs from the projected balance sheet in the Solvency Opinion because the projected balance sheet was based on the book value of Kurt's assets whereas the Balance Sheet Test rested on a market-based valuation of assets. (*Id.* at 40-41.)

Contrary to DOL's position, there is no bright-line rule for how long a fiduciary must review an expert report. *See Perez v. First Bankers Tr. Servs., Inc.*, 210 F. Supp. 3d 518, 533 (S.D.N.Y. 2016). Instead, this factor must be considered alongside Reliance's other alleged failings in weighing whether Reliance determined Kurt's fair market value in good faith. Similarly, whether Reliance misused the Solvency Opinion leading up to the

Transaction requires a fact-intensive analysis, situated in the broader context of the Transaction.

*Second*, DOL contends that SRR's market multiples were known to be inaccurate before the Transaction closed. According to DOL, on September 21, after Reliance approved the Transaction but before it closed, SRR acquired updated information that showed a decline in those market multiples, but SRR did not change its valuation, and Reliance never requested an updated valuation. (DOL Summ. J. Mem. at 66-67.) In response, Reliance argues that SRR's valuation update on September 21 took adequate account of the changes in market multiples because, between the time SRR issued its draft Analysis of Transaction Fairness and its September 21 update, Kurt's performance improved, offsetting the decline in market multiples and keeping the midpoint of the range of value for Kuban's stock at approximately $39 million. (Reliance Summ. J. Opp'n at 32-33.) Based on this updated information, SRR issued a new fairness opinion at the Transaction's closing, concluding that the $39 million price was still not greater than fair market value for Kuban's stock.

The Court finds that, whether this would have altered a hypothetical prudent fiduciary's decisions with respect to the Transaction, is a matter of disputed fact that cannot be resolved as a matter of law. *Cf. Perez v. First Bankers Tr. Servs., Inc.*, No. CV124450MASDEA, 2017 WL 1232527, at *76-78, 80 (D.N.J. Mar. 31, 2017) (holding, after a bench trial, that fiduciaries' imprudence in relying on an outdated valuation supported a finding that the fiduciaries did not qualify for the "adequate consideration" exemption to ERISA's prohibited transaction rules). Indeed, Reliance notes that there were

offsetting factors, which would require the Court to weigh the evidence and consider whether a hypothetical prudent fiduciary would have acted differently in the face of such changes.

*Third*, DOL argues that the projections SRR used in its draft Analysis of Transaction Fairness were overstated and, therefore, Reliance could not reasonably rely on them. (DOL Summ. J. Mem. at 67-69.) These projections estimated that Kurt's EBITDA margins would average 10.78% for the next four years, despite the fact that Kurt's average EBITDA over the preceding five years had been 6.83%. According to DOL, SRR's draft Analysis of Transaction Fairness did not justify the use of these higher projected margins.

In response, Reliance argues that its approval of SRR's draft Analysis of Transaction Fairness was appropriate and justified. (Reliance Summ. J. Opp'n at 30-32.) According to Reliance, although the five-year projections SRR used were high relative to Kurt's past performance, they were reasonable because they accounted for Kurt's improved performance coming out of the Great Recession. Reliance contends that DOL ignores this context when it focuses solely on Kurt's average adjusted EBITDA margins for the five years preceding 2011. In fact, Reliance believes that the reasonableness of the projections was corroborated by: (1) Kurt's improving financial performance during August 2011; and (2) U.S. Bank's decision to partially finance the Transaction based, in part, on the projections.

Of course, ignoring red flags that management-provided projections may be inflated, and then failing to probe such projections when the fiduciary's valuation firm relies on them in its valuation is strong evidence of a failure to abide by one's fiduciary

duties. *See Brundle v. Wilmington Tr. N.A.*, 241 F. Supp. 3d 610, 635-38 (E.D. Va. 2017), *aff'd*, 919 F.3d 763 (4th Cir. 2019), *as amended* (Mar. 22, 2019). Nevertheless, here, there are factual disputes as to whether Reliance was reasonably justified in relying on SRR's valuation. For example, the parties present conflicting expert testimony on this issue, thus precluding summary judgment.

*Fourth*, and finally, DOL argues that SRR artificially inflated the value of Kuban's shares by applying a control premium. Buyers generally "pay more for rights associated with control of the enterprise." *Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763, 777 (4th Cir. 2019) (citation and internal quotation marks omitted). Elements of "control" include "an interest which allows the shareholder to unilaterally direct corporate action, select management, decide the amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets." *Id.*

According to DOL, after the Transaction, despite paying a control premium and owning 100% of Kurt's outstanding stock, the ESOP did not gain control of Kurt's board, and its voting rights did not change. (DOL Summ. J. Mem. at 70-72.) Consequently, according to DOL, Reliance's failure to question the control premium, alone, resulted in the ESOP's overpayment of at least $4.7 million and a loss to the ESOP in that amount.

In Reliance's view, SRR's valuation of Kuban's stock on a control basis was appropriate because the ESOP did gain control of Kurt after the Transaction. (Reliance Summ. J. Opp'n at 34-36.) Reliance notes that the parties entered into an Investor Rights Agreement, allowing Kuban to designate one member of the five-member board until his seller notes were fully paid, and the ESOP was able to elect the remaining directors.

Reliance notes that the Investor Rights Agreement provides that, while the seller notes are outstanding, "the Trustee and any successor trustee is and shall be a directed trustee with regard to the election of directors." In directing the trustee to vote the ESOP's shares, Reliance explains that the Kurt board is acting as the ESOP's fiduciary, and it must act prudently and solely in the interests of the ESOP.

Determining whether the ESOP gained control through its purchase of Kuban's shares, and thus justified a control premium, is a "fundamentally factual dispute." *Acosta v. Vinoskey*, 310 F. Supp. 3d 662, 671 (W.D. Va. 2018); *cf. Estate of Godley v. Comm'r*, 286 F.3d 210, 215 (4th Cir. 2002) (characterizing the issue of whether a control premium is appropriate as a "factual matter"); *Estate of Ford v. Comm'r*, 53 F.3d 924, 926 (8th Cir. 1995) ("The issues of valuation and applicability of marketability and minority interest discounts are factual questions …."). Indeed, here, the parties dispute whether the ESOP gained additional control rights by virtue of the Transaction, and their respective experts disagree on this issue as well. Accordingly, fact issues preclude summary judgment.

### c.   Whether Reliance Failed to Substantively Negotiate the Transaction

Finally, DOL contends that Reliance did not substantively negotiate but instead simply agreed to Kuban's predetermined price. Failing to engage in substantive negotiations is evidence that a fiduciary failed to engage in a good faith process. *See Shay*, 100 F.3d at 1489; *see also Brundle v. Wilmington Tr. N.A.*, 241 F. Supp. 3d 610, 642-43 (E.D. Va. 2017), *aff'd*, 919 F.3d 763 (4th Cir. 2019), *as amended* (Mar. 22, 2019) ("Most

economically rational actors entering a negotiation would begin by low-balling their first offer, in an effort to test the waters and drive down their counterpart.").

In support of its position, DOL notes that Lillyblad explained to Premier Bank that the Board "approved the structure of the transaction," which would result in "[Kurt's] net worth [being] negative at closing due to the inside loan between Kurt Manufacturing and the ESOP for $39M." (DOL Summ. J. Mem. at 72-76.) Because the Board "approved the structure of the transaction" for $39 million before Reliance replaced the Directors as trustee, DOL contends that it is unsurprising that the Transaction closed at that price. DOL notes that Reliance's initial offer was $36 million, higher than the $34.2 million floor of SRR's calculated range of fair market value. In fact, even though $36 million ended up as the midpoint of the fair market value range in SRR's initial draft valuation exhibits, DOL points out that Reliance confirmed on August 15 that it agreed to the $36 million price before it even received the valuation. In DOL's view, this type of sham negotiation supports its argument that Reliance failed to engage in a good faith process, especially considering that there were no other interested buyers.

In response, Reliance contends that it did negotiate in good faith and secured favorable terms for the ESOP. (Reliance Summ. J. Opp'n at 41-44.) Reliance explains that Chartwell initially proposed a price of $45 million, and thereafter, Martin extended a counteroffer of $36 million, which Chartwell accepted. However, because of unresolved issues with Kuban's salary, the parties eventually settled at $39 million, and Kuban agreed to a reduced salary. Reliance also notes that it negotiated: (1) the size of the SARs pool from 10% to 7.5%; (2) the PIK interest rates for the Seller Notes from 4% (Tranche A) and

6% (Tranche B) to 3% on both notes; (3) a favorable indemnification from Kuban for potential environmental liabilities; and (4) employment agreements with Kurt's senior management with non-competition and non-solicitation covenants.

Whether Reliance negotiated in good faith and secured favorable terms for the ESOP can only be decided on a full evidentiary record. *See Hugler v. First Bankers Tr. Servs., Inc.*, No. 12 CV 8649 (VB), 2017 U.S. Dist. LEXIS 47813, at *37 (S.D.N.Y. Mar. 29, 2017) ("courts consider the failure to negotiate in light of all of the fiduciary's other conduct and the circumstances specific to the particular transaction at issue"); *cf. Shay*, 100 F.3d at 1489 (finding that the ESOP fiduciaries "completed the transaction without negotiation," which supported a finding that they did not carry their burden of proving that the ESOP received "adequate consideration").

### 3. Co-Fiduciary Liability as to the Directors

29 U.S.C. § 1105(a)(2) provides that, in addition to any liability that a fiduciary may have for his own breach, a fiduciary "shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan" if, by failing to comply with § 1104(a)(1) "in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach." Under § 1105(a)(2), a plaintiff must show that the fiduciary "failed to comply with its duties under ERISA, and thereby enabled a co-fiduciary to commit a breach." *Acosta v. Saakvitne*, 355 F. Supp. 3d 908, 924 (D. Haw. 2019) (citations omitted). Unlike co-fiduciary liability under § 1105(a)(1) and (3), co-fiduciary liability under § 1105(a)(2) does not require a plaintiff to prove knowledge. *Id.* Of course, a "claim of co-fiduciary liability … must co-exist with

some breach by a fiduciary of their duties under ERISA." *Krueger v. Ameriprise Fin., Inc.*, No. 11-cv-02781 (SRN/JSM), 2012 U.S. Dist. LEXIS 166191, at *54-55 (D. Minn. Nov. 20, 2012) (internal quotation marks and citation omitted).

DOL argues that the Directors are subject to co-fiduciary liability under § 1105(a)(2) because the Directors' breaches of their fiduciary duties to the ESOP, as discussed previously, enabled Reliance's subsequent breaches of its fiduciary duties to the ESOP. (*See* DOL Summ. J. Mem. at 87-88.) In response, the Directors contend that because DOL cannot establish any breach of fiduciary duty on the part of the Directors, DOL cannot establish co-fiduciary liability under § 1105(a)(2). (*See* Directors' Summ. J. Mem. at 23.)

As discussed earlier, genuine issues of material fact remain in dispute as to whether the Directors breached their fiduciary duties to the ESOP. And the Court finds that whether any such breach "enabled" a breach on the part of Reliance is a fact-based inquiry, precluding summary judgment.

### 4. Knowing Participant Liability as to the Directors

Under Count II, DOL seeks summary judgment on its claim that the Directors were "knowing participants" in Reliance's prohibited transaction. ERISA allows DOL to bring claims to "enjoin any act or practice which violates any provision" of ERISA or to "obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of" ERISA. *See* 29 U.S.C. § 1132(a)(5). As relevant here, ERISA imposes liability on any "person" who "knowingly" participates in a breach or violation of ERISA by "any other person." *Id.* § 1132(*l*)(1)(B); *see Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000) (explaining the breadth of this provision).

"Knowing participation" means "actual or constructive knowledge" of the circumstances that made the transaction unlawful. *Harris Trust*, 530 U.S. at 251.

DOL contends that the Directors are liable as knowing participants in Reliance's prohibited transaction because they: (1) "improperly orchestrated" the Transaction; (2) selected Reliance at the seller's insistence without searching for another trustee and effectively required Reliance to retain SRR as Reliance's valuation expert at the seller's insistence; and (3) created ten-year projections—instead of their usual one-year projections—and revised those projections to cause the calculations of Kurt's value to increase. (DOL Summ. J. Mem. at 88-89.) Further, DOL contends that the Directors failed to act when they: (1) ignored Premier Bank's warning that Kurt's projections were "aggressive"; (2) ignored the warnings that using Willamette's "conservative" methodology would result in a lower Kurt share price relative to the methodology used by Chartwell and SRR; and (3) never shared the information gathered from Mesirow with either Reliance or SRR. (*Id.* at 89-91.) In response, the Directors contend that this claim is based on the same arguments DOL advanced with respect to Count I and, therefore, is based on speculation. (*See* Directors' Summ. J. Opp'n at 13-17.)

Whether the Directors were "knowing participants" in Reliance's prohibited transaction is a fact-intensive inquiry, precluding summary judgment.

## IV.    CONCLUSION

Based on the foregoing, and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Partial Summary Judgment [Doc. No. 204] is **DENIED**;

2. Defendants Steven R. Carlsen, Paul A. Lillyblad, and Kelli Watson's Motion for Summary Judgment [Doc. No. 215] is **DENIED**;

3. Defendant Reliance Trust Company's Motion for Partial Summary Judgment [Doc. No. 224] is **DENIED**;

4. Defendants' Joint Motion to Exclude Expert Testimony of Dr. Mark Johnson [Doc. No. 207] is **DENIED**; and

5. Plaintiff's Motion to Exclude Expert Testimony of Corey Rosen [Doc. No. 228] is **DENIED**.

6. The Parties are ordered to meet and confer to discuss the format for trial in this matter. The Court welcomes a Zoom bench trial, particularly in light of the risks of COVID-19 to court personnel, counsel, and the witnesses. No later than March 17, 2021, the Parties shall submit a joint status report to the Court addressing this issue. Magistrate Judge Wright will also schedule a mandatory settlement conference prior to trial.

**IT IS SO ORDERED.**


Dated: March 2, 2021                                    s/Susan Richard Nelson
                                                        SUSAN RICHARD NELSON
                                                        United States District Judge

83